**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MICHAEL NEWDOW, *et al.*,

                Plaintiffs,

    v.

HON. JOHN ROBERTS, JR., *et al.*,

                Defendants.

Civil Action No. 1:08-cv-02248-RBW

---

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

MICHAEL NEWDOW
*In pro per* and *pro hac vice* (pending)
PO BOX 233345
SACRAMENTO, CA  95823

(916) 427-6669
NewdowLaw@gmail.com



ROBERT V. RITTER
DC BAR #414030
AHA – 1777 T STREET, NW
WASHINGTON, DC  20009

(202) 238-9088
BRitter@americanhumanist.org

Dockets.Justia.com

Pursuant to Fed. R. Civ. P. 65(a) and LCvR 65.1(c) and (d), Plaintiffs respectfully request that the Court issue a preliminary injunction enjoining Defendant Hon. John Roberts, Jr., from altering the words of the United States Constitution while administering the presidential oath of office (as prescribed in Article II) on January 20, 2009. Plaintiffs also respectfully request that the Court issue a preliminary injunction enjoining all remaining Defendants from having any religious prayer at the official Presidential Inaugural ceremonies scheduled to occur on the grounds of the United States Capitol on January 20, 2009.

Respectfully submitted this 5th day of January, 2009,


/s/ - Michael Newdow

Michael Newdow
*In pro per* and *pro hac vice* (pending)
PO Box 233345
Sacramento, CA  95823

(916) 427-6669
NewdowLaw@gmail.com

/s/ - Robert V. Ritter

Robert V. Ritter
DC Bar #414030
AHA – 1777 T Street, NW
Washington, DC  20009

(202) 238-9088
BRitter@americanhumanist.org

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**MICHAEL NEWDOW,** *et al.*,

       **Plaintiffs,**

  **v.**

**HON. JOHN ROBERTS, JR.,** *et al.*,

       **Defendants.**

**Civil Action No. 1:08-cv-02248-RBW**

---

**PROPOSED ORDER REGARDING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION**

---

MICHAEL NEWDOW
*In pro per* and *pro hac vice* (pending)
PO BOX 233345
SACRAMENTO, CA  95823

(916) 427-6669
NewdowLaw@gmail.com


ROBERT V. RITTER
DC BAR #414030
AHA – 1777 T STREET, NW
WASHINGTON, DC  20009

(202) 238-9088
BRitter@americanhumanist.org

On motion of the Plaintiffs and for good cause shown, the Court hereby ORDERS the

following:

Defendant Hon. John Roberts, Jr., shall adhere to the text of the Constitution in administering

the oath of office to the incoming president on January 20, 2009. Specifically, he shall recite the

following words and no others:

> I [Barack Obama] do solemnly swear (or affirm) that I will
> faithfully execute the Office of President of the United States, and
> will to the best of my Ability, preserve, protect and defend the
> Constitution of the United States.

Under no circumstances is he to append the phrase, "so help me God," to that oath.

It is further ORDERED that the remaining Defendants shall not permit or participate in

the clergy-led offering of an invocation, a benediction, or any other religious activity during

the official presidential inaugural ceremony on January 20, 2009.

Entered on this _____ day of January, 2009

_____

Prepared for Entry:


By:


/s/ - Michael Newdow                        /s/ - Robert V. Ritter

Michael Newdow                              Robert V. Ritter
*In pro per* and *pro hac vice* (pending)   DC Bar #414030
PO Box 233345                               AHA – 1777 T Street, NW
Sacramento, CA  95823                       Washington, DC  20009

(916) 427-6669                              (202) 238-9088
NewdowLaw@gmail.com                         BRitter@americanhumanist.org


January 5, 2009

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL NEWDOW, *et al.*,

        Plaintiffs,

v.

HON. JOHN ROBERTS, JR., *et al.*,

        Defendants.

Civil Action No. 1:08-cv-02248-RBW

---

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

MICHAEL NEWDOW
*In pro per* and *pro hac vice* (pending)
PO BOX 233345
SACRAMENTO, CA  95823

(916) 427-6669
NewdowLaw@gmail.com


ROBERT V. RITTER
DC BAR #414030
AHA – 1777 T STREET, NW
WASHINGTON, DC  20009

(202) 238-9088
BRitter@americanhumanist.org

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................5

I.   Plaintiffs will be irreparably harmed if the injunction does not issue..........................5

II.  Defendant will suffer no harm if the injunction does issue ...........................................5

III.  The public interest will be served by the injunction ....................................................7

IV.  Plaintiffs are likely to prevail on the merits ................................................................9

    a. Governmental advocacy of any religious view is absolutely contrary to
       the ideals specifically embraced within the Constitution.............................................9

    b. The challenged activities in this case violate every principle underlying
       the Establishment Clause, as well as every Supreme Court test..............................11

    c. Lee v. Weisman, not Marsh v. Chambers, is controlling..........................................13

    d. The prayers infringe upon Plaintiffs' Free Exercise, RFRA and Equal
       Protection rights .........................................................................................................17

CONCLUSION ...............................................................................................................19

# TABLE OF AUTHORITIES

## Cases

Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753 (1995)............................13

Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290 (D.C. Cir 2006)....................5

Chaplaincy of Full Gospel Churches v. United States Navy (In re Navy Chaplaincy),
   534 F.3d 756 (D.C. Cir 2008) ...................................................................................... 5

Employment Div. v. Smith, 494 U.S. 872 (1990) ...................................................................17

Epperson v. Arkansas, 393 U.S. 97 (1968) .............................................................................13

Everson v. Board of Education, 330 U.S. 1 (1947)............................................................6, 18

Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006)..............18

Kurtz v. Baker, 265 U.S. App. D.C. 1, 829 F.2d 1133 (1987)................................................16

Lee v. Weisman, 505 U.S. 577 (1992) ...............................................................................passim

Lynch v. Donnelly, 465 U.S. 668 (1984) ............................................................................6, 9

Marsh v. Chambers, 463 U.S. 783 (1983).........................................................................passim

McCreary County v. ACLU of Kentucky, 545 U.S. 844 (2005)..........................................8, 13

Santa Fe Independent School District v. Doe, 530 U.S. 290 (2000) .......................................11

Sherbert v. Verner, 374 U.S. 398 (1963)................................................................................17

Tinker v. Des Moines School Dist., 393 U.S. 503 (1969)........................................................17

University of Texas v. Camenisch, 451 U.S. 390 (1981)...........................................................5

## Statutes

42 U.S.C. §§ 2000bb et seq. (Religious Freedom Restoration Act (RFRA)).................................17

## Constitutional Provisions

Arkansas State Constitution, Article 19 ....................................................................................9

Maryland State Constitution, Article 37....................................................................................9

Mississippi State Constitution, Article 14.................................................................................9

Pennsylvania State Constitution, Article 1................................................................................9

South Carolina State Constitution, Article 17 ...........................................................................9

Tennessee State Constitution, Article 9.....................................................................................9

Texas State Constitution, Article 1...........................................................................................9

United States Constitution, Article VI.......................................................................................2

## Other Authorities

Gallup Poll News Service............................................................................................9

Madison J. *Memorial and Remonstrance* ......................................................................6

*Religion and Politics: the Ambivalent Majority, The Pew Research Center for the*
    *People and the Press in association with The Pew Forum on Religion and*
    *Public Life, September 20, 2000 (accessed at http://people-*
    *press.org/reports/print.php3?PageID=177)*..............................................................9

The Founders' Constitution, (The University of Chicago Press)................................15

*The Papers of George Washington, Presidential Series*, W. W. Abbot et al., eds.,
    (Mark A. Mastromarino, volume editor), (University Press of Virginia:
    Charlottesville, 1996)...........................................................................................10

*The Papers of James Madison*, ed. William T. Hutchinson and William M. E.
    Rachal (University of Chicago Press: Chicago, 1962)..........................................10

The Pew Research Center for the People and the Press in association with The
    Pew Forum on Religion and Public Life..................................................................9

*The writings of George Washington from the original manuscript sources,*
    Electronic Text Center, University of Virginia Library..........................................8

Thomas, Clarence, *An Afro-American Perspective: Toward a "Plain Reading" of*
    *the Constitution -- The Declaration of Independence in Constitutional*
    *Interpretation.* 1987 How. L.J. 691 (1987)...........................................................10

# INTRODUCTION

> [G]iving sectarian religious speech preferential access to a forum close to the seat of government (or anywhere else for that matter) would violate the Establishment Clause.[1]

The inauguration of the President of the United States is the nation's premier official ceremony. It occurs every four years, after the most momentous event in our political life: the election of the country's chief executive. At that venue, the leader of our nation's more than 300 million citizens takes his oath of office before a worldwide audience.

By tradition, the Chief Justice of the United States administers the oath to the President.[2] This is fitting, inasmuch as the Chief Justice is the embodiment of the rule of law, and of the devotion of our nation to the Constitution upon which our government and our people rely.

Article II of the Constitution contains the presidential oath of office, which is the only oath specified in the document: "I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States." Of note is the fact that the oath lacks the phrase "so help me God" or any other religious reference. This was a significant departure from many oaths of office in existence in the colonies, as well as on the European Continent, in the late 18th century.

The purely secular nature of the oath was not unintended. This is evidenced by such facts as:

---

[1] <u>Capitol Square Review and Advisory Bd. v. Pinette</u>, 515 U.S. 753, 766 (1995).

[2] This tradition began with John Adams' inauguration in 1797. It has recurred with every public inauguration since, with the sole exception of Millard Fillmore's inauguration in the House Chamber on July 10, 1850 (following the death of Zachary Taylor). See http://memory.loc.gov/ammem/pihtml/pioaths.html, accessed on December 27, 2008.

(a) Despite religious requirements for holding public office in nine of the eleven colonies that had constitutions, the Framers placed in the federal Constitution the Article VI test oath clause, which states, "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States."[3]

(b) The very first statute of the United States government, which set out the oath of office required for the members of Congress (under Article VI), not only has no "so help me God" phrasing, but its evolution included the affirmative removal of two references to God;[4]

(c) The nation added our Bill of Rights, with its first ten words being "Congress shall make no law respecting an establishment of religion," to the Constitution in 1791;

(d) That Establishment Clause was promulgated despite the fact that comments such as:

> Many pious people wish the name of the Supreme Being had been introduced somewhere in the new Constitution. Perhaps an acknowledgement may be made of his goodness or of his providence in the proposed amendments.[5]

were uttered by the era's prominent statesmen; and

(e) Among the first twenty presidents, involving twenty-eight separate presidential oath-taking ceremonies, not one instance of the use of "so help me God" or any similar addendum is known to have occurred.

This dedication to federal governmental secularity was well appreciated throughout the early years of the nation. For instance, in 1830, some attempted to diminish mail deliveries on

---

[3] The Framers were certainly aware that a generic Monotheistic oath could have been allowed. After all, the required oath under Pennsylvania's Constitution began with, "I do believe in one God, creator and governor of the universe." Pennsylvania Constitution of 1776, Article II, Section 10. The federal Constitutional Convention, of course, was held in Philadelphia.

[4] On April 6, 1789, the House of Representatives "Resolved, That the form of the oath to be taken by the members of this House, as required by the third clause of the sixth article of the Constitution of the Government of the United States, be as followeth, to wit: 'I, A B, a Representative of the United States in the Congress thereof, do solemnly swear (or affirm, as the case may be) in the presence of Almighty GOD, that I will support the Constitution of the United States. So help me God.'" 1 Annals of Congress 101 (April 6, 1789). Less than two months later, President Washington signed the federal government's first statute into law. The oath, "as required by ... the sixth article of the Constitution," is found within that statute: ""I, A. B. do solemnly swear or affirm (as the case may be) that I will support the Constitution of the United States."

[5] Letter from Dr. Benjamin Rush to John Adams (June 15, 1789), in 1 Letters of Benjamin Rush 517, 517 (L.H. Butterfield ed., 1951).

Sunday, based on the belief that the Sabbath should be used by people "to improve their minds and converse with their Maker."[6] Yet, when Congress's Committee on Post Offices and Post Roads reviewed the history of the Establishment Clause, it determined that "the conclusion is inevitable, that the line cannot be too strongly drawn between Church and State."[7] Thus, "[s]o far from stopping the mail on Sunday, the committee would recommend the use of all reasonable meanse [sic] to give it a greater expedition and a greater extension."[8]

Despite the foregoing, those seeking to infuse the federal government with their Monotheistic religious dogma eventually managed to do so. Thus, starting in the 1930s, the Chief Justice – with no authority whatsoever – began altering the constitutionally-prescribed oath by appending "so help me God." Additionally, invitations began being issued to clergy to invoke God's name at the inaugural ceremonies. Accordingly, a secular event – once embracing every citizen, regardless of his or her religious views – became exclusionary, turning Atheists and others into "political outsiders" and second-class Americans.

Such ecclesiastical involvement in the inauguration is completely unnecessary, as can readily be recognized by the success our Nation had for the first one hundred forty-plus years of its existence. More importantly, this intermingling of (Christian) Monotheism and government is contrary to the basic principles of religious freedom. There are Americans who deny the divinity

---

[6] H.R. Rep. No. 271, 21st Cong., 1st Sess. 1, 8 (1830).

[7] *Id*. at 3.

[8] *Id*. at 5. To be sure, presidents regularly delivered inaugural addresses that referenced God, and legislative chaplains were utilized during the founding era. But the Framers, "like other politicians, could raise constitutional ideals one day and turn their backs on them the next." Lee v. Weisman, 505 U.S. 577, 626 (1992) (Souter, J., concurring). Furthermore, it was James Madison, the "Father of the Constitution," who wrote that, "The establishment of the chaplainship to Congs is a palpable violation of equal rights, as well as of Constitutional principles." 3 Wm. & Mary Q. 534, 558 (E. Fleet ed. 1946).

of Jesus Christ and Americans who deny the existence of any god. For the Chief Justice of the United States – who is supposed to protect the rights of non-Christians and Atheists just as fervidly as he protects the rights of Christians and Monotheists – to use his position on the inaugural platform to turn these citizens into "political outsiders" at the very moment he administers the oath (which requires the new President to uphold the Constitution) is an egregious abuse of power. As the Supreme Court has repeated time and again, the Government and its agents must act in ways that maintain religious neutrality. See Appendix A (demonstrating this with 35 separate majority opinions). Altering the text of the Constitution to assert there is a deity, as well as affirmatively bringing in clergy to pray to that deity, is clearly not in keeping with this obligation.

The inauguration of President-elect Obama is only a few weeks away. Unless injunctive relief is provided, the damage will be done. Plaintiffs will be turned into "political outsiders," their Free Exercise rights to enjoy the blessings of liberty (including participating in governmental ceremonies) without being forced to confront religious dogma they find offensive will be abrogated, government will further send the message that this nation exists specially for Monotheists, and the many other impermissible adverse consequences of such manifest unconstitutional abuses of power will occur. Furthermore, there will be no way to remedy these constitutional harms.

# ARGUMENT

> [A] federal district court [should] consider four factors when
> deciding whether to grant a preliminary injunction: whether the
> plaintiff will be irreparably harmed if the injunction does not issue;
> whether the defendant will be harmed if the injunction does issue;
> whether the public interest will be served by the injunction; and
> whether the plaintiff is likely to prevail on the merits.

University of Texas v. Camenisch, 451 U.S. 390, 392 (1981). In this case, each of these factors is

easily met.

## I. Plaintiffs will be irreparably harmed if the injunction does not issue

That Plaintiffs will be irreparably harmed if the injunction does not issue has been

conclusively determined in this Circuit. In Chaplaincy of Full Gospel Churches v. England, 454

F.3d 290, 303 (D.C. Cir 2006), the Court wrote, "where a movant alleges a violation of the

Establishment Clause, this is sufficient, without more, to satisfy the irreparable harm prong for

purposes of the preliminary injunction determination."[9]

## II. Defendant will suffer no harm if the injunction does issue

The ultimate reason for having an inaugural ceremony is to have the President take the

oath of office as given in the Constitution. The injunction will not impair that function in any

manner whatsoever. As to the Defendants' desires to infuse (Christian) Monotheism into the

proceedings, Defendants will suffer no cognizable harm if, as Plaintiffs contend, the challenged

---

[9] Anticipating Defendants' inevitable standing challenge, Plaintiffs point to a subsequent
opinion in the Chaplaincy litigation. In Chaplaincy of Full Gospel Churches v. United States
Navy (In re Navy Chaplaincy), 534 F.3d 756, 764 (D.C. Cir 2008), the D.C. Circuit indicated
that Plaintiffs meet the necessary standing criteria, since the government will be "actively and
directly communicating a religious message through religious words or religious symbols -- in
other words, it [will be] engaging in religious speech that [will be] observed, read, or heard by
the plaintiffs."

activity is unconstitutional. If the argument is that President-elect Obama (unlike the first twenty presidents) feels that the constitutionally-prescribed oath is inadequate, and that he needs to add homage to God in order to support our secular Constitution, nothing wrought by this injunction will interfere with that exercise of the new chief executive's First Amendment rights. Barack Obama is free to add those words on his own. Neither Defendant Roberts' addition of "so help me God," nor the remaining Defendants' efforts to have clergy-led prayers are necessary.

Government-sponsored espousals of religious claims are what the Establishment Clause exists to prohibit. Should Defendants argue that declaring the glory of God yields worthy benefits, they will be making nothing but a religious claim. It is because people disagree on what, if any, benefits (or harms) result from any religious act, that the Clause was included in the Bill of Rights. As the "Father of the Constitution" wrote:

> [T]hat the Civil Magistrate is a competent judge of religious truth
> … is an arrogant pretension falsified by the contradictory opinions
> of rulers in all ages.

Madison J. *Memorial and Remonstrance* (excerpted from Everson v. Board of Education, 330 U.S. 1, 41 n. 31 (1947) (Rutledge, J., dissenting)). The religious ideals that Defendants find meritorious will undoubtedly be worthless (or worse) to some of the citizenry. If – as expected – those ideals include God and/or Jesus, Plaintiffs in this case will be among that crowd.

If the argument proffered is the one argued by a single former Supreme Court justice (i.e., that the prayers are not being used for religious purposes, but that they "serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society," Lynch v. Donnelly, 465 U.S. 668, 693 (1984) (O'Connor, J., concurring)), the facts belie this claim. There are myriad other ways to accomplish those secular purposes. Poetry, visual art, music and more all can serve those ends. Defendants, themselves,

plan to have music performed by the United States Marine Band, The San Francisco Boys Chorus and the San Francisco Girls Chorus, Aretha Franklin, Itzhak Perlman, Yo-Yo Ma, Gabriela Montero and Anthony McGill. Defendant Feinstein will provide welcoming remarks after calling the ceremony to order, and Elizabeth Alexander will recite poetry. Appendix B. Surely these efforts, requiring no reference to God, will solemnize the occasion, express confidence in the future, and encourage the recognition of what is worthy of appreciation in society.

So, too, will the recitation of the presidential oath of office itself ... perhaps more powerfully than any other act during the occasion. The facts that (i) the first twenty-seven presidential inaugurals took place with all the solemnity possible while no Chief Justice added exclusionary religious verbiage to the Constitution's text, and that (ii) the next sixteen inaugurals revealed the same atmosphere without the use of clergy-led prayer, reveal that this "solemnity" goal will still be readily achieved if the preliminary injunction is granted.

### III. The public interest will be served by the injunction

Defendant PIC has proclaimed that a "sense of unity and shared purpose is what this Inauguration will reflect." Plaintiffs strongly agree that this is a worthy public interest. Yet, as our first president noted:

> Religious controversies are always productive of more acrimony and irreconcilable hatreds than those which spring from any other cause.[10]

---

[10] George Washington, Letter to Sir Edward Newenham, June 22, 1792. In *The Writings of George Washington* from the original manuscript sources, Electronic Text Center, University of Virginia Library. Accessed on January 4, 2009 at http://etext.virginia.edu/etcbin/toccer-new2?id=WasFi32.xml&images=images/modeng&data=/texts/english/modeng/parsed&tag=public&part=69&division=div1.

The rectitude of this view is perhaps best proven by the endless stream of litigation over Religion Clause issues, including the instant case. Governmental favoritism and endorsement of any religious ideal is divisive. Thus, the "sense of unity and shared purpose" desired by Defendants is hampered, not advanced, by the challenged acts. The public interest – of upholding the Establishment Clause and ending this divisiveness – will be served by issuing the requested injunction.

Another public interest is ending discrimination based on religious belief. Yet, as Justice Scalia (joined by Chief Justice Rehnquist and Justice Thomas) has clearly demonstrated, persistent and repetitive official endorsements of religion at the highest levels of government, such as the additions of "so help me God" to the presidential oath of office and clergy-led prayers at inaugural ceremonies, lead to the view that the Establishment clause "permits the disregard of devout atheists." McCreary County v. ACLU of Kentucky, 545 U.S. 844, 893 (2005) (Scalia, J., dissenting). The fact that justices of the Supreme Court would be willing to place themselves on record as adhering to this astoundingly vile and discriminatory viewpoint reveals how effective these challenged practices are in furthering such an illicit end.

Similarly, this effect is seen in the fact that half the population would refuse to vote for an Atheist for public office simply on that religious basis alone,[11] that 32% of Americans have "Very Unfavorable" opinions of Atheists,[12] and that eight states still have clauses in their

---

[11] Poll Analyses, Reported March 29, 1999 by the Gallup Poll News Service. Accessed at http://www.gallup.com/poll/content/print.aspx?ci=3979 on December 16, 2004.

[12] *Religion and Politics: the Ambivalent Majority*, The Pew Research Center for the People and the Press in association with The Pew Forum on Religion and Public Life, September 20, 2000 (accessed at http://people-press.org/reports/print.php3?PageID=177 on January 2, 2009). This can be contrasted with 3% for Evangelical Christians, 3% for Jews, 3% for Catholics and 8% for Muslim Americans. Again, "voters have a far more favorable impression of every religion tested than they do of Atheists."

constitutions – today in 2009 – specifically denying to Atheists the right to hold elected office.[13] Each of the challenged acts "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." Lynch v. Donnelly, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring). Mitigating this outcome by issuing the preliminary injunction obviously serves the public interest.


## IV. Plaintiffs are likely to prevail on the merits

### a. Governmental advocacy of any religious view is absolutely contrary to the ideals specifically embraced within the Constitution

Anyone reviewing the history of our nation and the development of our Constitution is immediately struck by two complementary ideals: equality and liberty. In fact, even in the face of slavery and the "three-fifths clause," "the founding principles of equality and liberty" have been seen to have penetrated and permeated through our nation's development. See, Thomas,

---

[13] Arkansas State Constitution: Article 19, Section 1 ("No person who denies the being of a God shall hold any office in the civil departments of this State, nor be competent to testify as a witness in any court."); Maryland State Constitution: Article 37 ("That no religious test ought ever to be required as a qualification for any office of profit or trust in this State, other than a declaration of belief in the existence of God."); Mississippi State Constitution: Article 14, Section 265 ("No person who denies the existence of a Supreme Being shall hold any office in this state."); North Carolina State Constitution: Article 6, Section 8 ("The following persons shall be disqualified for office: First, any person who shall deny the being of Almighty God."); Pennsylvania State Constitution: Article 1, Section 4 ("No person who acknowledges the being of a God and a future state of rewards and punishments shall, on account of his religious sentiments, be disqualified to hold any office or place of trust or profit under this Commonwealth."); South Carolina State Constitution: Article 17, Section 4 ("No person who denies the existence of a Supreme Being shall hold any office under this Constitution."); Tennessee State Constitution: Article 9, Section 2 ("No person who denies the being of God, or a future state of rewards and punishments, shall hold any office in the civil department of this state."); Texas State Constitution: Article 1, Section 4 ("No religious test shall ever be required as a qualification to any office, or public trust, in this State; nor shall any one be excluded from holding office on account of his religious sentiments, provided he acknowledge the existence of a Supreme Being.")

Clarence, *An Afro-American Perspective: Toward a "Plain Reading" of the Constitution -- The Declaration of Independence in Constitutional Interpretation.* 1987 How. L.J. 691, 692 (1987). If there is any realm in which those principles were most fervidly applied, it is the realm of religion. <u>See</u>, <u>e.g.</u>, *The Papers of James Madison*, ed. William T. Hutchinson and William M. E. Rachal (University of Chicago Press: Chicago, 1962), I: 171 (where "The Father of the Constitution" altered George Mason's "the fullest Toleration in the Exercise of Religion" in the Virginia Declaration of Rights to read that "all men are equally entitled to the full and free exercise of it accord[in]g to the dictates of Conscience"); *Basic Writings of Thomas Jefferson*. Foner PS (ed.) (Willey Book Co.: New York, 1944) pg. 437 (where Thomas Jefferson, reviewing the history of his "Bill for Religious Freedom," noted that those who passed it "meant to include within the mantle of its protection, the Jew and the Gentile, the Christian and Mohometan, the Hindoo, and Infidel of every denomination."); and *The Papers of George Washington, Presidential Series*, W. W. Abbot et al., eds., (Mark A. Mastromarino, volume editor), (University Press of Virginia: Charlottesville, 1996) Vol. 6: 284-86 (where George Washington's famous letter to the Touro Synagogue can be found, stating that, "All possess alike liberty of conscience and immunities of citizenship."[14]).

The wealth of statements expressing these sentiments is as rich as can be, and others need not be provided in this Memorandum. Suffice it to say that for the Chief Justice of the United States to alter the text of the Constitution for religious purposes, and for clergy to give sectarian prayers, all in the midst of the inauguration of the President of this nation built on such a

---

[14] "Following the ratification of the Constitution, Washington spent much of his time assuring various religious minorities of his sincerity in supporting 'real Equality,' and not 'mere toleration,' for citizens of every faith in the young republic. Thirteen of his twenty-two responses to religious congregations made direct references to religious liberty and his support for their equal protection under the law." The Bill of Rights Institute, accessed at http://www.billofrightsinstitute.org/article.php?sid=171 on December 16, 2004.

universal appreciation of religious equality and liberty, is to violate both the letter and the spirit of the great charter upon which the entire ceremony is based.

### b. The challenged activities in this case violate every principle underlying the Establishment Clause, as well as every Supreme Court test

The Supreme Court has written that "religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State." Lee v. Weisman, 505 U.S. 577, 589 (1992). Clearly, the "State" (in the person of Defendant Roberts) is prescribing religious beliefs and expression when he – with no authority whatsoever – alters the Constitution's text so that the presidential oath of office includes the purely religious words, "so help me God."

Similarly, the High Court has warned that, "the religious liberty protected by the Constitution is abridged when the State affirmatively sponsors the particular religious practice of prayer." Santa Fe Independent School District v. Doe, 530 U.S. 290, 313 (2000). This statement – signed onto by six justices – is about as unequivocal as exists. There is no doubt that the remaining Defendants are "affirmatively sponsoring the particular religious practice of prayer" when they arrange for clergy to give prayer at the Nation's most important governmental ceremony.

In fact, the activities challenged in this case fail every test that the Supreme Court has enunciated in its Establishment Clause jurisprudence. Certainly it is not neutral to take the quintessential religious question – does God exist? – and provide the same one-sided answer to it at each iteration of the grandest ceremony our nation has.

Applying the Lemon test, one cannot gainsay that both the purpose and the effect of adding "so help me God" to the oath and of having prayer to God (and/or Jesus) are religious. Thus, the activity fails Lemon's first two prongs: "The Establishment Clause of the First

Amendment … prevents [the government] from enacting laws that have the 'purpose' or 'effect' of advancing or inhibiting religion." <u>Zelman v. Simmons-Harris</u>, 536 U.S. 639, 648-49 (2002).

With pressure to countenance the religious exercises – especially for children attending the formal inauguration exercise – far greater than that in <u>Lee</u>, the coercion test is manifestly violated. "[A]nytime the government endorses a religious belief there will almost always be some pressure to conform." <u>Lee</u>, 505 U.S. 577, 605 n.6 (1992) (Blackmun, J., concurring).

By intruding religious activity in the midst of the most renowned ceremony in our Nation's life, the government is obviously placing its imprimatur upon the given dogma. "When the government puts its imprimatur on a particular religion, it conveys a message of exclusion to all those who do not adhere to the favored beliefs." <u>Lee</u>, 505 U.S. 577, 606 (1992) (Blackmun, J., concurring) (footnote omitted). Thus, the "outsider test" is failed:

> A government statement "'that religion or a particular religious belief is favored or preferred'" violates the prohibition against establishment of religion because such "endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."

<u>Capitol Square Review & Advisory Bd. v. Pinette</u>, 515 U.S. 753, 773 (1995) (O'Connor, J., concurring) (citations omitted). There can be no question that the activity constitutes an "endorsement" of the given religious views. As mentioned, the Chief Justice is the embodiment of constitutional law in this nation, and only Monotheistic clergy are given unique access to the venerated inaugural podium. Even the most unreasonable "reasonable observer" (who is "acquainted with the text, … history, and implementation" of inaugural prayer. <u>Wallace v. Jaffree</u>, 472 U.S. 38, 76 (1985) (O'Connor, J., concurring)) would be forced to admit that these activities – in this setting – endorse the given religious claim(s).

Clergy-led prayers lead to divisiveness. Inasmuch as they also, without exception, endorse the purely religious notion that there exists a God, they "prefer" Defendants' Monotheism to Plaintiffs' Atheism. This, too, is prohibited: "[T]he First Amendmen[t] ... forbids alike the preference of a religious doctrine ... which is deemed antagonistic to a particular dogma." Epperson v. Arkansas, 393 U.S. 97, 106 (1968). In other words, the challenged practices violate "[t]he touchstone for our analysis [i.e.,] the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" McCreary County v. ACLU, 545 U.S. 844, 860 (2005) (citation omitted).

A relatively small sampling of additional principled statements made by Supreme Court justices through the years – all completely inconsistent with the notion of chaplains appearing to give prayer at the presidential inauguration – is included in Appendix C. In view of these statements – in addition to all of the foregoing – it seems virtually certain that Plaintiffs should prevail in this litigation.

### c. **Lee v. Weisman, not Marsh v. Chambers, is controlling**

Undoubtedly, Defendants will allude to Marsh v. Chambers, 463 U.S. 783 (1983) to attempt to justify their constitutionally infirm plans. Statements from the Supreme Court over the more than two decades since Marsh was decided – such as the previously-noted instruction that "the religious liberty protected by the Constitution is abridged when the State affirmatively sponsors the particular religious practice of prayer," Santa Fe, 530 U.S. at 313, and "though the First Amendment does not allow the government to stifle prayers which aspire to these ends, neither does it permit the government to undertake that task for itself," Lee, 505 U.S. at 589, raise substantial doubts as to whether or not Marsh remains good law. Additionally, it must be recalled that none other than James Madison (who, in addition to being the "Father of the

Constitution," was the person who first proposed the Bill of Rights to the Congress on June 8,

1789) pointedly answered that question nearly two hundred years ago:

> Is the appointment of Chaplains to the two Houses of Congress consistent with the Constitution, and with the pure principle of religious freedom?
>
> In strictness the answer on both points must be in the negative. The Constitution of the U. S. forbids everything like an establishment of a national religion. The law appointing Chaplains establishes a religious worship for the national representatives, to be performed by Ministers of religion, elected by a majority of them; and these are to be paid out of the national taxes. Does not this involve the principle of a national establishment, applicable to a provision for a religious worship for the Constituent as well as of the representative Body, approved by the majority, and conducted by Ministers of religion paid by the entire nation.
>
> The establishment of the chaplainship to Congs is a palpable violation of equal rights, as well as of Constitutional principles: The tenets of the chaplains elected [by the majority] shut the door of worship agst the members whose creeds & consciences forbid a participation in that of the majority. To say nothing of other sects, this is the case with that of Roman Catholics & Quakers who have always had members in one or both of the Legislative branches. Could a Catholic clergyman ever hope to be appointed a Chaplain? To say that his religious principles are obnoxious or that his sect is small, is to lift the evil at once and exhibit in its naked deformity the doctrine that religious truth is to be tested by numbers. or that the major sects have a right to govern the minor.[15]

Combining this with (i) the notice in <u>Marsh</u> that governmental activity will be struck

down when "there is [an] indication that the prayer opportunity has been exploited to proselytize

or advance any one ... faith or belief," <u>Marsh v. Chambers</u>, 463 U.S. 783, 794-95 (1983), as well

as (ii) the understanding that, to Atheists, Defendants are clearly proselytizing and advancing one

---

[15] The Founders' Constitution, Volume 5, Amendment I (Religion), Document 64 (The University of Chicago Press), citing James Madison's Detached Memoranda, ca. 1817, W. & M. Q., 3d ser., 3:554--60 (1946). Accessed on January 4, 2009 at http://press-pubs.uchicago.edu/founders/documents/amendI_religions64.html.

belief (i.e., Monotheism) by their challenge actions, the precedential value of <u>Marsh</u> is minimal at best.

Even if <u>Marsh</u> had significant precedential value, the inauguration looks more like the graduation prayers invalidated in <u>Lee</u> than the legislative prayers approved by the <u>Marsh</u> Court. As noted in the Complaint, the history of the challenged practices is short, lacking the "unambiguous and unbroken history of more than 200 years"[16] found in <u>Marsh</u>.  On the contrary, for the 140-plus years from the introduction and ratification of the Bill of Rights until Franklin Roosevelt's inaugurations, it appears that not a single one of the forty-two Presidential Inaugurations incorporated the activities being challenged in this case. Thus, as opposed to chaplain-led legislative prayer, inaugural prayer has not been present "[f]rom colonial times through the founding of the Republic and ever since."[17] Accordingly, the "special nook"[18] of <u>Marsh</u> is not present in the case at bar.

Another crucial limiting factor pertaining to legislative prayer is that such prayer – as opposed to that given at inaugurations – is not intended for the public at large:

> It is worth noting that just because <u>Marsh</u> sustained the validity of legislative prayer, it does not necessarily follow that practices like proclaiming a National Day of Prayer are constitutional. ... Legislative prayer does not urge citizens to engage in religious practices, and on that basis could well be distinguishable from an exhortation from government to the people that they engage in religious conduct.

---

[16] <u>Marsh v. Chambers</u>, 463 U.S. 783, 792 (1983).

[17] <u>Id</u>. at 786.

[18] "[T]he existing legislative prayer practice, Marsh plainly indicates, fits into a special nook - - a narrow space tightly sealed off from otherwise applicable first amendment doctrine." (<u>Kurtz v. Baker</u>, 265 U.S. App. D.C. 1, 829 F.2d 1133, 1147 (1987) (R.B. Ginsburg, J., dissenting))

<u>Allegheny County v. Greater Pittsburgh ACLU</u>, 492 U.S. 573, 603 (1989) (note 52).[19] An inaugural prayer is precisely such "an exhortation from government to the people that they engage in religious conduct."[20]

When the Supreme Court revisited the issue of government-sponsored prayer in <u>Lee v. Weisman</u>, 505 U.S. 577 (1992), it stated that "invocations and benedictions, even so-called nonsectarian ones … creat[e] an identification of governmental power with religious practice, endors[e] religion, and violat[e] the Establishment Clause." <u>Id.</u>, at 585. To be sure, that holding pertained to public schools, but the distinction – constitutionally – is one without a difference. After all, if "[n]either students [n]or teachers shed their constitutional rights ... at the schoolhouse gate" (<u>Tinker v. Des Moines School Dist.</u>, 393 U.S. 503, 506 (1969)), then other citizens certainly don't shed theirs by **not** entering that educational environment. The same infirmities exist any time government, in a non-legislative setting, "affirmatively sponsors the particular religious practice of prayer." <u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 313 (2000).

---

[19] Justice Souter has echoed this sentiment: "[T]his is not a case like <u>Marsh v. Chambers</u>, 463 U.S. 783, 77 L. Ed. 2d 1019, 103 S. Ct. 3330 (1983), in which government officials invoke spiritual inspiration entirely for their own benefit without directing any religious message at the citizens they lead." <u>Lee v. Weisman</u>, 505 U.S. 577, 630 (1992) (Souter, J., concurring) (note 8).

[20] At the 2001 inauguration, Senator McConnell introduced the invocation with, "[T]he Rev. Franklin Graham is with us today to lead the Nation in prayer," and Rev. Graham, himself, began, "Let us pray." Pastor Caldwell also started his benediction to "Almighty God" with the words, "Let us pray, please." 147 Cong. Rec. 7, S421-23 (January 22, 2001). Similarly, before Rev. Leon's invocation (in which he, too, began, "Let us pray"), Sen. Trent Lott noted that "we gather ... to give thanks to God for his blessings upon us all" at the last (2005) inauguration, 151 Cong. Rec. S102 (109th Cong., 1st Sess) (January 20, 2005). Pastor Caldwell, making a second inaugural appearance (where he again prayed in the name of Jesus Christ) began his benediction, "Let us pray, please." <u>Id</u>. at S104.

### d. The prayers infringe upon Plaintiffs' Free Exercise, RFRA and Equal Protection rights

Even if all of the Establishment Clause's principles and ideals were to be ignored, and even if the very limited holding in Marsh were to be extended to include a ceremony where there does not exist an "unambiguous and unbroken history of more than 200 years,"[21] Plaintiffs should still prevail. Under the Free Exercise Clause, 42 U.S.C. §§ 2000bb et seq. (Religious Freedom Restoration Act (RFRA)), and the Due Process Clause of the Fifth Amendment, the practices being challenged are patently unlawful.

In Sherbert v. Verner, 374 U.S. 398, 406 (1963), the Supreme Court noted that "to condition the availability of benefits upon [an individual's] willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties." For many of the Plaintiffs, participating in a Monotheistic ceremony – even by sitting in respectful silence – violates a cardinal principal of their religious faith. "[T]he 'exercise of religion' often involves ... abstention from ... assembling with others for a worship service." Employment Div. v. Smith, 494 U.S. 872, 877 (1990). And to any extent that the High Court appeared to pull back from that mandate, the retreat is applicable only when it involves "a neutral, generally applicable law." Id. at 881. There is obviously nothing neutral about adding Monotheistic references to the presidential oath of office, or leading a captive audience in prayer.

Although the Smith opinion removed strict scrutiny from Free Exercise claims, RFRA restored that construct when federal activity is at issue. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006). In the instant litigation, it is precisely such federal activity that involved. Because no valid interest at all exists for the government to

---

[21] Marsh v. Chambers, 463 U.S. 783, 792 (1983).

spatchcock Monotheism into a national ceremony, much less one that is compelling, Plaintiffs will undoubtedly prevail in their RFRA claims.

Finally, each component of Plaintiffs' Due Process rights will be violated should Defendants be permitted to interlard the inaugural ceremony with government-endorsed Monotheistic religious activity. Plaintiffs have substantive due process rights, by way of the Establishment Clause, to not be subjected to governmental activity that "degrades from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority."[22] Because there is no nonjudicial means by which they can defend these rights, procedural due process is infringed upon as well. Finally, because of this degradation, the equal protection component of the Due Process Clause is impaired as well.

---

[22] Madison J. *Memorial and Remonstrance Against Religious Assessments*, as provided in the Appendix to Everson v. Board of Education, 330 U.S. 1, 63-72 (1947) at 69.

**CONCLUSION**

If Defendant Roberts is permitted to alter the text of the Constitution and add the phrase, "so help me God" to the presidential inaugural oath of office, and/or if the remaining Defendants are permitted to utilize chaplains to give prayers at the inaugural ceremony, Plaintiffs – and millions of other Americans – will be further turned into second class citizens, purely on the basis of their religious beliefs. Under their sworn duty, these Defendants are obligated to prevent such injury, not to actively inflict it. In this case, unless the judiciary steps forward, citizens with minority religious faiths will suffer the very injuries our Religion Clauses exist to obviate.

There is no doubt that the remedy requested here is a weighty one, for which the Court will suffer significant criticism. But that criticism will come only from those seeking continuation of a clear constitutional infirmity for their own religious ends. Those who understand the meaning of "equality" and "liberty" will recognize the nobility of upholding constitutional principles.

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.[23]

The preliminary injunction must issue.

---

[23] <u>West Virginia Board of Education v. Barnette</u>, 319 U.S. 624, 638 (1943).

Respectfully submitted this 5th day of January, 2009,


<u>/s/ - Michael Newdow</u>                                    <u>/s/ - Robert V. Ritter</u>

Michael Newdow                                         Robert V. Ritter
*In pro per* and *pro hac vice* (pending)              DC Bar #414030
PO Box 233345                                          AHA – 1777 T Street, NW
Sacramento, CA  95823                                  Washington, DC  20009

(916) 427-6669                                         (202) 238-9088
NewdowLaw@gmail.com                                    BRitter@americanhumanist.org

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### Civil Action No. 1:08-cv-02248-RBW

### Newdow v. Roberts

### CERTIFICATE OF SERVICE


I hereby certify that on January 5, 2009, I served copies of:

**(1) PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION;**
**(2) PROPOSED ORDER REGARDING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; and**
**(3) MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

upon the following individuals and entities by placing them in the United States mail.

Hon. John G. Roberts, Jr.
Supreme Court of the United States
One First Street NE
Washington, DC 20543

Hon. John G. Roberts, Jr.
(Home address under seal)

Presidential Inaugural Committee 2009
Washington, DC 20599

Emmett Beliveau, Executive Director
Presidential Inaugural Committee 2009
Washington, DC 20599

Joint Cong Comm on Inaugural Ceremonies
United States Senate
331 Hart Senate Office Building
Washington, DC 20510

Senator Dianne Feinstein, Chairman
Joint Cong Comm on Inaugural Ceremonies
United States Senate
331 Hart Senate Office Building
Washington, DC 20510

Armed Forces Inaugural Committee
Joint Force Hdqrs - National Capital Region
US Army Military District of Washington
103 Third Avenue - Fort Lesley J. McNair
Washington, DC 20319-5058

Major Gen Richard J. Rowe, Jr., Chairman
Armed Forces Inaugural Committee
Joint Force Hdqrs - National Capital Region
US Army Military District of Washington
103 Third Avenue - Fort Lesley J. McNair
Washington, DC 20319-5058

Rev. Richard D. Warren
(Home address under seal)

Rev. Joseph E. Lowery
(Home address under seal)

Jeffrey Taylor
US Attorney for the District of Columbia
501 3rd Street NW, 4th Floor
Washington, DC 20001

Michael B. Mukasey
Attorney General of the United States
950 Pennsylvania Avenue NW
Washington, DC 20530

Additionally, these documents were electronically filed with the Clerk of the United States District Court for the District of Columbia by using the CM/ECF system.

I am at least 18 years of age and not a party to the cause.

Signature: _____     January _____, 2009

Printed Name: _____

Street Address: _____

City, State & Zip: _____

Phone: _____