**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHAEL NEWDOW, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 08-2248 (RBW) |
| | ) |
| HON. JOHN ROBERTS, JR., et al., | ) |
| | ) |
| Defendants. | ) |

**FEDERAL DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

GREGORY G. KATSAS
Assistant Attorney General

JOHN C. O'QUINN
Deputy Assistant Attorney General
Federal Programs Branch

JAMES J. GILLIGAN
Assistant Director

BRAD P. ROSENBERG
ERIC B. BECKENHAUER
Trial Attorneys
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 514-3374
Fax: (202) 616-8460
brad.rosenberg@usdoj.gov

Counsel for the Federal Defendants

Dockets.Justia.com

## INTRODUCTION

Plaintiffs, on the eve of the 56th Presidential Inauguration, have filed a Motion for a Preliminary Injunction seeking the extraordinary (and effectively final) relief of enjoining the invocations and benedictions that have been planned since December 17, 2008, for President-Elect Barack Obama's presidential inauguration. For the lead plaintiff here, however, this is not his second bite at the apple; it is his <u>third</u>: Mr. Newdow has previously — and unsuccessfully — sued to obtain equitable relief regarding prayers at the 2001 and 2005 presidential inaugurations, and sought in 2005 — again unsuccessfully — to obtain a preliminary injunction barring inaugural prayer that is virtually identical to the preliminary injunction that Mr. Newdow seeks here.

To be sure, this case involves plaintiffs beyond Mr. Newdow. Nonetheless, other than the addition of a claim regarding the President-Elect's intention to affirm his oath of office with the traditional phrase "so help me God," plaintiffs' request for injunctive relief here is virtually identical to the request for injunctive relief that Judge Bates of this Court rejected in 2005. Not once, however, does plaintiffs' Memorandum in Support of Plaintiffs Motion for Preliminary Injunction (Dkt. No. 4, Jan. 5, 2009) ("Pl. Mem.") mention either of Judge Bates' published decisions from the 2005 inaugural litigation ("<u>Newdow II</u>"). <u>See</u> <u>Newdow v. Bush</u>, 355 F. Supp. 2d 265 (D.D.C. 2005) (denying motion for preliminary injunction); <u>Newdow v. Bush</u>, 391 F. Supp. 2d 95 (D.D.C. 2005) (dismissing Newdow's complaint). Plaintiffs' Memorandum is equally silent with respect to Mr. Newdow's failed lawsuit regarding the 2001 presidential inauguration ("<u>Newdow I</u>").

Plaintiffs' failure to note these prior decisions is not surprising, as their Complaint here suffers from the exact same defects that doomed Mr. Newdow's previous litigation efforts. Simply put, although plaintiffs allege they are personally offended by inaugural prayers (and now, apparently, by the wishes of the President-Elect to be prompted "so help me God" once he takes the

oath of office), a citizen's discomfort or disagreement with government action does not constitute a concrete and particularized injury as required to establish standing for the purposes of the "case or controversy" requirement of Article III. And even if plaintiffs had alleged such an injury, an injunction against the defendants that plaintiffs have named in this lawsuit would not provide the relief that plaintiffs seek. Thus, plaintiffs also lack standing because they have failed to allege a redressable injury as to these defendants.

Even if the Court were to conclude that plaintiffs have standing, plaintiffs cannot demonstrate a substantial likelihood of success on the merits, as they must do in order to obtain a preliminary injunction. Plaintiffs cannot prevail on their claim that clergy prayers at presidential inaugurations violate either the First Amendment's Establishment Clause or the Religious Freedom Restoration Act. That claim is plainly foreclosed by <u>Marsh v. Chambers</u>, 463 U.S. 783 (1983), where the Supreme Court, in approving the Nebraska legislature's practice of opening legislative sessions with prayer offered by a paid chaplain, explained that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." <u>Id.</u> at 786. The historical record shows that presidential inaugural prayer, like legislative prayer, is "deeply rooted" in that same history and tradition, and is likewise constitutional.

Plaintiffs' novel claim regarding the traditional affirmation, "so help me God" — long understood to have been invoked by President Washington himself and every President since then — also fails. Plaintiffs concede that President-Elect Obama is entitled under the Constitution to affirm his oath of office with the very phrase to which plaintiffs object. As set forth below, the President-Elect wishes, after taking the oath of office, to conclude his swearing-in with the traditional phrase "so help me God," and the Chief Justice will accommodate the President-Elect's request. Plaintiffs' legal theory — that the President of the United States has a First Amendment

right to say the words "so help me God" after taking the oath of office, but not to have the same affirmation administered to him — simply makes no sense.

Even if plaintiffs had presented a cogent legal theory, their request for a preliminary injunction should nonetheless be denied. A preliminary injunction would uproot plans for the 56th Presidential Inaugural, which will take place in less than two weeks. That would cause irreparable injury to the President-Elect and the public at large, and alter the status quo by overturning long-established practice. In short, the preliminary injunction plaintiffs seek here is fundamentally at odds with the broader public interest in maintaining the Nation's traditional inaugural ceremonies.

For these reasons, as set forth in more detail below, this Court should deny plaintiffs' last-minute motion for a preliminary injunction.

## BACKGROUND

1. **Newdow I.**

Newdow's first challenge to inaugural prayers was filed on February 1, 2001, shortly after the January 20, 2001, inaugural ceremonies. At those ceremonies, the Reverend Franklin Graham delivered a prayer. Newdow alleged that Rev. Graham's prayer violated the Establishment Clause because "[t]o offer prayer at an official governmental ceremony is a religious act per se," and because Rev. Graham's prayer "was clearly sectarian as well." See 2001 Complaint ¶¶ 12-13 (attached hereto as Ex. 1). Newdow requested a declaration that President Bush violated the Establishment Clause by "utilizing any clergyman (much less a Christian minister) in his inauguration," and an injunction barring President Bush "from repeating this or engaging in any similar religious acts." Id. at 7.

The government moved to dismiss the complaint for lack of Article III standing and because Rev. Graham's prayer did not violate the Establishment Clause. On July 17, 2001, the Magistrate Judge issued Findings and Recommendations, concluding that Newdow had Article III standing to bring his action, but suggesting that the action be dismissed "insofar as plaintiff complains about permitting a chaplain (or the President) [to recite] any prayer at the Presidential inauguration." July 17, 2001, Findings and Recommendations, at 12 (attached hereto as Ex. 2). The Magistrate Judge noted that "[f]ormal prayers by Christian ministers have been associated with inaugurations since the inauguration of George Washington." Id. at 8 (citation omitted). "In addition," the Magistrate Judge observed, "every President has included reverent references to the deity in his inaugural address to the nation." Id. at 9. Thus, the "history of inaugural prayers, like the history of legislative prayers, indicates that they were not viewed [by the framers] as violating the Establishment Clause." Id. (citing Marsh v. Chambers, 463 U.S. 783 (1983)). The Magistrate Judge recommended against dismissal, however, "insofar as plaintiff is attacking the specifics of [Rev. Graham's] prayer as a violation of the Establishment Clause." Id. at 12.

President Bush and Newdow both filed objections to the Magistrate Judge's findings and recommendations,[1] but the District Court adopted them and dismissed Newdow's action insofar as Newdow sought an order that the President or a chaplain may not say any prayer as part of a presidential inauguration. See Order of Sept. 28, 2001 (attached hereto as Ex. 3). Subsequently, the Magistrate Judge issued findings and recommendations suggesting that "the entire case be dismissed for lack of jurisdiction because the courts cannot enjoin the President [or grant declaratory relief] in the circumstances of this case." Dec. 28, 2001, Findings and Recommendations, at 13 (Attached

---

[1] The government filed objections to the Judge's conclusion that Newdow had Article III standing to challenge the giving of any prayer at a presidential Inauguration.

hereto as Ex. 4). The Magistrate Judge concluded that "the inauguration of the President, and what may be said by the President or his speakers, is wholly integral to the Executive Branch," id. at 7, and involves nonministerial decisions that courts lack constitutional authority to regulate. See id. at 4-7 & n.4 & n.5. In the alternative, the Magistrate Judge recommended that the entire case be dismissed because (a) "prayer per se at the Presidential inauguration does not violate the Establishment Clause," as the District Court had already held, (b) "Newdow lacks standing to challenge the content of the prayer given at future inaugurations," and (c) declaratory relief was unavailable for the same reasons. See id. at 13.[2]

Newdow filed objections to the Magistrate Judge's December 28, 2001, Findings and Recommendations, and also filed a Motion for Leave to Amend his Complaint to assert claims against Senator Mitch McConnell, in his capacity as Chair of the Joint Congressional Committee on Inaugural Ceremonies ("JCCIC"), and certain other new defendants. The Magistrate Judge issued a final set of findings and recommendations, which suggested that the motion be denied. See Mar. 26, 2002, Findings and Recommendations at 8 (attached hereto as Ex. 5). The Magistrate Judge concluded that a court would lack constitutional authority to regulate Congress's participation in planning and carrying out a presidential Inauguration ceremony, for the same reasons the Magistrate Judge had earlier concluded that a court would lack the power to control what the President or anyone else says at a presidential inauguration. Id. at 6. The Magistrate Judge also concluded that the motion to add Senator McConnell should be denied because Newdow no more had standing to

---

[2] Newdow lacked standing to challenge the content of the prayer given at future Inaugurations because courts lack constitutional authority to "set[] forth the content of permissible prayer for future presidential inaugurations," Dec. 28, 2001, Findings and Recommendations, at 9, and because the court could not assume that any future presidential Inauguration would necessarily include the kind of specific religious references that Rev. Graham's prayer contained. See id. at 10.

challenge the content of Rev. Graham's invocation by suing Senator McConnell than by suing President Bush. See id. at 6. For example, the Magistrate Judge observed, a court could not issue an injunction directing the President, a Senator, or any other government official to "watch what [the President] and his chosen speakers say" at a presidential inauguration ceremony. Id. at 7.

The Magistrate Judge rejected Newdow's suggestion that the President or the JCCIC "could be ordered to ban clergy from the guest list." Id. at 7. That kind of an order, the Magistrate Judge observed, would be clearly invalid from a First Amendment standpoint. See id. at 8.[3] Since substituting Senator McConnell "or any other Inauguration associated person or entity" would not affect his recommendation in favor of dismissal, the Magistrate Judge resubmitted his December 28, 2001, Findings and Recommendations, as supplemented, to the District Court. Newdow filed objections, but the District Court adopted the Recommendations in full; it dismissed the case in its entirety, with prejudice. See May 23, 2002 Order at 2 (attached hereto as Ex. 6).

The Ninth Circuit affirmed. Newdow v. Bush, 89 Fed. Appx. 624, 625, 2004 WL 334438, at **1 (9th Cir. Feb. 17, 2004). Noting that "we may affirm on any proper ground, even if the district court did not reach the issue or relied on different grounds or reasoning," the Court held that Newdow "lacks standing to bring this action because he does not allege a sufficiently concrete and specific injury. See Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 482-86 . . . (1982)." Id. The Court added that the district court had not abused its discretion in denying Newdow's motion to file an amended complaint "because amendment would be futile." Id.

---

[3] See generally McDaniel v. Paty, 435 U.S. 618 (1978) (holding unconstitutional state statute disqualifying clergy from holding state office).

2.    __Newdow II.__

Newdow's second lawsuit challenging inaugural prayer was filed in this Court and challenged prayer at the 2005 Presidential Inauguration, and is virtually identical to this one. Newdow filed a verified complaint and a motion for a preliminary injunction on December 21, 2004. See Newdow II, 355 F. Supp. 2d at 270.  Newdow sued President Bush, the JCCIC, Senator Lott (as Chairman of the JCCIC), the Presidential Inaugural Committee ("PIC"), Craig Jenkins (as Executive Director of the PIC), the Joint Task Force-Armed Forces Inaugural Committee, its commander, and "one or more unnamed clergy (wo)men." Id. at 270 & n.5.  Newdow alleged that witnessing inaugural prayers at the 2001 inauguration made him feel "like a second class citizen and a 'political outsider' on account of his religious beliefs," and asserted that "[i]t is presumed that Proposed Clergy's prayers [at the 2005 inauguration] will make Plaintiff feel like an 'outsider' as well." Id. at 271 (citations omitted).  Newdow sought a declaratory judgment that inaugural prayers violate the Establishment and Free Exercise Clauses of the First Amendment and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, et seq.  Newdow also asked the Court to enjoin the defendants "'from utilizing any clergymen to engage in any religious act," or alternatively "from utilizing clergymen to engage in Christian religious acts at the 2005 Inauguration or future Presidential inaugurations." Newdow II, 355 F. Supp. 2d 271.

On January 14, 2005, Judge Bates denied Newdow's application for a preliminary injunction. Newdow II, 355 F. Supp. 2d 265 (D.D.C. 2005).  In analyzing whether the doctrine of issue preclusion made it unlikely that Newdow would succeed on the merits, the Court noted that "[a] review of Newdow's two complaints [for the 2001 and 2005 presidential inaugurals] shows direct parallels in the injury alleged by Newdow" and concluded that "issue preclusion based on Newdow I casts grave doubt on his likelihood of succeeding on the merits in this action." Id. at 273, 276.

The Court then turned to the issues raised in <u>Newdow II</u>.  Judge Bates, observing that Newdow faced "sizable hurdles on the issue of standing," <u>id.</u> at 276, noted that Newdow "alleged injuries that are not obviously particularized or specific to him," <u>id.</u> at 277.  As for redressability, the Court concluded that "the only party against whom an injunction would redress Newdow's injury is <u>President Bush</u> [since h]e <u>has ultimate decision-making power in selecting speakers for the Inauguration, including clergy</u>."  <u>Id.</u> at 280 (emphasis added).  Indeed, during oral argument, "<u>Newdow conceded</u> that <u>only an injunction against the President</u> can truly redress his injuries." <u>Id.</u> (emphasis added).  Judge Bates then noted the "serious separation of powers concerns," <u>id.</u> at 280, raised by Newdow's request for injunctive relief against the President:

> the Court's grave concerns about its power to issue an injunction against the President, which is the only method of redressing Newdow's alleged injuries, places in peril Newdow's standing to bring this action.  Without redressability and therefore standing, Newdow would be unable to succeed on the merits of his claims.

<u>Id.</u> at 282.

On the merits, Judge Bates explained that, because the contents of the 2005 inaugural prayers were unknown at the time Newdow sought a preliminary injunction, and because the Court only had the contents of the 2001 prayers and "snippets" from some earlier prayers, "there has not been a persuasive showing on the present record that inaugural prayer has been used to affiliate or proselytize under any reasonable definition of these words."  <u>Id.</u> at 288-89.  Judge Bates similarly observed that "Newdow has not offered a sufficient record to establish . . . a substantial likelihood of success in drawing this case apart from legislative prayer, military chaplains, and other similar acts of ceremonial deism that come within the <u>Marsh</u> exception to general Establishment Clause jurisprudence.  Newdow certainly has not done so to the extent necessary for the sweeping relief he seeks here."  <u>Id.</u> at 290.  And the Court found that "Newdow's remaining claims [regarding the Free

Exercise Clause and the RFRA] carry little force." Id. at 290.

In balancing the harms regarding the requested preliminary injunction, Judge Bates found that Newdow

> has not demonstrated that the balance of harms here strongly favors the injunctive relief he seeks. Certainly his showing is not sufficient to overcome the marginal showing of a likelihood of success on the merits of his claims. The threat of harm to his rights absent the requested injunction is generalized rather than specific, there is at least some risk of harm to others from entry of an injunction, and in the present circumstances the public interest simply does not favor the extraordinary relief that Newdow seeks.

Id. at 291.[4] In particular, the Court noted that "each inaugural ceremony is quite personal to the President honored, even down to the choice of clergy participating." Id. at 293. As for the broader public interest,

> There is a strong argument that, at this late date, the public interest would best be served by allowing the 2005 Inauguration ceremony to proceed on January 20 as planned. That would be consistent with the inclusion of clergy prayer in all Presidential inaugurations since 1937, and with the inclusion of religious prayer or reference in every inauguration commencing with the first inauguration of President Washington in 1789. To do otherwise, moreover, would at this eleventh hour cause considerable disruption in a significant, carefully-planned, national event, requiring program and other adjustments. The material change requested by Newdow in an accepted and well-established historical pattern of short prayers or religious references during Presidential inaugurations, based on this last-minute challenge, is not likely to serve the public interest, particularly where Newdow's ability to proceed with this action remains in doubt and there is no clear evidence of impermissible sectarian proselytizing.

Id. at 293. On these and other bases, Judge Bates denied Newdow's motion for a preliminary

---

[4] The Court also noted that Newdow did not file his action (and his motion for a preliminary injunction) until December 21, 2004, "just a month before the scheduled date of the 2005 Inauguration." Id. at 292. Accordingly, the Court found that "[t]his delay in seeking a preliminary injunction has placed defendants and the federal courts in a difficult position" and that "Newdow seeks a mandatory preliminary injunction that would alter the status quo by precluding the planned clergy prayers at the Inauguration, and that the preliminary relief he seeks would constitute the ultimate relief in this case." Id. Here, plaintiffs filed their Motion for a Preliminary Injunction on January 5, 2005 — a mere two weeks before the Inauguration.

injunction.  Id. at 294.[5]

In a subsequent decision, Judge Bates dismissed Newdow's case.  Newdow II, 391 F. Supp. 2d 95 (D.D.C. 2005).  Echoing the Court's earlier analysis, Judge Bates held that Newdow was precluded from relitigating his standing, id. at 101, and that the complaint must nevertheless be dismissed "because no justiciable case or controversy remains."  Id. at 101-02.  Building on his previous opinion, Judge Bates held that "Newdow lacks any of the indicia of a personal connection found in other prayer or public-display cases" and, on that basis, found that Newdow failed to allege a concrete injury-in-fact.  Id. at 104.  Judge Bates reiterated that Newdow's only possible avenue of relief would be against the President — a party against whom the Court could not issue an injunction or declaratory judgment.  Id. at 104-06.  Finally, the Court found that Newdow's claim was moot. See id. at 107-08.

## 3.     Plans for the 2009 Inauguration.

On January 20, 2009, President-Elect Barack Obama will be sworn in as the 44th President of the United States.  See U.S. Const., Amend XX, § 1.  Pursuant to a concurrent resolution of Congress, the JCCIC makes logistical arrangements for the Inauguration of President-Elect Obama and Vice President-Elect Biden.  See S. Con. Res. 67 (Feb. 28, 2008).  Senator Dianne Feinstein serves as Chair of that Committee.[6]  The Presidential Inaugural Committee ("PIC") is a private organization appointed by the President-Elect that coordinates numerous ceremonial events associated with the Inauguration, including the inaugural parade and inaugural balls.  36 U.S.C. §

---

[5] Newdow immediately appealed the denial of his motion for a preliminary injunction and sought an injunction pending appeal.  The D.C. Circuit denied Newdow's motion.  See Newdow II, No. 05-5003, 2005 WL 89011 (D.C. Cir. Jan. 16, 2005).

[6] More information on the JCCIC can be found at http://inaugural.senate.gov.

501; see also Newdow II, 355 F. Supp. 2d at 280.[7]  The Armed Forces Inaugural Committee ("AFIC") is a joint service committee charged with coordinating ceremonial support for the presidential inaugural.  See generally Declaration of Thomas L. Groppel (attached hereto as Ex. 7).[8]  Major General Richard J. Rowe, Jr. serves as Chair of that Committee.  In accordance with long-standing tradition, the Chief Justice of the United States has been invited to administer the presidential oath of office.  Rev. Rick Warren has been invited to provide an invocation, and Rev. Joe Lowery has been invited to provide a benediction, at the inauguration.

Plaintiffs filed their lawsuit on December 30 and delayed seeking a preliminary injunction until January 5, a mere 15 days before the inauguration.

## ARGUMENT

## I.    PLAINTIFFS LACK STANDING.

The "judicial power of the United States defined by Article III is not an unconditioned authority to determine the constitutionality of legislative or executive acts," but is limited to the resolution of actual "cases" and "controversies."  Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 471 (1982).  The doctrine of "standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).[9]

To have standing, a plaintiff first "must have suffered an 'injury in fact' — an invasion of

---

[7] More information on the PIC can be found at http://www.pic2009.org/content/home.

[8] More information on the AFIC can be found at http://www.afic.northcom.mil/about.html.

[9] "[T]he party invoking federal jurisdiction bears the burden of establishing its existence." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 104 (1998).  Federal courts should presume that they lack jurisdiction "unless the contrary appears affirmatively from the record." Renne v. Geary, 501 U.S. 312, 316 (1991) (citations omitted).

a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" Lujan, 504 U.S. at 560 (citations omitted). "Second, there must be a causal connection between the injury and the conduct complained of . . . ." Id. (citations omitted). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. (citations omitted). The Supreme Court has observed that "[its] standing inquiry has been especially rigorous" in cases such as the one at bar, where "reaching the merits of the dispute would force it to decide [whether] an action taken by one of the other two branches of the Federal Government [was unconstitutional]." Raines v. Byrd, 521 U.S. 811, 819-20 (1997).

Plaintiffs cannot satisfy their burden of proving standing because they cannot prove a concrete and particularized injury in fact and because any such injury would not be redressable.

### A. Plaintiffs Do Not Allege Concrete And Particularized Injuries Sufficient To Qualify As Injuries In Fact.

Plaintiffs' Preliminary Injunction Memorandum fails to describe any injury whatsoever that will befall plaintiffs should the Court not grant their motion. Plaintiffs do assert that they find the challenged conduct to be "offensive" and that it will turn them into "political outsiders." Pl. Mem. at 4 (Dkt. No. 4 at 13); see also id. at 19 (Dkt. No. 4 at 28) (plaintiffs "will be turned into second class citizens" and "will suffer the very injuries our Religion Clauses exist to obviate"). But other than these conclusory snippets, plaintiffs' memorandum is completely silent on the issue of injury.

Nor does plaintiffs' Complaint contain any allegations of injury sufficient to confer standing. As an initial matter, plaintiffs have failed to offer any evidence demonstrating injury. Unlike the Complaint in Newdow II, the Complaint here is unverified, and none of the forty-odd named plaintiffs have submitted a declaration in support of plaintiffs' motion. Plaintiffs have therefore

failed to meet their burden of persuasion to demonstrate an injury in fact that is sufficient to allow this Court to contemplate the "extraordinary remedy" of granting a preliminary injunction. Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004) ("A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion."); Local Civ. R. 65.1 ("The application [for a preliminary injunction] shall be supported by all affidavits on which the plaintiff intends to rely."). Plaintiffs would have this Court grant that remedy (and alter a presidential inauguration) based solely on the vague and unsupported allegations of injury contained in their Complaint and naked assertions contained in their motion.

Even if these allegations were properly supported by any kind of evidence, they would still be insufficient to demonstrate injury. Plaintiffs assert, for example, that they "have a right to view their government in action without being forced to confront official endorsements of religious dogma" (Compl. ¶ 83), that "[b]eing forced to confront such religious dogma as the price to pay for observing a governmental ceremony is a substantial burden upon Plaintiffs' rights of Free Exercise" (Compl. ¶ 84), that they feel like "'outsiders' due to their personal religious beliefs" (Compl. ¶ 88), and that plaintiffs' "social condition" will be "worsen[ed]" (Compl. ¶ 95). But these generalized assertions of social stigma and hurt feelings do not, by themselves, establish the kind of "concrete and particularized" injury Article III requires. Lujan, 504 U.S. at 560. The "psychological consequence presumably produced by observation of conduct with which one disagrees . . . is not an injury sufficient to confer standing under Article III, even though the disagreement is phrased in constitutional terms." Valley Forge, 454 U.S. at 485-86. In other words, Article III injury "is not measured by the intensity of the litigant's interest or the fervor of his advocacy." Id. at 486; accord Allen v. Wright, 468 U.S. 737, 755-756 (1984) ("abstract stigmatic injury" insufficient by itself to create Article III injury in fact); Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 223

n.13 (1974) ("abstract injury in nonobservance of the Constitution" insufficient to confer Article III injury).

Judge Kennedy of this Court found that very similar allegations of injury by Mr. Newdow did not confer standing to challenge Congress's practices regarding legislative prayer and its use of chaplains. In <u>Newdow v. Eagen</u>, 309 F. Supp. 2d 29, 34-35 (D.D.C. 2004), <u>appeal dismissed</u>, No. 04-5195, 2004 WL 1701043 (D.C. Cir. July 29, 2004), the Court held that Newdow's alleged injury of being "forced to confront religious dogma he finds offensive" was not a concrete and particularized injury because it consisted merely of emotional harm that has been rejected as a basis for standing under the principles articulated in <u>Valley Forge</u>.

The D.C. Circuit also has held that injured feelings alone do not constitute Article III injury. In <u>Kurtz v. Baker</u>, 829 F.2d 1133, 1141 (D.C. Cir. 1987), the Court of Appeals determined that a secular humanist lacked standing to challenge his exclusion from the U.S. House and Senate guest chaplains program. In rejecting plaintiff's theory that the exclusion injured him by stigmatizing secular humanists and atheists, the court noted that "allegations of stigmatic injury will not suffice to link a plaintiff personally to the conduct he challenges unless . . . the plaintiff personally has been denied a benefit." <u>Accord</u> <u>U.S. Catholic Conference v. Baker</u>, 885 F.2d 1020, 1024-25 (2d Cir. 1989) (pro-choice clergy lacked standing to challenge Catholic Church's tax-exempt status based on alleged stigma arising from "'government favoritism to a different theology'"); <u>Americans United for Separation of Church and State v. Reagan</u>, 786 F.2d 194, 201 (3d Cir. 1986) (religious groups lacked standing to challenge adoption of diplomatic relations with the Vatican based on suggestion that such relations would cast their religious views in an adverse light in the religious market). Plaintiffs' generalized feelings of being "outsiders" do not give them standing to challenge inaugural prayers.

Moreover, none of the plaintiffs here has a "personal connection" to the presidential inauguration sufficient to confer standing. See Newdow II, 391 F. Supp. 2d 95, 103-04 (D.D.C. 2005) (discussing at length the "personal connection" requirement to establish standing in Establishment Clause cases). Various plaintiffs allege that they will attend the inauguration, watch the inauguration on the National Mall, watch the inauguration on television, or not watch the inauguration at all. See Compl. ¶¶ 8-36. But as Judge Bates noted in Newdow II, none of these circumstances establishes the kind of personal connection sufficient to confer standing:

> Here, Newdow lacks any of the indicia of a personal connection found in other prayer or public-display cases. Certainly the Presidential Inauguration is a national event, but it is only held once every four years. In order to come into contact with the allegedly offensive prayers, Newdow must either watch it on television or make a special trip to Washington to observe the prayers in person. He can also avoid the prayers by not watching the television, or by not making the trip to Washington. But, under either scenario, he does not have the necessary personal connection to establish standing. Newdow does not come into regular contact with the inaugural prayers, nor is he forced to change his typical routine to avoid them. There is no evidence that he is a frequent or regular attendee or invitee at Presidential Inaugurations. Hence, without a personal connection to the inauguration that would make his injuries particularized and concrete, Newdow's alleged injuries — general offense and outsider status — are akin to the psychological injuries occurring from the observation of offensive conduct that the Supreme Court in Valley Forge deemed insufficient to establish an injury-in-fact.

Newdow II, 391 F. Supp. 2d at 104 (emphasis added) (internal citation omitted); see also Newdow v. Eagen, 309 F. Supp. 2d at 35 (no personal connection to Senate prayer when making a one-time special trip to observe it). Plaintiffs' anticipated one-time exposure to clergy prayer and the utterance of the phrase "so help me God" at the inauguration (whether viewed in person, on the National Mall, or on television) simply does not qualify as a particularized and concrete injury sufficient to confer standing.

Tellingly, we do not even know which of the individual plaintiffs will allegedly be "injured," much less how they will be injured, as none of the approximately 30 individual plaintiffs has alleged

any specific injury as to him or herself.  In any event, "'where large numbers of Americans suffer alike, the political process, rather than the judicial process, may provide the more appropriate remedy for the widely shared grievance.'"  Newdow II, 355 F. Supp. 2d at 277 (quoting FEC v. Atkins, 524 U.S. 11, 23 (1998)); see also Valley Forge, 454 U.S. at 475 ("'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches" are inappropriate for judicial determination (quoting Warth v. Seldin, 422 U.S. 490, 499-500 (1975)); United States v. Richardson, 418 U.S. 166, 176-77 (Article III requires a plaintiff to show that he or she is "in danger of suffering [a] particular concrete injury" that is not "undifferentiated and common to all members of the public") (internal quotation marks omitted).[10]

None of these precedents was disturbed by In re Navy Chaplaincy, 534 F.3d 756 (D.C. Cir. 2008), which plaintiffs cite in a footnote to assert that a plaintiff has standing to bring an Establishment Clause claim whenever they observe, read, or hear a government communication of "a religious message through religious words or religious symbols."  Pl. Mem. at 5 n.9 (Dkt. No. 4

---

[10] Plaintiffs also assert that various "unnamed children" will be injured by the challenged conduct.  See Compl. ¶¶ 36, 62, 96, 97, 124, 133; see also Pl. Mem. at 12 (Dkt. 4 at 21).  But plaintiffs' attempt to use unidentified "impressionable young children" who are allegedly in their "formative years" (Compl. ¶¶ 62, 97) — whoever they may be — to obtain the standing that the adult plaintiffs lack cannot salvage plaintiffs' motion.  Plaintiffs do not allege any injury to their children different from the "injuries" that plaintiffs allege will accrue to the children's parents.  And to the extent plaintiffs allege that the challenged conduct "amount[s] to the coercive imposition of religious dogma specifically denounced by the Supreme Court," plaintiffs properly concede that all of the cases they cite for this proposition involve public schools.  Compl. ¶ 97.  As the Supreme Court has observed, however, "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools."  Lee v. Weismann, 505 U.S. 577, 592 (1992) (citing cases); see also id. at 590 (Establishment Clause "concerns have particular application in the case of school officials); Part II.A.1.b, infra.  No such concerns are present here any more so than when children are present for the opening prayer at the beginning of a session of Congress.

at 14 n.9).  To the contrary, in <u>Navy Chaplaincy</u> the D.C. Circuit expressly rejected the plaintiffs'

claim of injury from "being subjected to [a] 'message' of religious preference conveyed" by the

government's actions, reiterating that "mere personal offense to government action does not give rise

to standing to sue." <u>In re Navy Chaplaincy</u>, 534 F.3d at 763 (citations omitted).  The court stressed

at length that to accord standing to anyone who becomes aware of or is offended by an allegedly

unconstitutional "message" would "eviscerate well-settled standing limitations." <u>Id.</u> at 764.  As

explained above, plaintiffs' allegations of psychological harm fail to meet these established standing

requirements.

Finally, none of the organizational plaintiffs (such as the American Humanist Association

or the Freedom From Religion Foundation) alleges any injury at all, or at least no "injury" separate

and apart from that alleged by the individual plaintiffs.  The Supreme Court has made clear that "an

organization's abstract concern with a subject that could be affected by an adjudication does not

substitute for the concrete injury required by Art. III." <u>Simon v. Eastern Ky. Welfare Rights Org.</u>,

426 U.S. 26, 40 (1976).  Thus, an organization "must meet the general standing requirements applied

to individuals." <u>Nat'l Taxpayers Union v. U.S.</u>, 68 F.3d 1428, 1433 (D.C. Cir. 1995).  For the

reasons set forth above, none of the allegations of the Complaint meets these general standing

requirements.  And for these same reasons, none of the plaintiff organizations has standing as a

representative of its members, as none of its members has standing to sue in his or her own right.

<u>See</u> <u>id.</u> at 1435.

**B.      Plaintiffs Lack Standing Because Their Claims for Relief Are Not Redressable.**

Plaintiffs also lack standing because they cannot prove that the injury they allege can be

"'redressed by a favorable decision.'" Lujan, 504 U.S. at 560 (internal citations omitted).

###### 1.    Plaintiffs' Alleged "Inaugural Prayer" Injury Is Not Redressable.

In Newdow II, Newdow sued many of the same defendants as those here.  By Newdow's own concession, however, none of the defendants named in this case can provide relief as to inaugural prayers.  In Newdow II, Mr. Newdow contended, and Judge Bates concurred, that although Newdow "brought this action against several defendants . . . the President himself has the exclusive decision-making authority as to whether there will be religious prayer at an inauguration."  Newdow v. Bush, 391 F. Supp. 2d 104 (emphasis added).

Plaintiffs' failure to name as a defendant the one individual with exclusive decision-making authority as to the format of the Presidential Inauguration (President-Elect Obama)[11] is not surprising, as Judge Bates held that the Court was without authority to grant an injunction or declaratory relief against the President of the United States.  Newdow II, 391 F. Supp. 2d at 106.  Accordingly, adding the President-Elect as a defendant would be futile, because district courts do not have the authority to issue equitable relief against the President-Elect.  See Franklin v. Massachusetts, 505 U.S. 788, 802-03 (1992) (plurality opinion) ("[I]n general, 'this court has no jurisdiction of a bill to enjoin the President in performance of his official duties.'" (quoting Mississippi v. Johnson, 71 U.S. 475, 501 (1866)); Swan v. Clinton, 100 F.3d 973, 978 (D.C. Cir. 1996) (noting that the Supreme Court has "issued a stern admonition that injunctive relief against the President personally is an extraordinary measure"); Newdow II, 391 F. Supp. 2d at 104-07.[12]

---

[11] Judge Bates rejected the suggestion that the Court could enjoin the Presidential Inaugural Committee instead of the President.  Newdow II, 391 F. Supp. 2d at 104-05.

[12] This Court need not address the precise question of whether these separation-of-powers concerns apply with equal force to the President-Elect (as opposed to the President), since plaintiffs

Plaintiffs face the same justiciability problems with Senator Feinstein and the JCCIC, as the same principles outlined in Newdow II prevent the Court from enjoining these defendants for their roles in the inaugural program. See Mississippi v. Johnson, 71 U.S. at 500 ("The Congress is the legislative department of the government; the President is the executive department. Neither can be restrained in its action by the judicial department."); Franklin v. Massachusetts, 505 U.S. 788, 829 (1992) (Scalia, J., concurring) (noting that a court may no more "direct . . . the Congress to perform particular legislative duties" than it may order the President to take specific official acts); Hearst v. Black, 87 F.2d 68, 72 (D.C. Cir. 1936) (refusing to enjoin acts taken in performance of Congress's discretion). In Newdow I the Magistrate Judge recognized this principle and concluded that the court lacked jurisdiction to grant injunctive or declaratory relief against the Congress (or the President) regarding what may be said by the President or his speakers at a presidential inauguration.[13]

An injunction against either Major General Richard J. Rowe, Jr. or the Armed Forces Inaugural Committee also would fail to redress plaintiffs' alleged injury in this case. Neither Major General Rowe nor AFIC has any control over the clergy who provide the prayers, nor do they provide any support in particular for the clergy to deliver prayers during the inauguration. See Groppel Decl. ¶¶ 6-9. Moreover, they do not have any role in the administration of the oath of

---

have not named President-Elect Obama as a defendant. Of course, to the extent that separation-of-powers concerns are any less applicable to the President-Elect, that would be because he is still a private citizen and, as such, is not a state actor subject to the Establishment Clause.

[13] See December 28, 2001 Findings and Recommendations at 4-7 (finding no jurisdiction to enjoin the President); March 26, 2002 Findings and Recommendations at 4-8 (denying Newdow's Motion to Amend Complaint to add Senator McConnell, as chairperson of the JCCIC, because courts cannot enjoin Congress). Although the Magistrate Judge phrased his decision in terms of jurisdiction, he also correctly phrased it in terms of standing as well. To say that a court lacks jurisdiction to enjoin the President or Congress in a particular respect is also to say that a party's request for such relief is not "redressable." Lujan, 504 U.S. at 560.

office.  See Groppel Decl. ¶ 10.  Accordingly, an injunction against either of these defendants would not prevent recitation of prayer that the President-Elect desires at his inauguration.

### 2.  Plaintiffs' Alleged "Oath of Office" Injury Is Not Redressable.

An injunction against the Chief Justice would fail to redress plaintiffs' alleged injury regarding the administration of the oath of office.  Plaintiffs concede that President-Elect Obama has the right to affirm his oath with the concluding phrase "so help me God" when he is sworn in to office.  See Compl. ¶ 107.  Before the commencement of this litigation, the Chief Justice instructed his Counselor to contact the President-Elect's transition team to ascertain the manner in which the President-Elect would like the presidential oath to be administered, specifically soliciting the President-Elect's wishes regarding the inclusion of the traditional phrase "so help me God."  See Declaration of Jeffrey P. Minear (attached hereto as Ex. 8).  President-Elect Obama has advised the Chief Justice that he wishes, upon taking his oath, to conclude his swearing-in with the affirmation, "so help me God."  Id.  And the Chief Justice intends to administer the oath of office to the President-Elect in accordance with the President-Elect's wishes regarding the phrase, "so help me God."  Id.  Accordingly, an injunction against the Chief Justice serves only to interfere with the President-Elect's desires regarding his inaugural ceremonies.

Such an injunction against the Chief Justice raises a separate redressability issue.  As plaintiffs' Complaint and motion make clear, nothing in the Constitution or the laws of the United States requires the Chief Justice to administer the presidential oath of office.[14]  Thus, if this Court

---

[14] For example, President Washington's first oath was administered by Robert Livingston, Chancellor of the State of New York; President Washington's second oath was administered by William Cushing, Associate Justice of the Supreme Court; President Tyler's oath was administered by William Cranch, Chief Justice of the U.S. Circuit Court; President Arthur's first oath was administered by John R. Brady, Justice of the New York State Supreme Court; President Theodore

were to issue an injunction against the Chief Justice (the relief plaintiffs have requested in their motion and proposed order), the President-Elect could merely exercise his prerogative to invite someone else to administer an oath that is followed by the phrase "so help me God." Thus, once again, the only person capable of providing the relief that plaintiffs seek is the President-Elect himself, as it is his decision whether to include the phrase "so help me God" in his oath and can select whomever he wishes to administer that oath (and whomever he selects would not be bound by a specific injunction against the Chief Justice). But plaintiffs have not named the President-Elect as a defendant, and any attempt to do so would be futile, as any such relief against the President-Elect would be improper for the reasons already stated. See Newdow II, 391 F. Supp. 2d at 106.

## II. PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION.

Even if the Court were to find that plaintiffs have standing, they are not entitled to injunctive relief. A grant of preliminary injunctive relief under Rule 65(a) "is considered an extraordinary remedy in this circuit." Sociedad Anonima Vina Santa Rita v. U.S. Dep't of Treasury, 193 F. Supp. 2d 6, 13 (D.D.C. 2001) (citations omitted). Because preliminary injunctive relief is "a drastic and unusual judicial measure," see Marine Transp. Lines v. Lehman, 623 F. Supp. 330, 334 (D.D.C. 1985), the power to issue such an injunction should be 'sparingly exercised,'" see Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citations omitted).

To prevail in a request for a preliminary injunction, a plaintiff bears the burden of

---

Roosevelt's first oath was administered by John R. Hazel, U.S. District Judge for the Western District of New York; President Coolidge's first oath was administered by John C. Coolidge, his father, a Notary Public; and President Johnson's first oath was administered by Sarah T. Hughes, U.S. District Judge for the Northern District of Texas. See The Architect of the Capitol, Presidential Oaths of Office, http://www.aoc.gov/aoc/inaugural/pres_list.cfm?renderforpring-1 (last visited Jan. 6, 2008).

demonstrating that: (1) there is a substantial likelihood of success on the merits; (2) failure to grant the injunction would result in irreparable injury; (3) the requested injunction would not substantially injure other interested parties; and (4) the public interest would be furthered by the injunction. <u>Katz v. Georgetown Univ.</u>, 246 F.3d 685, 687-88 (D.C. Cir. 2001) (citation omitted); <u>Nat'l Head Start Ass'n v. Dep't of Health & Human Servs.</u>, 297 F. Supp. 2d 242, 246-47 (D.D.C. 2004). Although these factors are balanced against each other, "it is especially important for the movant to demonstrate a likelihood of success on the merits." <u>Nat'l Head Start Ass'n</u>, 297 F. Supp. 2d at 247. Further, in a case such as this, where "the injunction sought would alter, rather than preserve, the status quo," the plaintiff must meet an even higher standard: he must demonstrate "a clear entitlement to relief" or that "extreme or very serious damage will result if the injunction does not issue." <u>Qualls v. Rumsfeld</u>, 357 F. Supp. 2d 274, 279 (D.D.C. 2005). As demonstrated below, Plaintiffs fail to carry that burden here.

**A.      Plaintiffs Fail to Demonstrate a Substantial Likelihood of Success on the Merits.**

**1.      Plaintiffs' Establishment Clause Challenge to Inaugural Prayer Is Foreclosed by the Supreme Court's decision in <u>Marsh v. Chambers</u> and this Court's decision in <u>Newdow II</u>.**

In <u>Marsh v. Chambers</u>, 463 U.S. 783 (1983), the Supreme Court rejected an Establishment Clause challenge to the Nebraska state legislature's practice of beginning each of its sessions with a prayer offered by a chaplain paid out of public funds, observing that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." <u>Id.</u> at 786. As demonstrated below, the tradition of inaugural prayer is just as "deeply embedded" in our Nation's history and is closely analogous to such opening legislative prayers; there is no persuasive reason to distinguish it from the legislative prayers upheld in <u>Marsh</u>.

Indeed, in weighing a nearly identical challenge to inaugural prayer four years ago, Judge Bates applied <u>Marsh</u> to conclude that Plaintiff Newdow was unlikely to succeed on the merits. <u>See</u> <u>Newdow II</u>, 355 F. Supp. 2d at 289.

        a.        **<u>Marsh</u> Forecloses Plaintiffs' Challenge To Inaugural Prayer.**

        (1)        **Our Nation's Tradition of Legislative and Inaugural Prayer Dates Back to the Founding.**

As the Court observed in <u>Marsh</u>, "From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom." <u>Id.</u> at 786. Thus, the Court explained, "the Continental Congress, beginning in 1774, adopted the traditional procedure of opening its sessions with a prayer offered by a paid chaplain." <u>Id.</u> at 787. Later, "the First Congress, as one of its early items of business, adopted the policy of selecting a chaplain to open each session with prayer," <u>id.</u> at 787-88, and a "statute providing for the payment of these chaplains was enacted into law on Sept. 22, 1789." <u>Id.</u> at 788 (citation omitted). Just three days later, the Court noted, "final agreement was reached on the language of the Bill of Rights." <u>Id.</u> (citation omitted).

In view of this history, the Supreme Court concluded that "[c]learly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment." <u>Id.</u> at 788 (footnote omitted). The Court explained: "It can hardly be thought that in the same week Members of the First Congress voted to appoint and to pay a Chaplain for each House and also voted to approve the draft of the First Amendment for submission to the States, they intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable." <u>Id.</u> at 790; <u>see also</u> <u>id.</u> at 788 (noting that the practice of legislative prayer

begun by the First Congress has "continued without interruption ever since that early session of Congress"). <u>Marsh</u> thus established that "[t]o invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment of religion,' but a tolerable acknowledgment of beliefs widely held among the people of this country." <u>Id.</u> at 792.

In upholding the legislative prayers at issue in <u>Marsh</u>, the Supreme Court did not draw any distinction between legislative prayer and prayer (and other references to God) by the Executive or Judicial Branches. To the contrary, the Court phrased its holding and rationale in broad terms that could equally apply to all three branches. <u>See id.</u> at 786 (noting that "[t]he opening of sessions of legislative <u>and other deliberative public bodies</u> with prayer is deeply embedded in the history and tradition of this country") (emphasis added); <u>id.</u> at 792 (noting that "[t]o invoke Divine guidance on a <u>public body</u> entrusted with making the laws" is not an establishment of religion) (emphasis added).

The Supreme Court also supported its holding in <u>Marsh</u> by referring to historical examples of ceremonial references to God by the Judicial and Executive Branches. For example, the Court noted that "[i]n the very courtrooms in which the United States District Judge and later three Circuit Judges heard and decided this case, the proceedings opened with an announcement that concluded, 'God save the United States and this Honorable Court,'" and that "[t]he same invocation occurs at all sessions of this Court," <u>id.</u> at 786 — a practice that originated in the days of Chief Justice Marshall, <u>see Engel v. Vitale</u>, 370 U.S. 421, 446 (1962) (Stewart, J., dissenting). Likewise, on the same day that final agreement was reached on the language of the Bill of Rights, "the House [of Representatives] resolved to request <u>the President</u> to set aside a Thanksgiving Day to acknowledge 'the many signal favors of Almighty God.'" 463 U.S. at 790 n.9 (emphasis added). These references demonstrate that the Supreme Court in <u>Marsh</u> did not intend to draw any distinctions between the

legislative, judicial, and executive branches with respect to the permissibility of ceremonial prayer and references to God.

Plaintiffs attempt to distinguish clergy-led inaugural prayers from the chaplain-led legislative prayers approved in <u>Marsh</u> on the theory that inaugural prayers do not have the same "unambiguous and unbroken history of more than 200 years" to justify them, asserting that the current practice of inviting clergy to say an Inaugural prayer originated in 1937, with the second Inauguration of President Franklin D. Roosevelt. Pl. Mem. at 15 (Dkt. No. 4 at 24); <u>see</u> Compl. ¶¶ 90-91. Plaintiffs' reading of the historical record is fundamentally mistaken.

Inaugural prayer, like legislative prayer, originated at the Founding and has continued to this day. Shortly after President Washington was sworn in in 1789, in accordance with resolutions passed by the Senate and House of Representatives, <u>see</u> S. Epstein, <u>Rethinking the Constitutionality of Ceremonial Deism</u>, 96 Colum. L. Rev. 2083, 2106 (1996) (quoting 1 Joseph Gales, <u>The Debates and Proceedings in the Congress of the United States</u> 25 (1834)), he and members of the Senate and House walked to St. Paul's Chapel, where Bishop Samuel Provost, Chaplain of the Senate, read prayers from the Book of Common Prayer. <u>See id.</u> at 2107 (footnote omitted). As with legislative prayer, it is simply inconceivable that the members of the First Congress, who drafted the Establishment Clause, thought it to prohibit presidential inaugural prayer, having also passed resolutions creating the very practice. <u>See Marsh</u>, 463 U.S. at 790 (the Supreme Court has recognized that actions of the First Congress are "contemporaneous and weighty evidence" of the Constitution's "true meaning") (citation omitted); <u>see also</u> <u>United States v. Curtiss-Wright Export Corp.</u>, 299 U.S. 304, 328 (1936) (construction "placed upon the Constitution . . . by the men who were contemporary with its formation" is "almost conclusive") (citation omitted).

From 1793 to 1937, the Senate chaplain delivered the inaugural prayers in the Senate chambers as part of the administration of the oath of office to the Vice-President. See Epstein, 96 Colum. L. Rev. at 2174 n.137. See also M. Medhurst, "God Bless the President": The Rhetoric of Inaugural Prayer 76 (1980) (unpublished Ph.D. dissertation) (attached hereto as Ex. 9) (noting that the Inauguration of the Vice-President was held separately, and before, the Inauguration of the President during those years so the Vice-President could "act in his role as President of the Senate and thus . . . preside over the Senate on inauguration day"). Since 1937, the Vice President-Elect has taken his oath of office during the same Inauguration ceremony as the President-Elect. See Medhurst, supra, at 76-77.

In addition to prayer by clergy, the longstanding practice of inaugural prayer also includes prayer by Presidents themselves. George Washington, after swearing his oath of office on a Bible, offered the following prayer in his first inaugural address: "It would be peculiarly improper to omit in this first official act my fervent supplications to that Almighty Being who rules over the universe, who presides in the councils of nations, and whose providential aids can supply every human defect, that His benediction may consecrate to the liberties and happiness of the people of the United States a Government instituted by themselves for these essential purposes." Inaugural Addresses of the Presidents of the United States, S. Doc. 101-10, p. 2 (1989) (attached hereto as Ex. 10). Thomas Jefferson offered the following prayer in his first inaugural address: "[M]ay that Infinite Power which rules the destinies of the universe lead our councils to what is best, and give them a favorable issue for your peace and prosperity." Id. at 17. Likewise, James Madison, who was the principal drafter of the Bill of Rights, see Everson, 330 U.S. at 13; id. at 523 (Jackson, J., dissenting), offered a similar prayer in his first inaugural address, where he invoked "the guardianship and guidance of

that Almighty Being whose power regulates the destiny of nations, whose blessings have been so conspicuously dispensed to this rising Republic, and to whom we are bound to address our devout gratitude for the past, as well as our fervent supplications and best hopes for the future." Inaugural Addresses of the Presidents of the United States, supra, at 28. Thus, even if there were no evidence of inaugural prayer by clergy, the fact that Presidents themselves have said such prayers since our Nation's earliest days supports the constitutionality of inviting clergy to recite prayer in their stead. If it is constitutional for the President to say a prayer at his inauguration, as Presidents Washington, Jefferson, Madison and others have done — and which plaintiffs do not appear to dispute — it is illogical conclude to that the President may not request a clergy member to say a prayer on his behalf.

In sum, as Judge Bates recognized in Newdow II, to prevail on the merits, plaintiffs would have to overcome the burden of demonstrating that "a House and Senate resolution at the first inauguration requiring a clergy-led inaugural prayer at a church; a practice of clergy-led inaugural prayer inside the Capitol from 1793 to 1933; a practice of clergy-led inaugural prayer outside the Capitol from 1937 to 2001; and frequent mentions of God, benedictions, and at least one prayer in the Presidential addresses themselves, taken together, do not establish a tradition of inaugural prayer that is sufficiently 'embedded in the history and tradition of this country' to fall within . . . Marsh." 355 F. Supp. 2d at 288. Once again, Plaintiffs fail to meet this burden.

### (2) Inaugural Prayer Cannot Reasonably Be Understood To Proselytize.

Marsh and Newdow II also refute Plaintiffs' contention that clergy-led inaugural prayers violate the Establishment Clause to the extent that they might incorporate monotheistic terminology

or beliefs.  See Pl. Mem. at 11-13; Compl. ¶¶ 90-95.  In approving legislative prayer in Marsh, the Supreme Court rejected the argument that the Nebraska legislature had violated the Establishment Clause by selecting a Presbyterian chaplain whose prayers were in the "Judeo-Christian tradition," declaring: "We cannot, any more than Members of the Congresses of this century, perceive any suggestion that choosing a clergy man of one denomination advances the beliefs of a particular church."  463 U.S. at 793.  The Marsh Court stressed that "[t]he content of [otherwise permissible ceremonial] prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief."  Id. at 794-95; see also Turner v. City Council, 534 F.3d 352, 356 (4th Cir. 2008) ("So long as the prayer is not used to advance a particular religion or to disparage another faith or belief, courts ought not to 'parse the content of a particular prayer.'") (quoting Marsh, 463 U.S. at 795).

For the same reasons, Plaintiffs' request for an injunction barring "the clergy-led offering of an invocation, a benediction, or any other religious activity" at the inauguration ceremony must be rejected.  Pl. Proposed Order at 2; see also Compl. ¶¶ IV, V (requesting injunction forbidding "overtly Christian religious acts," or, indeed, "any religious acts" whatsoever).[15]  As Marsh recognized, where a prayer constitutionally may be said in connection with an official government ceremony, the speaker must necessarily be allowed some leeway to pray within his or her own faith.  See Marsh, 465 U.S. at 791-92 (approving practice of legislative prayer even though the prayers had

---

[15] Even if the Court were to examine the content of previous inaugural prayers, including Rev. Graham's January 20, 2001 prayer, it could readily conclude that such prayers have contained the same kinds of general entreaties for the well-being of the Nation and the President and Vice President that inaugural prayers have routinely included since the nation's earliest days.  See Epstein, 96 Colum. L. Rev. at 2109 (quoting Inaugural prayers offered by Presidents Washington, Jefferson, and Madison); id. at 2174 n.8 (quoting Inaugural prayers offered by various clergy members).  Such prayers also closely resemble the kinds of legislative prayers that have been offered by paid legislative chaplains since the beginning of the Republic.  See id. at 2174 nn. 117-118.

come from the "Judeo-Christian tradition"); cf. Hobbie v. Unemployment Appeals Comm'n of Florida, 480 U.S. 136, 144-145 (1987) (noting that "the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause") (footnote omitted).  To hold otherwise would effectively require the oxymoron of an entirely religious prayer, or else to require the courts to prescribe the form and content of permissible ceremonial prayers, which the First Amendment would certainly not allow.  See, e.g., Lee v. Weisman, 505 U.S. 577, 588 (1992) (a government may not direct or control content of prayers at public events).

Moreover, as the en banc Tenth Circuit has correctly observed, "all prayers 'advance' a particular faith or belief in one way or another" in the sense that "the act of praying to a supreme power assumes the existence of that supreme power."  Snyder v. Murray City Corp., 159 F.3d 1227, 1234 n.10 (10th Cir. 1998) (en banc).  Nevertheless, Marsh undoubtedly permits reference to "a particular concept of God" — in that case, the Judeo-Christian God — that is not universally shared.  See id.[16]  What Marsh forbids is "proselytization" — that is, "aggressive" efforts to "convert citizens to particular sectarian views."  Id.

Here, there is no basis to conclude that, in the context of the broader inaugural ceremony, the clergy members' 2009 prayers could constitute impermissible proselytizing.  The record before the Court contains nothing more than snippets of various prayers delivered at previous inaugurations, see Compl. App. B, and as in Newdow II, the sole basis of Plaintiffs' objection appears to be that some of those prayers were specifically Christian in nature.  Cf. Newdow II, 355 F. Supp. 2d at 289.  However, even if the 2009 prayers do invoke Judeo-Christian faith, as explained above, Marsh

---

[16] Perhaps FN re content of prayer in Marsh.

establishes that such references are permissible. The Establishment Clause simply does not require the "extirp[ation] from public ceremonies [of] all vestiges of the religious acknowledgments that have been customary at civic affairs in this country since well before the founding of the Republic." Chaudhuri v. Tennessee, 130 F.3d 232, 236-37 (6th Cir. 1997), cert. denied, 523 U.S. 1024 (1998).[17]

### b. **Marsh, Not Lee v. Weisman or Santa Fe, Controls This Case.**

Plaintiffs argue that this case is controlled not by Marsh, but by the Supreme Court's decisions in Lee v. Weisman, 505 U.S. 577 (1992), and Santa Fe Independent School District v. Doe, 530 U.S. 290 (2000), which invalidated coercive, state-controlled prayer in the public school context. Plaintiffs also maintain that those decisions "raise substantial doubts as to whether or not Marsh remains good law." Pl. Mem. at 13. Both contentions are seriously mistaken.

As an initial matter, the coercion analysis applied in Lee and Santa Fe is properly confined to the public school context, and thus has no application here. In Lee, for example, which invalidated a policy permitting prayer at public secondary school graduation ceremonies, the Court emphasized that an objecting student's "attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory" given the significance of the event and the coercive pressures on schoolchildren. 505 U.S. at 586, 588; see also id. at 596 (finding the graduation setting "analogous to the classroom setting, where . . . the risk of compulsion is especially high"). Likewise, in Santa Fe, which struck down a policy permitting student-led prayer at high school football games, the Court stressed the "immense social pressure" that pushes schoolchildren to conform, especially in matters of social convention. 530 U.S. at 311. Thus, as the Tenth Circuit recently recognized,

---

[17] Accord Tanford v. Brand, 104 F.3d 982, 985 (7th Cir. 1997) (upholding, under Marsh, invocation and benediction at public university graduation ceremony).

"[s]ocial pressure to participate in a religious exercise . . . has been treated as an injury in fact only in a public school context," where "the [Supreme] Court has held that such pressure is functionally equivalent to a government requirement, due to the unique impressionability of schoolchildren combined with the strong pressure they feel to attend even non-mandatory school activities." Habecker v. Town of Estes Park, 518 F.3d 1217, 1226 (10th Cir. 2008) (citing Lee and Santa Fe).

Hence, this case clearly is controlled by Marsh, rather than Lee or Santa Fe. First, as noted earlier, that this case falls outside the public school context of Lee and Santa Fe is alone sufficient to render their coercion analysis inapplicable. See Habecker, 518 F.3d at 1226; Lee, 505 U.S. at 596 (noting the "[i]nherent differences between the public school system and a session of a state legislature"). Second, unlike in Lee and Santa Fe, where student attendance and participation were considered coerced, Plaintiffs' viewing of the Inaugural ceremony, whether in person or on television, is utterly voluntary, and they are "free to enter and leave with little comment and for any number of reasons." Lee, 505 U.S. at 597. Despite their assertion that viewing the inauguration would cause them to "confront religious dogma they find offensive," Pl. Mem. at 13 (Dkt. No. 4 at 22), that claim is no different from that of the dissenting legislator in Marsh, who heard the legislative chaplain's prayers at each session. Cf. Marsh 463 U.S. at 784-85. As for the "unnamed children" plaintiffs, whose ages are not specified, and who allegedly "will be watching the inaugural exercises along with their parents," Compl. ¶ 36, defendants have done nothing whatsoever to "pressure" them to view the inauguration or any portion thereof.

Moreover, there is no doubt that, contrary to plaintiffs' suggestion, Marsh remains good law.

The holding and rationale of that case have been repeatedly reaffirmed by the Supreme Court,[18] and

it has been applied by the courts of appeals in a number of different contexts.[19]  What is more, this

Court has twice recognized in cases brought by Mr. Newdow that neither Lee nor Santa Fe purported

to overrule the decision in Marsh.  See Newdow II, 355 F. Supp. 2d at 286 ("Marsh was not

overruled by Lee and Santa Fe."); Newdow v. Eagen, 309 F. Supp. 2d 29, 40-41 (D.D.C. 2004)

(same).  Plaintiffs thus invite this Court to err by declaring that Marsh has been implicitly overruled

— a prerogative that the Supreme Court has explicitly, and repeatedly, reserved for itself.  See Pub.

Citizen v. U.S. Dist. Court, 486 F.3d 1342, 1355 (D.C. Cir. 2007) (citing Agostini v. Felton, 521

U.S. 203, 237 (1997) ("[I]f a precedent of this Court has direct application in a case, yet appears to

rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case

which directly controls, leaving to this Court the prerogative of overruling its own decisions.")).

        **c.**        **Inaugural Prayer Survives the <u>Lemon</u> Test, Were It Applicable.**

In approving ceremonial prayer in Marsh, the Supreme Court did not apply the Lemon[20] test,

---

[18]  See, e.g., Lynch v. Donnelly, 465 U.S. 668, 673-674 (1984) (relying on Marsh in upholding inclusion of a nativity scene in city Christmas display); id. at 1369 (O'Connor, J., concurring) (noting that certain government acknowledgments of religion are permissible because of their "history and ubiquity"); County of Allegheny  v. ACLU, 492 U.S. 573, 625 (1989) (O'Connor, J.) (reiterating support for Marsh's reliance on "history and ubiquity")

[19]  See, e.g., Snyder, 159 F.3d at 1234 (applying Marsh to uphold invocational prayer at city council meetings); Chaudhuri, 130 F.3d at 237 (applying Marsh to uphold prayers at public university functions); Tanford, 104 F.3d at 986 (applying Marsh to uphold prayers at public university commencement); Katcoff v. Marsh, 755 F.2d 223, 232 (2d Cir. 1985) (applying Marsh to uphold practice of military chaplains); Murray v. Buchanan, 720 F.2d 689 (D.C. Cir. 1983) (en banc) (per curiam) (dismissing similar challenge to congressional chaplains "for want of a substantial constitutional question" in light of Marsh).

[20]  Lemon v. Kurtzman, 403 U.S. 602 (1971), stated that a law would survive an Establishment Clause challenge if it (1) has "a secular legislative purpose," (2) has a "principal or primary effect" that "neither advances nor inhibits religion," and (3) does not "foster an excessive government entanglement with religion." Id. at 612-13 (quotation marks and citation omitted).  In

and, accordingly, this Court need not do so here. The practice of Inaugural clergy prayer, however, easily satisfies that test, which, as modified, focuses on whether government action has a secular purpose and secular effects.

First, as Justice O'Connor has explained, "government acknowledgments of religion in public life . . . such as the legislative prayers upheld in Marsh . . . serve the secular purposes of 'solemnizing public occasions, expressing confidence in the future and encouraging the recognition of what is worthy of appreciation in society.' Because they serve such secular purposes and because of their 'history and ubiquity,' such governmental acknowledgments of religion are not understood as conveying an endorsement of particular religious beliefs." County of Allegheny, 492 U.S. at 625 (O'Connor, J., concurring); see also Marsh, 463 U.S. at 792 ("to invoke Divine guidance on a public body . . . is simply a tolerable acknowledgment of beliefs widely held among the people of this country").

The lower courts have reached the same conclusion in upholding the constitutionality of public ceremonial prayers. See Chaudhuri, 130 F.3d at 236 ("[a] prayer may serve to dignify or to memorialize a public occasion"); Tanford, 104 F.3d at 986 (invocation and benediction prayers at university graduation "serve legitimate secular purposes of solemnizing public occasions rather than approving particular religious beliefs."). Consistent with the above cases, inaugural prayer serves the permissible secular purpose of solemnizing the presidential inauguration in a manner that, as explained above, reflects a historical practice rooted in our Nation's first presidential inauguration. Thus, contrary to Plaintiffs' contention, Pl. Mem. 11-12, the purpose of inaugural prayer is not

---

Agostini v. Felton, 521 U.S. 203 (1997), the Court refined the "Lemon test" to treat the "excessive entanglement" inquiry as "an aspect of the inquiry into a statute's effect." Id. at 222-223.

impermissibly religious.

Second, the primary effect of inaugural prayer is neither to promote nor to advance religion. In cases involving ceremonial government acknowledgments of religion, the "primary effects" prong of the <u>Lemon</u> test turns on the perceptions of an objective, reasonable observer, not on the reaction of "isolated nonadherents," or whether "<u>some</u> people may be offended," or even "whether <u>some</u> reasonable person <u>might</u> think [the government] endorses religion." <u>Capitol Square Review & Advisory Bd. v. Pinette</u>, 515 U.S. 753, 779-80 (1995) (O'Connor, J., concurring). That objective observer is charged with an awareness of our "unbroken history" (<u>Lynch</u>, 465 U.S. at 674) of similar references to the Nation's religious heritage in, for example, the Declaration of Independence ("Creator"), the National Anthem ("God"), and on our coins ("In God we trust"). <u>See</u> <u>McCreary County v. ACLU</u>, 545 U.S. 844, 866 (2005) (rejecting standard of "an absentminded objective observer" for "one presumed to be familiar with the history of the government's actions and competent to learn what history has to show"). That objective observer is likewise charged with an understanding of the role of inaugural prayer "in our Nation's cultural landscape," <u>see</u> <u>Elk Grove</u>, 542 U.S. at 35, 38 (O'Connor, J., concurring), to solemnize a ceremony in a manner tracing back to the earliest days of our Nation. Viewed in this context, inaugural prayer involves no greater appearance of endorsement of religion than any of the other ceremonial references to God that are ubiquitous in our nation's history and culture.[21] Thus, even if it applied the <u>Lemon</u> test, the Court

_____

[21] The Supreme Court has catalogued those other permissible religious references in a number of different opinions, including <u>Marsh</u>, 463 U.S. at 786-90; <u>Lynch v. Donnelly</u>, 465 U.S. at 675-77; and <u>Zorach v. Clauson</u>, 343 U.S. 306, 312-13 (1952). Those references include, among others, the practice of opening court sessions with "God save the United States and this honorable Court," the federal statutes making Thanksgiving and Christmas paid holidays for federal employees, <u>see</u> <u>Lynch</u>, 465 U.S. at 676; and the statute that directs the President to declare a National Day of Prayer each year, <u>see</u> <u>id.</u> at 677.

should reject Plaintiffs' challenge to inaugural prayer.

2. **Plaintiffs' Establishment Clause Challenge to Concluding the Presidential Oath with the Traditional Phrase "So Help Me God" Is Meritless.**

Plaintiffs next claim that, although the First Amendment protects the President-Elect's right to affirm his oath of office with the words "so help me God," it forbids the Chief Justice from prompting him to utter the same words, at the President-Elect's request, after administering the oath. This, Plaintiffs contend, would amount to an "alteration" of the text of the oath in violation of the Establishment Clause.  Pl. Mem. at 1 (Dkt. No. 4 at 10); Compl. ¶¶ 99-125.  There are three independently sufficient reasons to reject this meritless claim.

First, Plaintiffs' principal support for this claim is a dubious reading of the historical record that should be rejected.  Plaintiffs assert that none of the first twenty Presidents is known to have said "so help me God" after taking the oath, Pl. Mem. at 2 (Dkt. No. 4 at 11); that the oath was so affirmed only intermittently between 1881 and 1933, Compl. ¶¶ 104-06; and that it was not until the 1930s that the Chief Justice began adding the words after the oath, Pl. Mem. at 3 (Dkt. No. 4 at 12). To the contrary, however, the addition of the phrase has long been traced to President George Washington's first inauguration.  See McCreary, 545 U.S. 844, 886 (2005) (Scalia, J., dissenting) ("George Washington added to the form of Presidential oath prescribed by Art. II, § 1, cl. 8, of the

---

References to God also are prominent in the National Anthem, see Engel v. Vitale, 370 U.S. 421, 449 & n.5 (1962) (Stewart, J., dissenting); the Gettysburg Address, see Sherman v. Community Consol. Sch. Dist. No. 21, 980 F.2d 437, 446 (7th Cir. 1992); the Declaration of Independence, see id., the Constitution itself, see U.S. Const. Art. VII (referring to the "Year of our Lord"); and the Nation's currency and coins, see Gaylor v. United States, 74 F.3d 214, 216-18 (10th Cir. 1996) (rejecting Establishment Clause challenge to use of the national motto, "In God we trust," and its reproduction on currency and coins).

Constitution, the concluding words 'so help me God.'") (citing Blomquist, <u>The Presidential Oath, the American National Interest and a Call for Presiprudence</u>, 73 UMKC L. Rev. 1, 34 (2004)); <u>Elk Grove</u>, 542 U.S. at 26-27 (Rehnquist, C.J., concurring) (noting that Washington "repeated the oath, adding, 'So help me God.'") (citing M. Riccards, <u>A Republic, If You Can Keep It: The Foundation of the American Presidency, 1700-1800</u>, at 73-74 (1987)); Medhurst, <u>supra</u>, at 62 ("As the last word [of the oath] still lingered in the air, Washington added, spontaneously, 'I swear, so help me God.'"). Other sources confirm that every subsequent President has followed Washington's lead, adding the words "so help me God" after the oath of office. 1 <u>Guide to the Presidency</u> 561 (Nelson, ed.) (2008); Blomquist, <u>The Presidential Oath</u>, 73 UMKC L. Rev. at 34. Accordingly, the solemnization of the presidential oath with the words "so help me God," just like the practices of legislative prayer and inaugural prayer, is "deeply embedded in the history and tradition of this country" and, as already explained, is fully consistent with the Establishment Clause. See <u>Marsh</u>, 463 U.S. at 786; <u>see also</u> Part II.A.1, <u>supra</u>. (It is also, at most, a form of inaugural prayer that constitutionally follows <u>a fortiori</u> from the tradition discussed above.)

Second, the First Congress, in addition to creating the practices of legislative prayer and inaugural prayer, also prescribed the following oath for federal judges when it passed the Judiciary Act of 1789:

> I, A. B., do solemnly swear or affirm, that I will administer justice without respect to persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties incumbent on me . . . according to the best of my abilities and understanding, agreeably to the constitution, and laws of the United States. <u>So help me God.</u>

Judiciary Act of 1789, ch. 20, § 8, 1 Stat. 73, 76 (Sept. 24, 1789) (emphasis added) (codified as amended at 28 U.S.C. § 453). This oath remains nearly unchanged from its original form and,

notably, still contains the phrase "So help me God." 28 U.S.C. § 453.[22]  Again, as with legislative

and inaugural prayer, it would defy reason to conclude that the members of the First Congress, who

drafted the Establishment Clause, thought it to be violated by appending the words "so help me God"

to the presidential oath, when they included precisely those words in the judicial oath.  See Marsh,

463 U.S. at 790 (actions of the First Congress are "contemporaneous and weighty evidence" of the

Constitution's "true meaning") (citation omitted); Curtiss-Wright Export Corp., 299 U.S. at 328

(construction "placed upon the Constitution . . . by the men who were contemporary with its

formation" is "almost conclusive").  To so conclude would be "to treat the founders of the United

States as unable to understand their handiwork."  Sherman v. Cmty. Consol. Sch. Dist. 21, 980 F.2d

437, 445 (7th Cir. 1992).

Third, in two cases, the Supreme Court has unreservedly described oaths ending with the

words "so help me God" as consistent with the Establishment Clause, and has used them as a

benchmark to measure the constitutionality of other government action.  In Zorach v. Clauson, 343

U.S. 306 (1952), in declining to invalidate a state program allowing students to be released from

public school for religious instruction, the Court cautioned against "press[ing] the concept of

separation of Church and State to . . . extremes" by invalidating "references to the Almighty that run

---

[22] Section 8 of the Judiciary Act was originally codified in Section 712 of the Revised Statutes.  See R.S. § 712 (1874).  It was later reenacted as Section 257 of the Judicial Code of 1911.  See Act of Mar. 3, 1911 ("An Act to codify, revise, and amend the laws relating to the judiciary."), ch. 231, § 257, Pub. L. No. 61-475, 36 Stat. 1087, 1161 (codified at 28 U.S.C. § 372 (1940)).  The same Act repealed Section 712 of the Revised Statutes.  See id. § 297, 36 Stat. 1168.  The oath was recodified to its current location in the United States Code in 1948.  See Act of June 25, 1948 ("An Act to revise, codify, and enact into law title 28 of the United States Code entitled 'Judicial Code and Judiciary.'"), § 453, Pub. L. No. 80-773, 62 Stat. 869, 907 (codified at 28 U.S.C. § 453).  From 1789 until the present day, the only modification to the oath (other than minor punctuation changes) took place in 1990, when the words "according to the best of my abilities and understanding, agreeably to" were stricken and replaced with the word "under."  See Judicial Improvements Act of 1990, § 404, Pub. L. No. 101-650, 104 Stat. 5089, 5124 (Dec. 1, 1990).

through our laws, our public rituals, [and] our ceremonies" such as "'so help me God' in our courtroom oaths." Id. at 313. Similarly, in Abington School District v. Schempp, 374 U.S. 203 (1963), the Court explained, in the course of invalidating laws requiring Bible reading in public schools, that the Establishment Clause does not proscribe the numerous public references to God that appear in historical documents and ceremonial practices, such as oaths ending with "So help me God." 374 U.S. at 213. Were the Establishment Clause construed otherwise, a "fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: 'God save the United States and this Honorable Court,'" Zorach, 343 U.S. at 313, an objection which, if entertained, would reflect not neutrality but "hostility toward religion," Schempp, 374 U.S. at 225 — which itself is constitutionally impermissible.

Although Zorach and Schempp did not involve direct challenges to the recitation of the words "so help me God" after the presidential oath, they are nonetheless controlling precedent on the constitutionality of that practice. "When an opinion issues for the [Supreme] Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." Seminole Tribe of Florida v. Florida, 517 U.S. 44, 67 (1996); cf. United States v. Oakar, 111 F.3d 146, 153 (D.C. Cir. 1997) (noting that "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative") (citation omitted). The Supreme Court's analysis of oaths ending in the words "so help me God" in Zorach and Schempp was an integral part of the rationale of each decision. Specifically, that analysis provided the constitutional baseline for permissible official acknowledgments of religion, against which the practices at issue in Zorach and Schempp were then measured.

For decades, the Court and individual Justices "have grounded [their] decisions in the

oft-repeated understanding," Seminole Tribe, 517 U.S. at 67, that patriotic and ceremonial references to God such as the one in the Pledge of Allegiance ("one Nation under God"), the National Motto ("In God we trust"), our National Anthem ("And this be our motto 'In God is our Trust.'"), formal court cries ("God save the United States and this Honorable Court"), and, of course, public oaths, do not offend the Establishment Clause. As the Seventh Circuit has declared, "If the [Supreme] Court proclaims that a practice is consistent with the establishment clause, we take its assurances seriously. If the Justices are just pulling our leg, let them say so." Sherman, 980 F.2d at 448.

3.     **Plaintiff's "Free Exercise" Claim Under The Religious Freedom Restoration Act Is Without Merit.**

Plaintiffs also argue that they are likely to prevail on the merits because the challenged conduct infringes their rights under the Free Exercise Clause, the Religious Freedom Restoration Act ("RFRA"), and the Due Process Clause. See Pl. Mem. at 17.[23] Judge Bates in Newdow II found that these claims "carry little force." Id. at 290. So, too, should this Court.[24]

Assuming, arguendo, that professed atheists can invoke RFRA, their claims nonetheless lack

---

[23] RFRA provides that a "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the application of the burden to the person "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that . . . interest." Id. § 2000bb. Congress enacted RFRA in response to Employment Division v. Smith, 494 U.S. 872 (1990), "to restor[e] the test set forth in Sherbert v. Verner, 374 U.S. 398, 83 S. Ct. 1790 (1963), as the standard for Free Exercise challenges to laws of general applicability." Henderson v. Kennedy, 253 F.3d 12, 15 (D.C Cir. 2001). Although RFRA has been held unconstitutional as to the States, City of Boerne v. Flores, 521 U.S. 507 (1997), it still applies to the federal government. See, e.g., Holy Land Foundation for Relief & Development v. Ashcroft, 333 F.3d 156, 167 (D.C. Cir. 2003).

[24] Plaintiffs assert without authority that their substantive due process rights "by way of the Establishment Clause" will be violated. Pl. Mem. at 18 (Dkt. No. 4 at 27), and make similar assertions as to their procedural due process and equal protection rights. Id. These novel allegations merely repackage plaintiffs' Establishment Clause claims and should be rejected on that basis.

merit.[25]  First, inasmuch as plaintiffs are not required by law to view or attend the inauguration, they

cannot claim, based on the recitation of inaugural prayers or the affirmation "so help me God," that

they will be forced "to engage in conduct that their religion forbids."  Henderson, 253 F.3d at 16.

Nor have they alleged (much less shown) that they have a religious duty to view or attend the

inauguration, such that the inclusion of prayer, or the phrase "so help me God," "prevents them from

engaging in conduct their religion requires."  Id..  Thus, defendants' conduct will not substantially

burden the exercise of plaintiffs' religion within the meaning of RFRA.  See id.

    Second, plaintiffs fail to state a claim under RFRA or the Free Exercise Clause because

they are challenging what is, in essence, the government's conduct of its own internal operations —

how the President-Elect chooses to memorialize and solemnize his taking the constitutionally-

prescribed oath of office (see U.S. Const., Art. II, § 1).  It is settled law that the Free Exercise Clause

"cannot be understood to require the Government to conduct its own internal affairs in ways that

comport with the religious beliefs of particular citizens."  Bowen v. Roy, 476 U.S. 693, 699-700

(1986).  That Clause "affords an individual protection from certain forms of governmental

compulsion; it does not afford an individual a right to dictate the conduct of the Government's

internal procedures."  Id.  See also Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S.

439, 450-51 (1988) ("incidental effects of government programs, which may make it more difficult

to practice certain religions but which have no tendency to coerce individuals into acting contrary

to their religious beliefs," do not "require government to bring forward a compelling justification for

_____

    [25] The Supreme Court has not decided whether an atheist can sue under the Free Exercise
Clause.  Several lower courts, however, have assumed that atheism is a "form of religion" for
purposes of Title VII of the Civil Rights Act of 1964.  Reed v. Great Lakes Companies, Inc., 330
F.3d 931, 934 (7th Cir. 2003) (noting the case law).

its otherwise lawful actions").

Thus, the clergy prayers and oath of office do not impose a "substantial burden" on plaintiffs' alleged exercise of religion, or, in this case, of "non-religion." Plaintiffs are free to conduct themselves as atheists whether or not clergy prayers or the phrase "so help me God" are uttered on January 20, 2009. Plaintiffs identify no tangible impairment of their rights to profess atheism arising from the challenged conduct.[26] As Judge Kollar-Kotelly has observed, "[a] substantial burden does not arise merely because 'the government refuses to conduct its own affairs in ways that comport with the religious beliefs of particular citizens.'" Alliance for Bio-Integrity v. Shalala, 116 F. Supp. 2d 166, 180 (D.D.C. 2000) (holding that a statement of policy on genetically-modified food did not violate RFRA) (citation omitted).[27]

## B.     Irreparable Harm to Plaintiffs.

Plaintiffs cite Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 303 (D.C. Cir. 2006) for the proposition that, "where a movant alleges a violation of the Establishment Clause, this is sufficient, without more, to satisfy the irreparable harm prong for purposes of the preliminary injunction determination." Pl. Mem. at 5 (Dkt. No. 4 at 14). As the D.C. Circuit subsequently held,

---

[26] See also Branch Ministries v. Rossotti, 211 F.3d 137, 141 (D.C. Cir. 2000) (holding that IRS's revocation of tax-exempt status of a church due to its having engaged in political activity did not violate RFRA; the sole effect of the loss of such status would be decrease the amount of monies available to the church for its religious practices).

[27] In any event, even if plaintiffs could assert a prima facie showing of a "substantial burden" on their "free exercise" rights under RFRA, that burden is outweighed by the government's compelling interest in the inauguration going forward as planned. The "solemnization" of this important occasion is a "compelling" governmental interest. Moreover, there are simply no less restrictive means that would accommodate the directly-conflicting interests – plaintiffs' interest in there being absolutely no clergy prayers or the utterance of the phrase "so help me God" by the Chief Justice, versus the President-Elect's desire that clergy recite prayers on his behalf, and that he be sworn into office using the traditional affirmation "so help me God."

however, that decision "presuppos[es] that a party has standing to allege such a violation." In re Navy Chaplaincy, 534 F.3d at 763 (citing England, 454 F.3d at 303-04 & n.8); see also Part I.A, supra. As plaintiffs lack such standing here, they do not fall within the scope of the holding in England. If plaintiffs cannot satisfy the showing of irreparable injury to satisfy Article III's standing requirement, the Court may not simply presume irreparable harm. And even assuming plaintiffs have valid Establishment Clause interests in this case, those interests would not justify the injunctive relief they seek because the other elements of the preliminary injunction test so overwhelmingly counsel against granting an injunction.

### C. The Requested Injunction Would Substantially Injure Other Interested Parties.

Injunctive relief should not be granted where it would substantially injure other interested parties. See Katz v. Georgetown Univ., 246 F.3d at 687-88. "[E]ven where denial of a preliminary injunction will harm the plaintiff, the injunction should not be issued where it would work a great and potentially irreparable harm to the party enjoined." Dorfmann, 414 F.2d at 1173.

An injunction against clergy prayer at the inauguration would obviously "silence" the speech interests of Revs. Warren and Lowery, which itself raises First Amendment concerns. See Newdow II, 355 F. Supp. 2d at 292 ("An injunction would restrict the Free Exercise interests of the non-governmental clergy members invited to give an invocation or benediction at the Inauguration."). More importantly, an injunction would directly injure the President-Elect's own interests in having a prayer recited on his behalf at his inauguration. See id. at 292-93 ("an injunction would impact the speech and other interests of the President in including prayer as part of a ceremonial event" that is "quite personal to him"). Similarly, an injunction that precludes the Chief Justice from administering the oath of office in a manner consistent with the President-Elect's express wish to

affirm his oath with the phrase "so help me God"[28] would violate the President-Elect's desires regarding his inaugural ceremonies, and raises concerns about interfering with his own First Amendment rights.  And more generally, "the thought of a federal court . . . [in any way] restraining the President[-Elect] from conducting his inauguration ceremony as he sees fit must necessarily give one pause."  Id. at 293.

Moreover, the preliminary injunction that plaintiffs seek would essentially grant them the ultimate relief they seek in this case with respect to the upcoming inauguration.  But a preliminary injunction, standing on its own, should not constitute an adjudication of the merits of a case.  See, e.g., University of Texas v. Camenisch, 451 U.S. 390, 395  (1981) ("[I]t is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits.");  Heckler v. Redbud Hosp. Dist., 473 U.S. 1308, 1313-14 (1985).  To like effect, plaintiffs face a particularly high burden of persuasion here because they seek to change what constitutes "the status quo" — the planned clergy prayer and administration of the oath at the inauguration in accordance with traditions that can be traced to the earliest days of the Republic.  LeBoeuf, Lamb, Greene & MacRae, LLP. v. Abraham, 180 F. Supp.2d 65, 71 (D.D.C. 2001).  These two factors — that plaintiffs seek essentially a final adjudication of this case through the vehicle of a preliminary injunction that, if granted, would upset the long-standing status quo — makes plaintiffs' burden to demonstrate a clear entitlement to preliminary relief that much greater.  It is a burden they have not come close to discharging.

Finally, plaintiffs have unreasonably delayed seeking injunctive relief.  "The 'last-minute nature of an application' or an applicant's 'attempt at manipulation' of the judicial process is grounds

---

[28] See Declaration of Jeffrey P. Minear.

for denial of a stay, in and of itself." Sandoz, Inc. v. Food and Drug Admin., 439 F. Supp. 2d 26, 31 (D.D.C. 2006) (quoting Gomez v. U.S. Dist. Ct. for the N. Dist. of Cal., 503 U.S. 653, 654 (1992) (per curiam)), aff'd, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006); see also National Council of Arab Americans v. City of New York, 331 F. Supp.2d 258, 265-66 (S.D.N.Y. 2004) (applying doctrine of laches to deny plaintiff's motion, noting delay in seeking review of denial of demonstration permit). A "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." Oakland Tribune, Inc. v. Chronicle Pub. Co., 762 F.2d 1374, 1377 (9th Cir. 1985); see also GTE Corp. v. Williams, 731 F.2d 676, 678-79 (10th Cir. 1984).

Mr. Newdow and his co-plaintiffs could have filed this suit well in advance of the scheduled inauguration. Yet they waited until only two weeks before the event itself to seek injunctive relief. In Newdow II, Judge Bates criticized Newdow for waiting until December 21 to seek an injunction. Newdow II, 355 F. Supp. 2d at 292. Here, of course, plaintiffs waited until January 5 to seek injunctive relief, even though the roles of Revs. Warren and Lowery in the inauguration were publicly announced on December 17. See App. D, attached to plaintiffs' Complaint (Dkt. 1-5). The use of the phrase "so help me God," in light of its long-standing historical usage, also could have been easily anticipated. Whether this Court applies the "laches" doctrine or simply assesses plaintiffs' delay as a factor in considering the equities, plaintiffs' timing has been unreasonable, placing defendants and the Court in the awkward posture of responding to and evaluating plaintiffs' claims in a highly-compressed time period.

### D. The Requested Injunction Would Not Serve The Public Interest.

A preliminary injunction would not serve the public interest. See Newdow II, 355 F. Supp. 2d at 293 (outlining the "strong argument that . . . the public interest would best be served by allowing the 2005 Inauguration ceremony to proceed on January 20 as planned"). That interest is best

served by allowing the inaugural ceremony to proceed as planned, and in a manner wholly consistent with the practice of prayer at presidential inaugurations, and the affirmation "so help me God," that stretch back to President Washington's First Inauguration in 1789. There is no reason to "reverse course" and abandon these longstanding and widely-accepted aspects of the inaugural ceremony.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's motion for a preliminary injunction.


Dated: January 8, 2009

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JOHN C. O'QUINN
Deputy Assistant Attorney General
Federal Programs Branch

JAMES J. GILLIGAN
Assistant Director

___/s/ Brad P. Rosenberg_____
BRAD P. ROSENBERG (DC Bar 467513)
ERIC B. BECKENHAUER (Cal. Bar 237526)
Trial Attorneys
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 514-3374
Fax: (202) 616-8460
brad.rosenberg@usdoj.gov

Counsel for the Federal Defendants