# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MICHAEL NEWDOW, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:08-cv-02248-RBW |
| | ) | |
| HON. JOHN ROBERTS, JR., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

## PROPOSED BRIEF *AMICUS CURIAE* OF
## THE AMERICAN CENTER FOR LAW AND JUSTICE
## IN SUPPORT OF THE DEFENDANTS

---

James M. Henderson (#452639)
 *Counsel of Record*
Jay Alan Sekulow*
Stuart J. Roth*
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
(202) 546-8890

*Attorneys for Amicus Curiae*

Shannon Demos Woodruff*
Erik M. Zimmerman*
AMERICAN CENTER FOR LAW & JUSTICE
1000 Regent University Dr.
Virginia Beach, VA 23464
(757) 226-2489

* - Not admitted in this court

The American Center for Law and Justice (ACLJ) is an organization dedicated to the defense of constitutional liberties secured by law. ACLJ attorneys have presented argument in numerous cases before the Supreme Court of the United States, including several cases involving the Establishment Clause. ACLJ attorneys have participated as counsel of record for parties and/or *amicus curiae* in numerous cases before the lower federal courts, including this Court.

*Amicus* has dedicated time and effort to defending and protecting First Amendment freedoms. It is this commitment to the integrity of the United States Constitution and Bill of Rights that compels it to oppose the motion for preliminary injunction. Newdow's strategy to purge all religious observances and references from American public life must not be permitted to move forward.

Newdow's targeting of religious expression in the federal government is particularly ill-considered given the decision of the Supreme Court of the United States in *Marsh v. Chambers*, 463 U.S. 783 (1983). This personal crusade serves no purpose other than to waste judicial resources at a time in our Nation's history when those resources are needed in cases involving real threats to American liberties. Moreover, a strategy like Newdow's will undoubtedly embolden further challenges to other religious expressions in the Capitol, including the several

---

[1] This brief is filed upon Motion to the Court and with the consent of the Plaintiffs. The government and PIC Defendants take no position on the filing of *amicus* briefs in this matter. Attempts were made to contact Defendants Warren and Lowery; however, we have not received any response to date. *Amicus* ACLJ discloses that no counsel for any party in this case authored in whole or in part this brief and that no monetary contribution to the preparation of this brief was received from any person or entity other than *amici curiae*.

religious works of art,[2] and various religious inscriptions in the Capitol Complex,[3] as well as the prayer rooms in House and Senate Office buildings.[4]

The ACLJ urges the Court to deny the motion for a preliminary injunction, and to enter judgment for the Defendants.

## SUMMARY OF ARGUMENT

In his first inaugural address, President Washington proclaimed that "no people can be bound to acknowledge and adore the Invisible Hand which conducts the affairs of men more than those of the United States," because "every step by which they have advanced to the character of an independent nation seems to have been distinguished by some token of providential agency." *Inaugural Addresses of the Presidents of the United States*, S. Doc. No. 10, 101st Cong., 1st Sess. 2 (1989). Thus, the Inauguration of the man who was "first in war, first in peace, and first in the hearts of his countrymen," was blessed with an invocation of Divine Aid by the very Chief Executive. Every subsequent Inaugural has likewise afforded the Chief Executive the opportunity to expressly invoke Divine Aid, or to acknowledge the working of the Divine Hands

[2] For example, in the Rotunda of the Capitol Building are paintings with religious themes, such as The Apotheoisis of Washington, depicting the ascent of George Washington into Heaven, and the Baptism of Pocahontas, portraying Pocahontas being baptized by an Anglican minister.
[3] For example, a wall in the Cox Corridor of the Capitol is inscribed with a line from Katherine Lee Bates' Hymn, America the Beautiful, "America! God shed his grace on thee, and crown thy good with brotherhood from sea to shining sea." The National Motto, In God We Trust," is inscribed on a wall in the House Chamber. In the prayer room of the House Chamber, two distinctly religious statements are inscribed: 1) "Annuit coeptus," which means "God has favored our undertakings;" 2) "Preserve me, O God - for in thee do I put my trust," *Psalm* 16:1.
[4] Newdow's overall strategy seeks to proscribe religious expression well beyond the Capitol including: presidential addresses invoking the name of God, the invocation "God save the United States and this Honorable Court" prior to judicial proceedings, oaths of public officers, court witnesses, and jurors and the use of the Bible to administer such oaths, the use of "in the year of our Lord" to date public documents, the Thanksgiving and Christmas holidays, the National Day of Prayer, and the national motto "In God We Trust."

in the enterprise that is this great Nation. *See generally Inaugural Addresses of the Presidents of the United States*, *supra.*

This is neither the first, nor the second time that Michael Newdow has challenged the constitutionality of prayer at a presidential inauguration.  It is the third.  In 2001, Michael Newdow filed suit in the Eastern District of California complaining that the practice of offering prayers as part of the presidential inaugural ceremonies violated the United States Constitution.[5] The district court in that case dismissed his case with prejudice and the Ninth Circuit affirmed the dismissal. Four years later, the Newdow came to this very Court with the same complaint, seeking to enjoin President Bush from allowing invited clergy to pray at his second inauguration ceremony.  Judge Baker of this Court denied injunctive relief and eventually dismissed the case.[6] Now, Newdow has reappeared once again in federal court to complain about prayer at inaugural ceremonies and to obtain injunctive relief against such pretended constitutional wrongs.[7]

Like so many other unsuccessful litigants, Newdow would like a "do over" rule for constitutional decisions. Finality of judgments, essential to respect for the law and efficiency of the judicial process, bars even the most worthy claimant from having more than one bite at the same apple. Newdow's previous failures on the merits, of the precise kind and nature as presented here, warrants a dismissal of his complaint here and strongly counsels against likely success on the merits, an important consideration in deciding the motion for preliminary injunction.

---

[5] *Newdow v. Bush*, No. 01-218 (E.D. Cal. July 17, 2001).
[6] *Newdow II,* 391 F. Supp. 2d 95 (D.D.C. 2005).
[7] Other than involving Plaintiffs other than Mr. Newdow and including a challenge to the traditional phrase "so help me God" used by Presidents to affirm their oath of office, Plaintiffs' motion here is identical to the request for injunctive relief in the 2005 case.

To justify the request for injunctive relief, Newdow has patched together quotations from various Supreme Court cases. Unsurprisingly to this *Amicus*, because this pattern of his pre-dates this lawsuit, he relies principally upon contextually inapt quotations from Supreme Court decisions arising in the context of public schools. With meager analysis, Newdow argues that permitting any prayer at the presidential inauguration offends the Constitution because it violates the Establishment Clause. Newdow also summarily concludes that such prayer burdens his rights under the Free Exercise Clause, the Religious Freedom Restoration Act, and the Due Process Clause.

Newdow's conclusion rests on the flawed premise that the Supreme Court's decision upholding the constitutionality of legislative chaplains in *Marsh v. Chambers*, is no longer good law.[8] As this Court knows, a willing mind can find a proof text for virtually any given proposition from the Supreme Court's extensive Establishment Clause jurisprudence. An accurate understanding of the Court's Establishment Clause cases, however, requires a more considered analysis. Newdow's failure to undertake such an analysis is evident.

Newdow fails to account for *Marsh*, either the text of it or subsequent explanations of it by the Court. The gravamen of Newdow's challenge is that the inaugural prayers turn "Atheists and others into 'political outsiders' and second-class Americans."[9] In his efforts to dodge the historical precedent test of *Marsh*, Newdow misrepresents the Court's Establishment Clause jurisprudence.

In fact, nothing in the Court's current Establishment Clause jurisprudence suggests that if given the opportunity, the current Supreme Court would overrule its decision in *Marsh v. Chambers*. To the contrary, post-*Marsh* statements by various Justices establish that if presented

---

[8] *See* Prel. Inj. Brief at 13.
[9] *Id.* at 3.

for the first time with the question raised in *Marsh,* the Court would reach the same result. Even assuming arguendo that Newdow were correct that subsequent Supreme Court decisions cast doubt on *Marsh*'s continued validity, the Supreme Court requires the lower courts to follow controlling precedent, leaving the Supreme Court the prerogative of overruling its own cases.

## ARGUMENT

### I. THE REVEREND DOCTOR NEWDOW HAS TWICE LOST CLAIMS THAT INAUGURAL PRAYER VIOLATES THE UNITED STATES CONSTITUTION.

Michael Newdow first challenged inaugural prayer on February 1, 2001, alleging that the occurrence of any prayer at the Presidential Inauguration, and the content of the prayer given at the January 2001 Inauguration, violated the First Amendment's Establishment Clause ("*Newdow I*").[10] Newdow sought a declaratory judgment that the President violated the Establishment Clause by allowing the Reverend Franklin Graham to pray at his 2001 inauguration and an injunction preventing the President, in his official capacity, from "repeating this or engaging in similar religious acts" in the future.[11] The district court granted in part the President's motion to dismiss for failure to state a claim in September 2001 because, although Newdow had standing to challenge the giving of prayer in general at inaugurations, "prayers per se at the Presidential Inauguration do not violate the Establishment Clause."[12]

Concerning the content of any specific inauguration prayer, the President's motion for summary judgment was granted and the case was "dismissed with prejudice" in May 2002 on

---

[10] Magistrate's Findings and Recommendations at 1, *Newdow v. Bush*, No. 01-218 (E.D. Cal. Mar. 26, 2002) (adopted by District Judge on May 21, 2002 in order which dismissed the case with prejudice) ("*Newdow I*").

[11] Complaint at 7, *Newdow v. Bush*, No. 01-218 (E.D. Cal).

[12] Magistrate's Findings and Recommendations at 7, 9, *Newdow v. Bush*, No. 01-218 (E.D. Cal. July 17, 2001) (adopted by District Judge on Sept. 28, 2001).

two alternative grounds.[13] First, the court held "[t]hat the entire case [should] be dismissed for lack of jurisdiction because the courts cannot enjoin the President in the circumstances of this case, nor . . . grant declaratory relief against [him]."[14] In the alternative, the court held that Newdow lacked standing to question the content of any specific inauguration prayer because his alleged injuries "could not be redressed by an injunction or declaratory relief."[15] Due to the lack of jurisdiction and Newdow's lack of standing, the court stated, "the case should not proceed to the merits."[16] The court also rejected Newdow's attempt to add additional defendants late in the litigation.[17]

The Ninth Circuit Court of Appeals affirmed the judgment on a different prong of the standing test, holding that "Newdow lacks standing to bring this action because he does not allege a sufficiently concrete and specific injury."[18]

Mr. Newdow's second challenge to the practice of inaugural prayer ("*Newdow II*") came before Judge Baker of this Court on January 14, 2005 when Newdow sought to enjoin President Bush from allowing invited clergy to pray at his inauguration ceremony.[19] Again, the crux of Newdow's argument was that the proposed prayer would make him feel like an "outsider."[20] In deciding the motion for a preliminary injunction, this Court focused mostly on Newdow's likelihood of success and the balance of the harms.

---

[13] Order at 2, *Newdow v. Bush*, No. 01-218 (E.D. Cal. May 21, 2002).

[14] Magistrate's Findings and Recommendations at 13, *Newdow v. Bush*, No. 01-218 (E.D. Cal. Dec. 28, 2001) (adopted by District Judge on May 21, 2002 in order which dismissed the case with prejudice).

[15] *Id.* at 9. "[N]o present injunction could be realistically framed to encompass future, speculative, religious inaugural invocations." *Id.* at 10.

[16] *Id.* at 12.

[17] Magistrate's Findings and Recommendations at 3, *Newdow v. Bush*, No. 01-218 (E.D. Cal. Mar. 26, 2002).

[18] *Newdow v. Bush*, 89 Fed. App'x 624, 625 (9th Cir. 2004) (unpublished).

[19] *Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005) ("*Newdow II*").

[20] *Id.* at 271.

Analysis of Newdow's likelihood of success required this Court to examine his challenge with respect to issue preclusion, standing, and the merits of his First Amendment claim. Judge Baker explained that Newdow's previous litigation at the Ninth Circuit and his Complaint in the case at hand revealed "direct parallels."[21] Therefore, Newdow appeared to be "precluded from relitigating his standing to bring an *Establishment Clause* action challenging inaugural prayers" because the issues were so closely related.[22] Judge Baker concluded that "issue preclusion based on Newdow I casts grave doubt on his likelihood of succeeding on the merits."[23] He further noted that "[e]ven if Newdow's . . . action [was] not precluded by . . . Newdow I, he face[d] sizable hurdles on the issue of standing."[24] Specifically regarding the issue of redressability, Judge Baker found an injunction against presidential speech to be an "'extraordinary'" event that would "'raise[] judicial eyebrows.'"[25] Once again, Newdow and the other Plaintiffs in this case have not established standing because they failed to articulate a sufficiently concrete and specific injury that is redressable as to the Defendants.

As for Newdow's First Amendment claim, Judge Baker noted that, even if Newdow could overcome the standing requirement, he would have had difficulty winning on the merits.[26] Because of the longstanding tradition of clergy prayer at inaugurations,[27] Judge Baker correctly

---

[21] *Id.* at 272 (citing *Newdow v. Bush*, 89 Fed. App'x 624, 2004 WL 334438, at *1 (9th Cir. Feb. 17, 2004)).

[22] *Id.* at 274.

[23] *Id.* at 276.

[24] *Id.*

[25] *Id.* at 281 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 792 (1992) (plurality opinion)).

[26] *Id.* at 282.

[27] The court gave the following information regarding the history of prayer at inaugural addresses: (1)

> [I]naugural prayer can be traced to the founding of this country. Shortly before the first inauguration of George Washington in 1789, a Senate Committee resolved that "after the oath shall have been administered to the President, he, attended by the Vice-President, and members of the Senate, and House of

held that the practice would be subject to the *Marsh*, rather than the *Lemon* test.[28] Judge Baker then explained that, in order to win on the merits,

> Newdow would have to show that a House and Senate resolution at the first inauguration requiring a clergy-led inaugural prayer at a church; a practice of clergy-led inaugural prayer inside the Capitol from 1793 to 1933; a practice of clergy-led inaugural prayer outside the Capitol from 1937 to 2001; and frequent mentions of God, benedictions, and at least one prayer in the Presidential addresses themselves, taken together, do not establish a tradition of inaugural prayer that is sufficiently "embedded in the history and tradition of this country" to fall within the settings as to which *Marsh* allows a role for ceremonial deism in our nation's events consistent with *Establishment Clause* jurisprudence.[29]

Judge Baker pointed out Newdow's failure to distinguish the practice of inaugural prayer from other acts of ceremonial deism such as military chaplains, legislative prayer, and other government practices that fall within the *Marsh* framework.[30]  Accordingly, based upon the unlikelihood of standing, redressability, or success on the merits, Judge Baker concluded that Newdow did not possess the requisite substantial likelihood of success to support an injunction.[31]

Finally, Judge Baker explained that, even if Newdow could have proved a substantial likelihood of success and even if Newdow had articulated some specific harm, the balance of harms did not favor the extraordinary relief sought:

---

Representatives [shall] proceed to St. Paul's Chapel, to hear divine service, to be performed by the chaplain already appointed."
*Id.* at 286 (citing Stephen B. Epstein, *Rethinking the Constitutionality of Ceremonial Deism*, 96 COLUM. L. REV. 2083, 2106 (1996) (alteration in original)).  (2) "From President Washington's second inauguration in 1793 to President Franklin Delano Roosevelt's second inauguration in 1937, the inaugural prayer was moved from a church to the Senate chambers . . . where it was given during administration of the oath of the Vice-President." *Id.* at 287 (citing *Epstein, supra*, at 2106 & n.137). And (3) after 1937, "each of the Presidential inaugurations has featured at least two prayers delivered by clergymen invited by the President. These prayers have frequently been sectarian, with references to Jesus Christ our Lord and the Father, . . . the Son, and . . . the Holy Ghost." *Id.* (internal quotation omitted).
[28] *Id.* at 286-87.
[29] *Id.* at 287.
[30] *Id.* at 290.
[31] *Id.* at 291.

> The material change requested by Newdow in an accepted and well-established historical pattern of short prayers or religious references during Presidential inaugurations, based on this last-minute challenge, is not likely to serve the public interest, particularly where Newdow's ability to proceed with this action remains in doubt and there is no clear evidence of impermissible sectarian proselytizing.[32]

Thus, this Court denied Newdow's motion:

> Given the significant doubt that his action can proceed in the face of substantial questions relating to issue preclusion and standing, and the absence of a clearly established violation of the Establishment Clause, the Court concludes that Newdow has not satisfied the threshold requirement for extraordinary preliminary relief -- a convincing showing of a substantial likelihood of success on the merits. Moreover, the balance of harms here, and particularly the public interest, does not weigh strongly in favor of the injunctive relief Newdow requests, which would require the unprecedented step of an injunction against the President.[33]

The factual similarities between the initial suit, *Newdow I,* the subsequent suit, *Newdow II,* and the present suit would likely lead a court to determine that Newdow is attempting to relitigate the same cause of action that he brought in 2001 and again in 2004. Given that Plaintiffs' claims in this new litigation are virtually identical to those brought in the two prior inaugural prayer challenges, the court should once again deny injunctive relief.

## II. THE SUPREME COURT'S DECISION IN *MARSH V. CHAMBERS* REQUIRES THIS COURT TO DISMISS NEWDOW'S COMPLAINT.

*Marsh v. Chambers* controls this case and supports the dismissal of the Complaint. 463 U.S. 783. In *Marsh*, the United States Supreme Court conducted a searching examination of the nation's history when considering a challenge to the Nebraska state legislature's practice of opening its sessions with prayer by a paid chaplain. Upholding the practice, the Court rested its legal conclusion on the fact that the "opening of sessions of legislative and *other deliberative*

---

[32] *Id.* at 293. It is worth noting that Plaintiffs did not file this lawsuit until December 30, 2008, despite the fact that Judge Baker specifically noted that Newdow's delay in *Newdow II* "placed Defendants and the federal courts in a difficult position." *Id.*

[33] *Id.* In a subsequent decision, Judge Bates dismissed Newdow's case. *Newdow II,* 391 F. Supp. 2d 95 (D.D.C. 2005).

*public bodies* with prayer is deeply embedded in the history and tradition of this country." 463 U.S. at 786 (emphasis added). As the Court reasoned, "[i]n this context, historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the Practice authorized by the First Congress their actions reveal their intent." *Id.* at 790.

The *Marsh* Court observed that the First Congress "did not consider opening prayers as a proselytizing activity or as symbolically placing the government's official seal of approval on one religious view," *id.* at 792 (internal quotation marks and citation omitted); rather, the framers merely considered "invocations as conduct whose effect harmonized with the tenets of some or all religions.'" *Id.* (quoting *McGowan v. Maryland,* 366 U.S. 420, 442 (1961)).

In *Marsh*, the Court held further that there was no establishment of religion even though the same Presbyterian minister had served as the chaplain for 16 years and had his salary paid from public funds. "To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country." *Id.* The Supreme Court concluded that "legislative prayer presents no more potential for establishment" than practices previously upheld, such as grants for higher education at religious institutions and tax exemptions for religious organizations. *Id.* at 791 (citations omitted).

Rejecting Newdow's arguments to the contrary, both the Ninth Circuit and this Court in his prior lawsuits concluded that prayer at presidential inaugurations is controlled by *Marsh*. Presidential inaugurations have included formal prayers by Christian ministers since the

inauguration of George Washington.[34] Moreover, the Inaugural Addresses of virtually every President have invoked assistance of the Divine to the enterprise of the Presidency and for the blessing of the Nation and its People.[35] Pursuant to a congressional resolution, after the oath of office was administered and the President had given his inaugural address, he, along with the Vice President and members of Congress proceeded to St. Paul's Chapel for the recitation of prayers by the chaplain of Congress.[36] Although no longer conducted in a church, inaugural prayers remain integral to the inauguration ceremony to this day. Every inaugural ceremony for the last sixty-five years has included explicit supplications to Jesus Christ.[37] Moreover, inaugural prayers during the last two centuries have incorporated the Lord's Prayer found in the book of Matthew.[38]  As set forth in the federal Defendants' brief, the use of the words "so help me God" after taking the oath of office enjoys a similar long history in this country.  Accordingly, it too satisfies the *Marsh* test.

Nevertheless, Newdow, having examined the Supreme Court public school religions cases, including *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 313 (2000), suspects that *Marsh* is constitutionally suspect. In the alternative, Newdow attempts to sidestep the controlling precedent of *Marsh*.

---

[34] Epstein, *supra* note 27 (citing Martin Jay Medhurst, *"God Bless the President": The Rhetoric of Inaugural Prayer*, 61 (1980) (unpublished Ph.D. dissertation, Pennsylvania State University) (on file with the Pennsylvania State University Library)).

[35] *See generally Inaugural Addresses of the Presidents of the United States*, S. Doc. No. 10, 101st Cong., 1st Sess. (1989).

[36] *Id.* at 2107.

[37] Epstein, *supra* note 27, at 2106-08.

[38] In *Newdow I*, Magistrate Judge Hollows found that under *Marsh* "presidential invocations to the Deity, i.e., prayers, at inaugurations were historical and commonplace" and that "[a]s such, the prayers in general did not offend the Establishment Clause of the First Amendment to the Constitution." See Findings and Recommendations, No. CIV S-01-0218 LKK GGH PS, December 28, 2001, at 2.

## A. No Supreme Court Establishment Clause Case Decided Subsequent to *Marsh v. Chambers* Undercuts *Marsh*'s Vitality.

Contrary to Newdow's assertions, it is quite clear that a solid majority of the current Supreme Court would reach the same result if *Marsh v. Chambers* were before it today. None of its subsequent decisions suggest any diminution of *Marsh's* vitality. In fact, whenever a Court majority has addressed *Marsh*, it has defended the *Marsh* decision. More importantly, those Justices who have expressed continuing (if qualified) approval of the Court's *Lemon*[39] test, including current Justice Stevens, have expressly stated that *Marsh* is reconcilable with the *Lemon* test, and the endorsement test, which is merely an elaboration on the *Lemon* test.

The Court has reaffirmed its holding in *Marsh. See, e.g. Lynch v. Donnelly*, 465 U.S. 668, 688-690 (1984). In *Lynch*, the Court recognized the "unbroken history of official acknowledgment by all three branches of government of the role of religion in American life." 465 U.S. at 674. "Our history is replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders." *Id.* at 675. The Court listed many examples of our "government's acknowledgment of our religious heritage," beginning with the historical practice of employing Congressional chaplains. *Id.* at 672, 676.

> The interpretation of the Establishment Clause by Congress in 1789 takes on special significance in light of the Court's emphasis that the First Congress "was a Congress whose constitutional decisions have always been regarded, as they should be regarded, as of the greatest weight in the interpretation of that fundamental instrument." It is clear that neither the 17 draftsmen of the Constitution who were Members of the First Congress, nor the Congress of 1789, saw any establishment problem in the employment of congressional Chaplains to

---

[39] *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). Justices Scalia, Thomas and Kennedy have been clear in opining that the *Lemon* test should be discarded. *See, e.g., Lee v. Weisman,* 505 U.S. 577, 644 (Scalia, J., and Thomas, J., dissenting); *County of Allegheny v. ACLU*, 492 U.S. 573, 655-57 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part); *see also Wallace v. Jaffree*, 472 U.S. 38, 107-13 (1985) (Rehnquist, J., dissenting).

offer daily prayers in the Congress, a practice that has continued for nearly two centuries. It would be difficult to identify a more striking example of the accommodation of religious belief intended by the Framers.

*Id.* at 676 (citations omitted).

The Court concluded that

[t]his history may help explain why the Court consistently has declined to take a rigid, absolutist view of the Establishment Clause. We have refused "to construe the Religion Clauses with a literalness that would undermine the ultimate constitutional objective *as illuminated by history*." In our modern, complex society whose traditions and constitutional underpinnings rest on and encourage diversity and pluralism in all areas, an absolutist approach in applying the Establishment Clause is simplistic and has been uniformly rejected by the Court.

*Id.* at 678 (citation omitted).[40]

In *Lynch*, Justice O'Connor, who also joined in the majority opinion, squarely repudiated the notion that legislative prayer violated any of the Supreme Court's Establishment Clause tests, including, most importantly, her newly minted "endorsement test." *See Lynch v. Donnelly*, 465 U.S. 668, 688-90 (1984) (O'Connor, J., concurring). Justice O'Connor introduced the endorsement test to clarify the Court's *Lemon* test, specifically the second prong that asks whether the governmental practice or policy has the effect of advancing or inhibiting religion. *Id.* (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971)). Citing with approval the Court's decision in *Marsh*, Justice O'Connor stated that "government[al] acknowledgments of religion," such as legislative chaplains,

serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society. For that reason, and because of their history and ubiquity, those practices are not understood as conveying government approval of particular religious beliefs.[41]

---

[40] *Id.*
[41] *Id.* at 693 (O'Connor, J., concurring).

A year later in *Wallace v. Jaffree*, Justice O'Connor repeated her approval of the Court's decision in *Marsh*. 472 U.S. 38, 67 (1985) (O'Connor, J., concurring). "The Court properly looked to history in upholding legislative prayer . . . . As Justice Holmes once observed, if a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it." *Id.* at 80 (quotation marks and citations omitted). The architect of the endorsement test has thus been quite unequivocal that the Supreme Court's decision in *Marsh* is fully reconcilable with the endorsement test.

In *County of Allegheny v. ACLU*, the majority, which Justice Stevens joined, approved Justice O'Connor's harmonization of the endorsement test with *Marsh*. 492 U.S. 573 (1989). "The concurrence [in *Lynch*] ... harmonized the result in *Marsh* with the endorsement principle in a rigorous way, explaining that legislative prayer (like the invocation that commences each session of this Court) is a [constitutional] form of acknowledgment of religion." 492 U.S. at 595 n.46 (citations omitted). Furthermore, the majority opinion also defended *Marsh* by observing that "[l]egislative prayer does not urge citizens to engage in religious practices." *Id.* at 601 n.52.

The three dissenting Justices in *County of Allegheny* – Justices Kennedy, Rehnquist and Scalia – went even further than the majority and Justice O'Connor. The dissenters indicated that using the endorsement test to strike down national traditions such as legislative prayer would be a disturbing departure from the Court's precedents upholding the constitutionality of government practices recognizing the nation's religious heritage. *Id.* at 657-58 (Kennedy, J., concurring in part and dissenting in part). Justice Kennedy explained that the Establishment Clause does not

> require a relentless extirpation of all contact between government and religion. . . . Government policies of accommodation, acknowledgment, and support for religion are an accepted part of our political and cultural heritage. . . . [W]e must be careful to avoid "[t]he hazards of placing too much weight on a few words or phrases of the Court," and so we have "declined to construe the Religion

Clauses with a literalness that would undermine the ultimate constitutional objective as illuminated by history."

*Id.* at 657 (second alteration in original) (quoting *Walz v. Tax Comm'r*, 397 U.S. 664, 670-71 (1970)).[42]

### B. Lower Courts Have Consistently Relied on *Marsh* to Sustain the Constitutionality of Government Practices Similar to Inaugural Prayer.

In *Van Zandt v. Thompson*, when the Seventh Circuit Court of Appeals was presented with a claim similar to Newdow's, 839 F.2d 1215, 1217 (7th Cir. 1988), it ruled that *Marsh* was dispositive, *Id.* at 1219. In *Van Zandt,* the speaker of the Illinois House of Representatives introduced legislation to convert a state capitol hearing room into a prayer room with tax dollars. *Id.* at 1216. The room was for the members of the General Assembly to use for prayer and meditation. *Id.* The Court of Appeals for the Seventh Circuit ruled that the legislation posed no Establishment Clause problems. *Id.* at 1224.

The court noted that although there was no historical evidence that the First Congress set aside a legislative prayer room, *Marsh* also stood for the broader proposition that legislatures may, consistent with the Establishment Clause, acknowledge "in relatively modest and nonintrusive ways, some role for spiritual practices in their work." *Id.* at 1219. Significantly, the Seventh Circuit rejected the argument that the constitutionality of the legislative prayer room should have been evaluated under the Supreme Court's various Establishment Clause tests, rather than the *Marsh* test:

> Based on Marsh we are inclined to view a legislature's internal spiritual practices as a special case. We read Marsh to derive partly from the traditions of the nation and of the states and partly from a degree of deference to the internal spiritual practices of another branch of government or of a branch of the government of another sovereign. The Illinois legislature's argument from tradition, while

---

[42] 492 U.S. at 657 (Kennedy, J., concurring) (quoting *Walz v. Tax Comm'r*, 397 U.S. 664, 670-71 (1970)).

> weaker than the Nebraska legislature's argument from tradition in Marsh, has
> some force. Defendants cannot point to the establishment of a prayer room by the
> First Congress or to a long and unbroken practice of state legislatures' providing
> such facilities. They can, however, point to a broader tradition, discussed in
> Marsh, of legislatures' acknowledging, in relatively modest and nonintrusive
> ways, some role for spiritual values in their work. We do not read Marsh as
> limiting this tradition to the specific practices that date back to the enactment of
> the Bill of Rights.

*Id. Cf. Sands v. Morongo Unified Sch. Dist.*, 809 P.2d 809, 819 n.9 (Cal. 1991) (holding that

*Marsh* and *Van Zandt* establish that the judiciary ought to defer to the legislative branch in

matters pertaining to that branch's internal affairs). In fact, the courts have uniformly upheld the

practice of opening legislative sessions and other similar gatherings with prayers. *See Bogen v.

Doty*, 598 F.2d 1110, 1111 (8th Cir. 1979) (opening of county board meetings with prayer by

unpaid clergy); *Colo v. Treasurer and Receiver Gen.*, 378 Mass. 550, 392 N.E.2d 1195 (1979)

(opening of legislative sessions with prayer by paid clergy); *Lincoln v. Page*, 109 N.H. 30, 241

A.2d 799 (1968) (opening a town meeting with prayer by unpaid clergy).

More recently, the Fourth Circuit Court of Appeals discussed several examples of "our

history . . . replete with official references to the value and invocation of Divine guidance in

deliberations and pronouncements of the Founding Fathers and contemporary leaders." *Myers v.

Loudoun County Pub. Schs.*, 418 F.3d 395, 404 (4th Cir. 2005) (internal quotations omitted). In

that case, the court was presented with a challenge to the pledge of allegiance as administered

under Virginia's Recitation Statute, which required "daily, voluntary, recitation of the Pledge in

the classrooms of Virginia's public schools is constitutional." *Id.* at 408. The court upheld the

recitation because it did "not threaten an establishment of religion." *Id.* at 397. The court stated

that the Establishment Clause does not require a separation of Church and State "in every and all

aspects," *id.* at 403, and "must [] be viewed with the understanding that we are a religious people

whose institutions presuppose a Supreme Being," *id.* (internal quotations omitted). As the court

noted, the history of the United States is abounding with examples of government activities which invoke the favors and mercy of the "Almighty God." *Id.* at 403. Those examples included the Declaration of Independence, the Constitution, Congressional chaplains who opened each session with prayer, and President Washington's public day of prayer proclamation. *Id.* at 403-04.

Furthermore, the court explained that the history of the President offering supplications and prayers before God during his inaugural address has continued unbroken since the founding of America: "Every President since Washington has referred to God in his inaugural address, including our current President Bush and his immediate predecessors, Presidents Clinton and Bush. Moreover, Presidents swear their oath of office on a Bible, administered by the Chief Justice of the United States Supreme Court." *Id.* at 404 n.10. America has "an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Id.* at 405. "Unless we are to presume the founders of the United States were unable to understand their own handiwork," *id.* at 404 (international quotations omitted), the President's appeal to God during his inauguration at the U.S. Capital, which was approved by Congress as a building for church services, is consistent with the Establishment Clause.

Like prayer before a legislative session or other similar public gathering, the broad tradition of including prayer in presidential inaugurations is a mere example of the President acknowledging the role for spiritual values in his work in a relatively modest and nonintrusive way.

## III. THE SUPREME COURT'S SCHOOL PRAYER CASES DO NOT UNDERMINE *MARSH* OR THE CONSTITUTIONALITY OF PRESIDENTIAL INAUGURAL PRAYER.

Newdow's reliance on Supreme Court decisions arising in the public school context is as telling as the Emperor's parade through town in his New Clothes. His attempt to create doubt regarding the vitality of *Marsh* based on decisions arising in the public school context is likewise a transparent attempt to avoid governing law. Newdow's reliance on obiter dicta, from the Supreme Court's cases addressing state-sponsored religious activity in the public schools, advises this Court as clearly as an honest admission from him would, that he has no binding authority to justify his conclusions.

Newdow ignores completely the Supreme Court's frequently articulated conviction that state-sponsored religious activity in the public schools raises unique Establishment Clause concerns. Accordingly, neither *Lee v. Weisman* nor *Santa Fe* are legally or factually relevant to the constitutionality of prayer at presidential inaugurations. In fact, in *Santa Fe*, the Supreme Court noted that "nothing in the Constitution as interpreted by this Court prohibits any public school student from voluntarily praying at any time before, during, or after the schoolday." *Santa Fe*, 530 U.S. at 313.

In *Lee v. Weisman*, the Court explained that, "[a]s we have observed before, there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." 505 U.S. 577, 592 (1992). In *Board of Education of Westside Community Schools v. Mergens*, Justice Kennedy carefully explained the Court's distinct approach to Establishment Clause issues arising in public school settings:

> The inquiry with respect to coercion must be whether the government imposes pressure upon a student to participate in a religious activity. This inquiry, of course, must be undertaken with sensitivity to the special circumstances that exist

in a secondary school where the line between voluntary and coerced participation may be difficult to draw.[43]

These special circumstances pertain to prayer "involving young impressionable children whose school attendance is statutorily compelled, and utilizing the prestige, power, and influence of school administration, staff, and authority." *School Dist. v. Schempp*, 374 U.S. 203, 307 (1963) (Goldberg, J., concurring). *See also Edwards v. Aguillard*, 482 U.S. 578, 583-84 (1987) ("The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary").

Justice O'Connor has also pointed out the Court's oft-stated recognition of a fundamental difference between government acknowledgments of religious heritage, such as Presidential prayers or legislative prayers, and government-sponsored religious exercises directed at what the Court considers to be impressionable school children. Presidential prayers are "received in a noncoercive setting and are primarily directed at adults, who presumably are not readily susceptible to unwilling religious indoctrination." *Wallace v. Jaffree*, 472 U.S. 38, 81 (1985) (O'Connor, J., concurring). Of course, legislative prayers are directed to an even narrower, and presumably more acquiescent, audience. There is no conceivable risk of coercing religious belief. Newdow's attempt to inspire doubts about *Marsh*'s vitality from the Supreme Court's decisions involving religious activity in public schools fails.

---

[43] *Bd. of Educ. of Westside Comm. Schs. v. Mergens*, 496 U.S. 226, 261-62 (1990) (Kennedy, J., concurring).

Finally, even if there were any doubts about *Marsh*'s continuing vitality, the Supreme Court has been quite clear that the lower courts are to apply controlling precedent even if subsequent cases appear to have undercut that precedent's reasoning. *See, e.g., Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions"). Therefore, even assuming *arguendo* that Newdow's assertions about *Marsh*'s vitality had any merit, lower courts (including this Court) are yet obliged to apply *Marsh* until the Supreme Court says otherwise.

## CONCLUSION

For the foregoing reasons, the motion for the preliminary injunction should be denied.

Respectfully submitted this 13th day of January, 2009,

/s/ James M. Henderson
James M. Henderson (#452639)
  *Counsel of Record*
Jay Alan Sekulow*
Stuart J. Roth*
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
(202) 546-8890

Shannon Demos Woodruff*
Erik M. Zimmerman*
AMERICAN CENTER FOR LAW & JUSTICE
1000 Regent University Dr.
Virginia Beach, VA 23464
(757) 226-2489

* - Not admitted in this court

*Attorneys for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I certify that, on January 13, 2009, a true and correct copy of this document was served

by Federal Express on the following counsel in this case:

| | |
|---|---|
| Robert V. Ritter | Joe Lowery |
| Appignani Humanist Legal Center | 3121 Cascade Rd S.W. |
| 1777 T. Street, NW | Atlanta, GA 30311 |
| Washington, DC 20009 | *Defendant* |
| *Counsel for Plaintiffs* | |

Robert V. Ritter
Appignani Humanist Legal Center
1777 T. Street, NW
Washington, DC 20009
*Counsel for Plaintiffs*

Brad P. Rosenberg
United States Department of Justice
Civil Div., Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
*Counsel for Government Defendants*

Joe Lowery
3121 Cascade Rd S.W.
Atlanta, GA 30311
*Defendant*

E. Desmond Hogan
Hogan & Hartson
555 Thirteenth St., N.W.
Washington, D.C. 20004
*Counsel for PIC Defendants*

Rick Warren
1 Saddleback Parkway
Lake Forest, CA 92630
*Defendant*

I certify that, on January 13, 2009, a true and correct copy of this document was served

by United States mail, along with a courtesy copy by electronic mail, on the following counsel in

this case:

Michael Newdow
P.O. Box 233345
Sacramento, CA 95823
newdowlaw@cs.com
*Counsel for Plaintiffs*

/s/ James M. Henderson
James M. Henderson
*Counsel for Amicus*