# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL NEWDOW, *et al.*,

               **Plaintiffs,**

    **v.**

HON. JOHN ROBERTS, JR., *et al.*,

               **Defendants.**

**Civil Action #1:08-cv-02248-RBW**

---

## PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE #1

---

MICHAEL NEWDOW
*In pro per* and *pro hac vice*
PO BOX 233345
SACRAMENTO, CA  95823

(916) 427-6669
NewdowLaw@gmail.com


ROBERT V. RITTER
DC BAR #414030
AHA – 1777 T STREET, NW
WASHINGTON, DC  20009

(202) 238-9088
BRitter@americanhumanist.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ...................................................................................1

ARGUMENT ..........................................................................................2

A. PLAINTIFFS HAVE STANDING..........................................................2

  1.  Plaintiffs Have Suffered an "Injury in Fact" ...................................2

    (a) Plaintiffs' "Injury in Fact" is "Concrete and
        Particularized" ....................................................................2

    (b) Plaintiffs' "Injury in Fact" is "Actual or Imminent, Not
        'Conjectural' or 'Hypothetical'" ...................................8

  2.  There is a Causal Connection Between the Injuries
      and the Conduct Complained Of .....................................................10

  3.  It is Irrefutable that Each of Plaintiffs' Injuries Will
      Be "Redressed By a Favorable Decision" .......................................11

    (a) District Courts Have the Power to Tell the Chief Justice
        to Abide by the Constitution .......................................................12

    (b) The President's Use of "So Help Me God" Does Not
        Excuse the Harm Resulting from the Chief Justice's
        Addition of Those Purely Religious Words ...............................16

    (c) PIC is Unquestionably a State Actor for the Purposes of
        This Litigation ...........................................................................18

    (d) The Inability to Enjoin the President Does Not Deprive
        the Court of Its Authority to Enjoin Defendants Here..............19

**B. THERE IS NO ISSUE PRECLUSION AS TO THE NON-NEWDOW PLAINTIFFS** ............................................................22

**C. THERE IS NO NEED TO EXAMINE NEWDOW'S STANDING** .................................................................23

**D. THERE IS NO ISSUE PRECLUSION AS TO PLAINTIFF NEWDOW** ..................................................................24

    **1. There is No Issue Preclusion Against Newdow Regarding Clergy-Led Prayers** ........................................27

        (a) The "Precondition Requisite" Has Now Been Supplied ...........29

        (b) There are New Factual Issues in the Instant Litigation ...........31

        (c) The Law Has Changed ................................................32

        (d) Application of Issue Preclusion Would Work a "Basic Unfairness" ...................................................35

    **2. There is No Issue Preclusion Against Newdow Regarding Defendant Roberts** .........................................35

        (a) Newdow's "Personal Connection" to the Unauthorized "So Help Me God" Addition Cannot Seriously be Disputed .............................................................35

        (b) This is a Different Claim Against a Different Defendant ........38

**CONCLUSION** ...............................................................40

# TABLE OF AUTHORITIES

## Cases

Allegheny County v. Greater Pittsburgh ACLU, 492 U.S. 573 (1989).......... 7

Allen v. McCurry, 449 U.S. 90 (1980) ........................................................ 28

Allen v. Wright, 468 U.S. 737 (1984) .................................................... 7, 10

American Medical International, Inc. v. Secretary of Health, Education &
    Welfare, 677 F.2d 118 (D.C. Cir. 1981).................................................. 32

Animal Legal Defense Fund v. Glickman, 154 F.3d 426 (D.C. Cir. 1998) (*en
    banc*) .................................................................................................. 6, 23

Baker v. Carr, 369 U.S. 186 (1962) ............................................................ 3

Barlow v. Collins, 397 U.S. 159 (1970) ..................................................... 21

Barnes-Wallace v. City of San Diego, 530 F.3d 776 (9th Cir. 2008) 32, 34, 35

Barnes-Wallace v. City of San Diego, 551 F.3d 891 (9th Cir. 2008)............ 34

Bd. of Liquidation v. McComb, 92 U.S. 531 (1876).................................... 13

Blonder-Tongue Lab. v. Univ. of Ill. Found., 402 U.S. 313 (1971)............. 22

Carey v. Population Servs. Int'l, 431 U.S. 678 (1977) ................................ 23

Chaplaincy of Full Gospel Churches v. United States Navy (In re Navy
    Chaplaincy), 534 F.3d 756 (D.C. Cir. 2008)............................................. 6

Clinton v. City of New York, 524 U.S. 417 (1998)...................................... 19

Commissioner v. Sunnen, 333 U.S. 591 (1948) .......................................... 32

Doran v. Salem Inn, Inc., 422 U.S. 922 (1975) ........................................... 11

Dozier v. Ford Motor Co., 702 F.2d 1189 (D.C. Cir. 1983).................. 28, 31

Duke Power Co. v. Carolina Env. Study Group, 438 U.S. 59 (1978) ............ 3

Emergency Coalition to Defend Educational Travel v. United States
    Department of the Treasury, 545 F.3d 4 (D.C. Cir. 2008) ......................... 3

Engel v. Vitale, 370 U.S. 421 (1962)..................................................... 7, 16

Evans v. Newton, 382 U.S. 296 (1966) ...................................................... 18

Ex parte Va., 100 U.S. 339 (1880).............................................................. 15

Fla. State Conf. of the NAACP v. Browning, 522 F.3d 1153 (11th Cir. 2008)
    .................................................................................................................. 9

Forrester v. White, 484 U.S. 219 (1986) .................................................... 14

Franklin v. Massachusetts, 505 U.S. 788 (1992)......................................... 20

Hernandez v. Commissioner, 490 U.S. 680 (1989)....................................... 3

Larson v. Valente, 456 U.S. 228 (1982) ..................................................... 17

Lee v. Weisman, 505 U.S. 577 (1992).......................................................... 7

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ........................ 2, 5, 8, 9

Lynch v. Donnelly, 465 U.S. 668 (1984)....................................................... 7

Lynch v. Johnson, 420 F.2d 818 (6th Cir. 1970) ........................................... 14

Mahoney v. Babbitt, 105 F.3d 1452 (D.C. Cir. 1997)................................. 19

Marbury v. Madison, 5 U.S. 137 (1803).................................................... 12

Marsh v. Chambers, 463 U.S. 783 (1983) ................................................... 7

Martin v. Wilks, 490 U.S. 755 (1989) ........................................................ 22

McCreary County v. ACLU, 545 U.S. 844 (2005)........................................ 7

Mississippi v. Johnson, 71 U.S. 475 (1866) .............................................. 13

Montana v. United States, 440 U.S. 147 (1979) ......................... 31, 32, 38, 39

Mountain States Legal Foundation v. Glickman, 92 F.3d 1228 (D.C. Cir.
    1996) ........................................................................................................ 23

Natural Resources Defense Council v. Thomas, 805 F.2d 410 (D.C. Cir.
    1986) ........................................................................................................ 18

Newdow v. Bush, 391 F. Supp. 2d 95 (D.D.C. 2005) ............................ 8, 26

Newdow v. Bush, 89 Fed. Appx. 624 (9th Cir. 2004).................................. 32

Pearson v. Callahan, 172 L. Ed. 2d 565 (2009)........................................ 12

Pharm. Care Mgmt. Ass'n v. District of Columbia, 522 F.3d 443 (D.C. Cir.
    2008) ........................................................................................................ 28

Samuels v. Mackell, 401 U.S. 66 (1971) ................................................... 11

Santa Fe Independent School District v. Doe, 530 U.S. 290 (2000)............. 7

Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26 (1976) ........................... 4

Stump v. Sparkman, 435 U.S. 349 (1978) .................................................. 14

Thomas v. Review Bd., 450 U.S. 707 (1981)............................................... 3

Thompson v. W. States Med. Ctr., 535 U.S. 357 (2002)............................... 4

United States v. Moser, 266 U.S. 236 (1924) ............................................ 39

United States v. SCRAP, 412 U.S. 669 (1973) ............................................ 4

Valley Forge College v. Americans United, 454 U.S. 464 (1982)......... 4, 5, 6

Van Orden v. Perry, 545 U.S. 677 (2005) ................................................... 7

Wallace v. Jaffree, 472 U.S. 38 (1985)........................................................ 7

Watt v. Energy Action Educational Foundation, 454 U.S. 151 (1981)....... 23

Westside Community Bd. of Ed. v. Mergens, 496 U.S. 226 (1990) ............ 16

Wilbur v. United States, 281 U.S. 206 (1930)............................................ 13

Yamaha Corp. of America v. United States, 961 F.2d 245 (D.C. Cir. 1992) 28

## Constitutional Provisions

United States Constitution, Article II ............................................. 1, 8, 11, 15

## Websites

http://durbin.senate.gov/capreport.cfm ........................................................... 9
http://fpc.state.gov/114510.htm ...................................................................... 1
http://gwpapers.virginia.edu/index.html ...................................................... 38
http://memory.loc.gov/ammem/pihtml/pioaths.html .................................... 15
www.restorethepledge.com........................................................................... 37

## Other Authorities

147 Cong. Rec. 7 (January 22, 2001) .......................................................... 24
Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* ............................................................................. 29

# **INTRODUCTION**

The inauguration of the President of the United States has been called "the transcendent ritual of America's democracy and representative government."[1] During the 1930s, that ritual was altered to include governmental espousals of Monotheism. Specifically, without any authority, (i) Chief Justices of the United States began appending the phrase, "so help me God," to the oath of office specified in Article II of the United States Constitution, and (ii) government agents began providing Monotheistic clergy with unique access to the inaugural platform to pray to God during that grandest of official national ceremonies.

On November 4, 2008, Barack Obama was elected President. On December 17, Defendant JCCIC announced that two Christian chaplains would be providing prayers during the official January 20, 2009 inaugural proceedings. Appendix A. In response, Plaintiffs, on December 30, 2008, filed suit challenging those prayers and the presumed repetition of the unauthorized religious addition to the oath of office. Document 1. Plaintiffs subsequently moved for a Preliminary Injunction on January 5, 2009, Document 4, for which a hearing was held on January 15. The following day, the Court denied the Preliminary Injunction Motion, and issued an Order for the Plaintiffs to show cause "by February 23, 2009, why this Court

---

[1] As described by Donald R. Kennon, Ph.D., Chief Historian of the United States Capitol Historical Society. (Remarks of January 14, 2009, given at the Foreign Press Center, accessed on January 30, 2009 at http://fpc.state.gov/114510.htm.)

should not dismiss this case based on the plaintiffs' lack of standing and issue

preclusion as to plaintiff Newdow." Document 42. This filing is Plaintiffs'

Response to that Order.


## ARGUMENT

### A.  PLAINTIFFS HAVE STANDING

> [T]he irreducible constitutional minimum of standing
> contains three elements. First, the plaintiff must have
> suffered an "injury in fact" -- an invasion of a legally
> protected interest which is (a) concrete and
> particularized, and (b) "actual or imminent, not
> 'conjectural' or 'hypothetical,'" Second, there must be a
> causal connection between the injury and the conduct
> complained of -- the injury has to be "fairly . . .
> trace[able] to the challenged action of the defendant, and
> not . . . the result [of] the independent action of some
> third party not before the court." Third, it must be
> "likely," as opposed to merely "speculative," that the
> injury will be "redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).


### 1. Plaintiffs Have Suffered an "Injury in Fact"

#### (a) Plaintiffs' "Injury in Fact" is "Concrete and Particularized"

"The essence of the standing inquiry is whether the parties seeking to invoke

the court's jurisdiction have 'alleged such a personal stake in the outcome of the

controversy as to assure that concrete adverseness which sharpens the presentation

of issues upon which the court so largely depends for illumination of difficult

constitutional questions.'" <u>Duke Power Co. v. Carolina Env. Study Group</u>, 438

U.S. 59, 72 (1978) (citing <u>Baker v. Carr</u>, 369 U.S. 186, 204 (1962)). In this case,

Plaintiffs unequivocally have that "personal stake," inasmuch as they are seeking

to uphold their personal rights to view the inauguration of their President without

having to countenance governmental endorsements of (Christian) Monotheism.

It is important to note that the standing question is distinct from merits

considerations, and that, in fact, "[i]n considering standing, we must assume the

merits in favor of the party invoking our jurisdiction." <u>Emergency Coalition to</u>

<u>Defend Educational Travel v. United States Department of the Treasury</u>, 545 F.3d

4, 10 (D.C. Cir. 2008). Thus, in making the standing determination, the Court must

assume that Defendants' actions do, in fact, violate the Establishment, Free

Exercise, and Equal Protection Clauses, as well as RFRA.

It is also important to note that religious liberty includes the right of

individuals to determine for themselves how harmful is a governmental espousal of

religious dogma. Thus, it "is not within the judicial ken," <u>Hernandez v.</u>

<u>Commissioner</u>, 490 U.S. 680, 699 (1989), for the Court to contend that Defendant

Roberts' unauthorized "so help me God" addendum is not injurious. Similarly, any

contention that clergy-led prayers are "ceremonial" or otherwise lack religious

significance "is not to turn upon a judicial perception." <u>Thomas v. Review Bd.</u>, 450

U.S. 707, 714 (1981). As the Supreme Court stated in another context, "the speaker

and the audience, not the government, assess the value of the information presented." Edenfield v. Fane, 507 U.S. 761, 767 (1993). Moreover, even if Plaintiffs, themselves, were to consider the injury to be trivial, "'an identifiable trifle is enough for standing to fight out a question of principle.'" United States v. SCRAP, 412 U.S. 669, 690 (n.14) (1973) (citation omitted).

As indicated, there must be a personal harm for standing to accrue. One "relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 38 (1976). In this case, the injuries to Plaintiffs – i.e., their inability to personally participate in and witness the inauguration of their President without being forced to personally countenance the governmental espousal of a purely religious notion they find offensive (i) from the seemingly official alteration of the Constitution's text, and (ii) from (Christian) Monotheistic prayers offered by government-enabled (Christian) Monotheistic clergy – will cease once Defendants' challenged practices are terminated.

Perhaps the most cited case in terms of this "personal injury" notion is Valley Forge College v. Americans United, 454 U.S. 464 (1982). There, an organization "firmly committed to the constitutional principle of separation of church and State," id., at 486, sought to invalidate the transfer of government property to a Christian college. Noting that the property was "located in Chester

County, Pa. The named plaintiffs reside[d] in Maryland and Virginia; their organizational headquarters [we]re located in Washington, D. C. They learned of the transfer through a news release," id. at 487, the Supreme Court held that the plaintiffs lacked standing. This was because no plaintiff "suffered, or [wa]s threatened with, an injury other than their belief that the transfer violated the Constitution." Id. (n.23). Article III, said the justices, does not give litigants "a special license to roam the country in search of governmental wrongdoing and to reveal their discoveries in federal court." Id.

In other words, Valley Forge stands for the "particularized" notion reiterated ten years later in Lujan: "By particularized, we mean that the injury must affect the plaintiff in a personal and individual way." 504 U.S. at 561 (n.1). In this case, that criterion has definitely been met: each Plaintiff has been personally and individually injured because each may personally and individually enjoy the "transcendent ritual of America's democracy" only at the cost of having to personally and individually endure the governmental espousal of what they, personally and individually, find to be offensive, purely religious dogma.

A careful reading of Valley Forge in its entirety finds this idea to be expressed with the utmost clarity. Nonetheless, confusion has arisen, largely from the following passage:

> Although respondents claim that the Constitution has been violated, they claim nothing else. They fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees.

Id. at 485 (emphasis in original). Justice Rehnquist's choice of the word, "observation," was unfortunate, inasmuch as – out of context – it appears to refer to personal "observation" of specific governmental acts. Yet that is precisely what Valley Forge does **not** reference. Rather, "observation" in this passage equates to "learning by way of secondary sources" (as occurred in Valley Forge, where the plaintiffs did not personally observe the property transfer, but "learned of the transfer through a news release").

This understanding is corroborated by numerous cases, including this Circuit's Animal Legal Defense Fund v. Glickman, 154 F.3d 426, 428 (D.C. Cir. 1998) (*en banc*) (animal welfare advocates had standing "when they **observed** primates living under [inhumane] conditions") and Chaplaincy of Full Gospel Churches v. United States Navy (In re Navy Chaplaincy), 534 F.3d 756, 764 (D.C. Cir. 2008) (standing exists when "religious speech [is] **observed** ... by the plaintiffs"). (Emphases added.) In fact, even the **desire** to personally **observe** suffices for standing. "Of course, **the desire to ... observe** an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of

standing." Lujan, 504 U.S. at 562-63 (emphasis added). Thus, in every Supreme Court case where the plaintiffs personally and individually **observed** religious displays, standing has accrued. See, e.g., McCreary County v. ACLU, 545 U.S. 844 (2005) (Ten Commandments); Van Orden v. Perry, 545 U.S. 677 (2005) (same); Allegheny County v. Greater Pittsburgh ACLU, 492 U.S. 573 (1989) (menorah and Christmas tree); Lynch v. Donnelly, 465 U.S. 668 (1984) (crèche).

Most important in this determination is that standing was found for all of the plaintiffs in the five Supreme Court cases involving government-endorsed prayer: Santa Fe Independent School District v. Doe, 530 U.S. 290 (2000) (prayer at high school football games); Lee v. Weisman, 505 U.S. 577 (1992) (prayer at high school graduations); Wallace v. Jaffree, 472 U.S. 38 (1985) (prayer in public school classrooms); Marsh v. Chambers, 463 U.S. 783 (1983) (prayer in legislative chamber); Engel v. Vitale, 370 U.S. 421 (1962) (prayer in public school classrooms). For standing purposes, there is no distinction between any of these cases and the case at bar. See Allen v. Wright, 468 U.S. 737, 751-52 (1984) ("In many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases.").[2]

---

[2] All seem to agree that the merits determination in the case at bar will be made by deciding if it is more like Marsh or more like Lee. But the Court has not sought to address the merits issue in its Order to Show Cause. Rather, it is only standing that is being considered, and standing clearly existed in both Marsh and Lee.

### (b) Plaintiffs' "Injury in Fact" is "Actual or Imminent, Not 'Conjectural' or 'Hypothetical'"

Regarding the President, the Constitution mandates that "[b]efore he enter on the Execution of his Office, he shall take the following Oath or Affirmation." Article II, Section 1. This constitutional requirement has taken place with the Chief Justice adding the purely religious phrase, "so help me God," to the constitutionally-prescribed text in a public ceremony following every presidential election since 1933.[3] Similarly, having (Christian) clergy lead the audience in prayer to God has been a part of every such inaugural since 1937. Document 1-3. Thus, as was demonstrated on January 20, the "actual" standing criterion is met.

Despite this, it has been suggested that "actual or imminent" criterion is not met because there is no "imminence" in a quadrennial injury: "Certainly the Presidential Inauguration is a national event, but it is only held once every four years." Newdow v. Bush, 391 F. Supp. 2d 95, 104 (D.D.C. 2005). The immediate response to this argument is that the Supreme Court would not have used the word, "or," if it intended to mean "and." "[T]he plaintiff must have suffered an 'injury in fact' ... which is ... 'actual **or** imminent.'" Lujan, 504 U.S. at 560 (emphasis added)). Accordingly, having demonstrated that the injury is "actual" and not "conjectural," imminence is not required.

---

[3] Should the Court so require, Plaintiffs can provide video recordings to corroborate this fact.

Moreover, even if "imminence" were required, there is "imminence" as that term pertains to the standing inquiry. As the Eleventh Circuit has noted in <u>Fla. State Conf. of the NAACP v. Browning</u>, 522 F.3d 1153, 1161 (11th Cir. 2008) (citation omitted), "An imminent injury is one that is 'likely to occur immediately,'" where "immediacy requires only that the anticipated injury occur with some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months." In other words, "imminence" for standing is synonymous with "not too speculative." ("'[I]mminence' is ... a somewhat elastic concept, [whose] purpose ... is to ensure that the alleged injury is not too speculative for Article III purposes." <u>Lujan,</u> 504 U.S. at 564 (n.2). There is nothing speculative at all about the fact that Plaintiffs will suffer the same injuries that have occurred with perfect quadrennial regularity for the past 70-plus years.[4] During that time, *all* Chief Justices have *always* added "so help me God" to the text of the constitutional oath, and *all* inaugural committees have *always* included clergy-led prayers.[5]

---

[4] "It's celebrated every four years, rain or shine, snow, war or peace. We always have an inauguration every four years." Marvin Kranz, historical specialist, Manuscript Division, Library of Congress, speaking of presidential inaugurations on Senator Dick Durbin's *The Capitol Report* of May, 2005, accessed on February 8, 2009 at http://durbin.senate.gov/capreport.cfm.

[5] Incidentally, contending that future uses of "so help me God" and clergy-led prayer are "speculative" guts Defendants' key merits argument (i.e., that the clear constitutional violations in this case are justified because of their "history and tradition"). <u>See</u>, <u>e.g.,</u> Federal Defendants' Opposition (Document 13 at 3).

### 2. There is a Causal Connection Between the Injuries and the Conduct Complained Of

That there is a causal connection between Plaintiffs' first injury (i.e., being forced to hear the oath administered with purely religious verbiage they find offensive as the price to pay for watching the inauguration of their President) and the conduct of Defendant Roberts cannot be denied. As seen from the Declaration of the "Counselor to the Chief Justice," Jeffrey P. Minear, Defendant Roberts chose to alter the constitutionally-prescribed text and add the "so help me God" phrase. Document 13-9.

The necessary causality also exists with the Complaint's other injury (i.e., being forced to hear clergy-led prayer as the price to pay for watching the inauguration). Like Defendant Roberts, the other defendants controlled whether or not the offensive religious verbiage would be espoused. Access to the inaugural platform by the appointed Clergy was under their domain.

Basically, the "causation" component of standing is determined by asking, "Is the line of causation between the illegal conduct and injury too attenuated?" Allen v. Wright, 468 U.S. at 752. In the instant case, there is no attenuation at all. Each instance of "illegal conduct" (i.e., altering the presidential oath of office and enabling clergy-led prayers) directly causes the injuries being asserted (i.e., Plaintiffs being forced to personally witness the governmental endorsements of offensive religious dogma as the price to pay for watching inaugurations).

### 3. It is Irrefutable that Each of Plaintiffs' Injuries Will Be "Redressed By a Favorable Decision"

It is clear that, if the Court enjoins[6] Defendant Roberts from altering the oath of office specified in the Constitution's Article II, and if it enjoins the other Defendants from using their powers to put into place inaugural invocations and benedictions honoring God, the harms to Plaintiffs will disappear. In other words, Plaintiffs will no longer be personally compelled (as the price to pay for exercising their right to observe the inauguration of the President) to suffer through government-sponsored messages claiming that the United States favors religious views that are completely incompatible with and contradictory to their own religious beliefs, and, concomitantly, that the nation disfavors their religious views.

Despite the foregoing, the Court has suggested it is powerless to provide the relief sought because (a) a District Court is impotent to tell the Chief Justice what to do, Transcript at 68:7-13; (b) if the President says "so help me God," there is no additional injury when the words are also said by the Chief Justice, Transcript at 54:5-9; (c) PIC is a private actor, Transcript at 67:22-68:3; and (d) the inability to

---

[6] Although Plaintiffs have sought both injunctive and declaratory relief, they will argue only in terms of injunctive relief here since the arguments for declaratory relief are essentially the same. Of course, now that the 2009 inauguration is past and the 2013 inauguration is four years away, "the practical effect of [injunctive and declaratory] relief will be virtually identical." Samuels v. Mackell, 401 U.S. 66, 73 (1971). Accordingly, "a district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary." Doran v. Salem Inn, Inc., 422 U.S. 922, 930 (1975).

enjoin the President deprives the Court of its authority to enjoin Defendants here. Transcript at 52:12-18. Plaintiffs believe each of these contentions is incorrect.

**(a) District Courts Have the Power to Tell the Chief Justice to Abide by the Constitution**

More than two centuries ago, the Supreme Court made it clear that "[t]he government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." <u>Marbury v. Madison</u>, 5 U.S. 137, 162 (1803).[7] Furthermore, it highlighted that, "[i]t is not by the office of the person ..., but the nature of the thing to be done that the propriety or impropriety of issuing a mandamus, is to be determined." <u>Id</u>., at 170. In that case (involving the actions of the Secretary of State), the Court went on to say that although the judiciary cannot intervene when "executive discretion is to be exercised," <u>id</u>., a judicial remedy is available when an official is "directed by law to do a certain act affecting the absolute rights of individuals." <u>Id</u>., at 171.

In other words, in terms of the President and his subordinates (where judicial intervention raises separation of powers concerns), there is a difference between

---

[7] Just last month, the Supreme Court unanimously reiterated this view, noting that there is a "need to hold public officials accountable when they exercise power irresponsibly." <u>Pearson v. Callahan</u>, 172 L. Ed. 2d 565, 572 (2009).

executive activity and mere ministerial duties. This distinction was further

discussed in <u>Mississippi v. Johnson</u>, 71 U.S. 475, 498 (1866):

> A ministerial duty, the performance of which may, in proper cases, be required of the head of a department, by judicial process, is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law;

in <u>Bd. of Liquidation v. McComb</u>, 92 U.S. 531, 541 (1876):

> [W]hen a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a *mandamus* to compel its performance; and when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate compensation cannot be had at law, may have an injunction to prevent it;

and in <u>Wilbur v. United States</u>, 281 U.S. 206, 218-19 (1930):

> Where the duty in a particular situation is so plainly prescribed as to be free from doubt and equivalent to a positive command it is regarded as being so far ministerial that its performance may be compelled by mandamus, unless there be provision or implication to the contrary.

In the case at bar, the Chief Justice is asked to do nothing but administer the oath

of office as specified in the Constitution. It is a pure ministerial function.

If the courts have jurisdiction over the President when such ministerial

duties are at issue, <u>Johnson</u>, 71 U.S., at 499 ("In each of these cases nothing was

left to discretion. There was no room for the exercise of judgment. The law required the performance of a single specific act; and that performance, it was held, might be required by mandamus."), then they surely have jurisdiction when a ministerial function includes no separation of powers issue.

As for the Court's concern about "whether a law court judge has the authority to enjoin a higher judge," Transcript at 68:10-11, Plaintiffs would argue that judicial hierarchy is not relevant to the instant action against the Chief Justice. As is the case when judicial immunity is at issue, "[i]t is only for acts performed in his 'judicial' capacity," Stump v. Sparkman, 435 U.S. 349, 360 (1978), that such protections arise. As has been wryly noted, "A judge does not cease to be a judge when he undertakes to chair a PTA meeting, but, of course, he does not bring judicial immunity to that forum, either." Lynch v. Johnson, 420 F.2d 818, 820 (6th Cir. 1970).

When Defendant Roberts administered the oath of office, it had nothing whatever to do with his judicial role. It was a purely administrative act, and – just as is the case with judicial immunity – the individual performing it does not acquire any legal protections that would not be available to any others.

In fact, administrative (as opposed to judicial) acts garner no judicial immunity even if they are "essential to the very functioning of the courts," Forrester v. White, 484 U.S. 219, 228 (1986). Thus, in Ex parte Va., 100 U.S. 339

(1880), a state judge was actually arrested and jailed because he refused to permit

blacks to serve as jury members. Even though that activity was intimately related

to a trial, the Supreme Court denied that jurist's habeas corpus request:

> Whether the act done by him was judicial or not is to be
> determined by its character, and not by the character of
> the agent. Whether he was a county judge or not is of no
> importance. The duty of selecting jurors might as well
> have been committed to a private person as to one
> holding the office of a judge. ... It is merely a ministerial
> act.

Id., at 348. Surely the administration of the oath by Defendant Roberts has far less

to do with any judicial function than selecting a jury. So, too, does it have less to

do with judicial function than enforcing a Bar Code, yet "judges acting to enforce

the Bar Code [sh]ould be treated like prosecutors, and thus [are] amenable to suit

for injunctive and declaratory relief. Once again, it [i]s the nature of the function

performed, not the identity of the actor who perform[s] it, that inform[s] our

immunity analysis." Forrester, 484 U.S. at 228-29 (citation and "Cf." omitted).

Whether Defendant Roberts is Chief Justice or not is of no importance to the

command of the Constitution's Article II, Section 1.[8] Accordingly, in this case,

Defendant Roberts should be treated the same as any other oath administrator.

---

[8] In fact, it was Calvin Coolidge's father, a notary public, who administered the
1923 oath of office to his son. http://memory.loc.gov/ammem/pihtml/pioaths.html
(accessed on February 9, 2009).

**(b) The President's Use of "So Help Me God" Does Not Excuse the Harm Resulting from the Chief Justice's Addition of Those Purely Religious Words**

At the January 15 hearing, counsel for the Federal Defendants stated:

> [I]f, as Plaintiffs concede, they suffer no injury from hearing someone stand there and sincerely invoke the traditional supplication "so help me God" at the conclusion of their oath, it's -- it really is sophistry to say ... that they experience some kind of actual injury ... by seeing those same words spoken by the person who is administering the oath.

Transcript 29:24 – 30:5. This argument completely misses the "crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." <u>Westside Community Bd. of Ed. v. Mergens</u>, 496 U.S. 226, 250 (1990). Plaintiffs no more object to hearing "so help me God" or viewing clergy-led, Monotheistic prayers than they object to Jehovah's Witnesses passing out their tracts or churches displaying crosses. When emanating from private individuals without the backing of the government, religious expressions are cherished by Plaintiffs, for they can then debate those harboring contrary views on an equal basis in the public square. It is only "[w]hen the power, prestige and financial support of government is placed behind [that] particular religious belief," <u>Engel v. Vitale</u>, 370 U.S. 421, 431 (1962), that Plaintiffs object.

In other words, the "distinction between if the President-Elect utters those words and you are there and hear them as compared to the Chief Justice of the United States," Transcript 53:22-25, is huge. Those who observe someone individually adding "so help me God" to an oath (especially when there is an oath administrator who has first recited the oath **without** those words) immediately recognize that the addendum reflects nothing but the oath-taker's personal religious beliefs. When the administrator includes that phrase as a component of the text, however, the message sent is that paying homage to God is part and parcel of the state's official (religious) orthodoxy.

Plaintiffs also respectfully dispute the Court's argument that a second violation of their basic constitutional rights is permissible because legal obstacles exist to block a remedy to a first violation. Transcript 54:5-9. To begin with, "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." Larson v. Valente, 456 U.S. 228, 243 (n.15) (1982). Additionally, to whatever extent Barack Obama's Free Exercise rights did not mitigate his Establishment Clause violation, "[t]wo wrongs do not make a right." Natural Resources Defense Council v. Thomas, 805 F.2d 410, 435 (D.C.

Cir. 1986). Each additional governmental dig at Plaintiffs' religious views further

marginalizes and disenfranchises them.[9]

### (c) PIC is Unquestionably a State Actor for the Purposes of This Litigation

According to its own Articles of Incorporation, Defendant PIC exists "to

carry out the functions and activities connected with the inauguration of the

President of the United States." Document 12-2 at 3. Yet PIC claims that it "is not

a governmental entity subject to the strictures of the Establishment Clause and

RFRA. ... PIC is, instead, a private, non-profit corporation." Document 12 at 7.

This claim has been clearly refuted by the Supreme Court:

> [W]hen private individuals or groups are endowed by the
> State with powers or functions governmental in nature,
> they become agencies or instrumentalities of the State
> and subject to its constitutional limitations.

Evans v. Newton, 382 U.S. 296, 299 (1966). The case at bar involves what is

perhaps the quintessential public governmental function: the inauguration of the

nation's President. As this Circuit has described it, "the observance of the

inauguration of the Chief Executive of the United States [is] an event less private

---

[9] Once more, the racial analogy seems quite apt. Would anyone have a difficult
time understanding that black plaintiffs confronted with "separate but equal" water
fountains suffered additional injuries when also forced to sit at "separate but equal"
cafeteria tables? Or (using a perhaps more precise analogy) if after having been
required to use "separate but equal" bathrooms at the White House, they were also
required to use "separate but equal" bathrooms at the Supreme Court?

than almost anything else conceivable." <u>Mahoney v. Babbitt</u>, 105 F.3d 1452, 1457 (D.C. Cir. 1997).

Defendant PIC doesn't even discuss this central matter. Rather, it points to such highly tangential issues as insurance, Document 12 at 8, and references cases "like the Red Cross, like Yale University." Transcript at 57:24. The Red Cross and Yale University deal with charitable care and education – activities in which non-governmental individuals and enterprises are routinely involved. Plaintiffs are unaware of, and Defendants have not revealed, any private entities that have ever controlled the official ceremonies of the inauguration of the nation's President.

### (d) The Inability to Enjoin the President Does Not Deprive the Court of Its Authority to Enjoin Defendants Here

Plaintiffs will assume, *arguendo*, that the Court lacks jurisdiction to direct the President to abide by the Constitution during the inauguration. That lack of injunctive jurisdiction against the Chief Executive, however, surely does not deprive Plaintiffs of standing to seek declaratory relief against the instant Defendants. <u>Clinton v. City of New York</u>, 524 U.S. 417, 433 (1998) ("Having found that [the plaintiffs] are actually injured, traceability and redressability are easily satisfied - - each injury is traceable to the President's [actions], and would be redressed by a declaratory judgment that the [actions] are invalid.").

In fact, injunctive relief is also available. In <u>Franklin v. Massachusetts</u>, 505

U.S. 788, 802 (1992) – a case almost directly on point regarding the standing

analysis (except that the injunction in <u>Franklin</u> targeted the Secretary of Commerce

(i.e., one of the nation's highest ranking officials), rather than the PIC (and similar

"lower level" individuals and entities targeted here)) – the Supreme Court

explicitly wrote that "injunctive relief against executive officials like the Secretary

of Commerce is within the courts' power." Moreover:

> **For purposes of establishing standing**, however, we
> need not decide whether injunctive relief against the
> President was appropriate, because we conclude that the
> injury alleged is likely to be redressed by declaratory
> relief against the Secretary alone.

<u>Id</u>., at 803 (emphasis added).

<u>Franklin</u> also addressed the matter of the executive branch disregarding a

judicial determination:

> [W]e may assume it is substantially likely that the
> President and other executive and congressional officials
> would abide by an authoritative interpretation of the ...
> constitutional provision **by the District Court**, even
> though they would not be directly bound by such a
> determination.

<u>Id</u>. (emphasis added). Thus, this Court's concern regarding the President (i.e., that

"he'd be able to say, 'Come up on this stage.' I don't think anybody can stop that

from occurring, and therefore, I fail to see how I have the ability to provide the

redress that the Plaintiffs are seeking," Transcript 70:8-11) was expressly discounted by the justices.

In this regard, it might be noted that the lower courts routinely grant standing to litigants challenging executive branch decisions. This Court, itself, has done so repeatedly. Appendix B (listing ten such cases in just the past year alone). The argument made in this case (i.e., that the President can always take matters into his own hands and appoint others, or else in some other way do what the courts have declared unconstitutional), existed for each of those cases, too. As the Supreme Court noted in <u>Barlow v. Collins</u>, 397 U.S. 159, 166 (1970), "judicial review of ... administrative action is the rule, and nonreviewability an exception which must be demonstrated." No such demonstration has been made in this case.

## B.  THERE IS NO ISSUE PRECLUSION AS TO THE NON-NEWDOW PLAINTIFFS

It appears that the Court and Defendants have acknowledged that the non-Newdow Plaintiffs have standing to bring both claims in this litigation. Transcript at 60:21-61:4. This follows from the well-established principle that:

> litigants ... who never appeared in a prior action ... may not be collaterally estopped without litigating the issue. They have never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position.

Blonder-Tongue Lab. v. Univ. of Ill. Found., 402 U.S. 313, 329 (1971). Similarly:

> All agree that "[i]t is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." This rule is part of our "deep-rooted historic tradition that everyone should have his own day in court." A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.

Martin v. Wilks, 490 U.S. 755, 761-62 (1989) (citations omitted).

## C. __THERE IS NO NEED TO EXAMINE NEWDOW'S STANDING__

"For each claim, if constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim." Animal Legal Defense Fund v. Glickman, 154 F.3d 426 (D.C. Cir. 1998) (citing Mountain States Legal Foundation v. Glickman, 92 F.3d 1228, 1232 (D.C. Cir. 1996)). See also Carey v. Population Servs. Int'l, 431 U.S. 678, 682 (1977) (Once one plaintiff "has the requisite standing [courts] have no occasion to decide the standing of the other appellees."); Watt v. Energy Action Educational Foundation, 454 U.S. 151, 160 (1981) (Once one plaintiff has been shown to have standing, "we do not consider the standing of the other plaintiffs.").

As has already been demonstrated, the non-Newdow Plaintiffs have standing to raise the two claims in this case. Thus, this Court need not consider Newdow's standing, including the issue preclusion matter that has been claimed to deprive Newdow of it. If it chooses to do so, however, the Court should conclude that issue preclusion does not apply under the facts of this (and the past) litigation.

## D.  THERE IS NO ISSUE PRECLUSION AS TO PLAINTIFF NEWDOW

While viewing the inauguration of President George W. Bush at home on television on January 20, 2001, Plaintiff Newdow was stunned to see Christian clergy using the inaugural platform to lead the audience in overtly Christian prayer.[10] In response, this patriotic American filed suit against the President to preclude any future similar violations of the Constitution's religion clauses.

Defendant Bush moved to dismiss, largely based on the contention that watching the inauguration at home on television was not the same, for standing purposes, as being physically present in Washington, DC:

> Here, Newdow has not alleged any facts showing he had direct contact with the governmental conduct he challenges.  Like the plaintiffs in <u>Valley Forge</u> who lived in a different state from where the real estate was located, Newdow was 3,000 miles away from the inaugural activities he watched on television. His lack of geographical proximity to the inaugural prayer dooms his claim to standing.

Appendix C (Defendant Bush's June 6, 2001 Reply to Plaintiff's Opposition to Motion to Dismiss, at 3).

The Magistrate Judge disagreed, finding that Newdow had suffered an injury in fact:

---

[10] Rev. Franklin Graham led a prayer "in the name of the father, and of the son, the Lord Jesus Christ, and of the Holy Spirit." 147 Cong. Rec. 7, S422 (January 22, 2001). Pastor Kirbyjon Caldwell prayed "in the name that is above all other names, Jesus the Christ." <u>Id</u>., at S423.

> After hearing on the President's initial motion to dismiss, the undersigned found that Newdow had standing to challenge the statement of prayers per se at the inauguration. "Electronic" attendance was found to be the same for standing purposes as physical attendance.

Document 13-6 at 2:3-5. However, the Magistrate Judge recommended granting the President's Motion to Dismiss, mostly for defects in redressability (e.g., "the courts ha[ve] no jurisdiction to enter an injunction against the President." Id., at 2:20.). The Magistrate Judge's Findings and Recommendations were adopted by the District Court on May 23, 2002. Document 13-7.

Newdow appealed to the Ninth Circuit, which – in a very sparsely worded opinion – ruled that "[Newdow] lacks standing to bring this action because he does not allege a sufficiently concrete and specific injury." Document 13 at 7. In other words, the Court of Appeals contradicted the District Court (which had found that Newdow's injury was concrete and specific), but gave no indication as to why. Furthermore, the panel did not rule on the redressability issues.

Since Newdow was unaware of a single prayer case where a plaintiff was deemed not to have suffered a concrete and specific injury after personally witnessing a challenged prayer, Appendix D (Declaration of Michael Newdow (hereafter "MN Decl"), ¶ 5), the only reasonable conclusion was that the Ninth Circuit found, as Defendant Bush had argued, that televised viewing is different from in-person viewing.

By that time, Newdow's already great interest in presidential inaugurals had blossomed. Thus, he decided he would travel to Washington, D.C., to attend the 2005 inaugural. He contacted his senator's office soon after President Bush's reelection and successfully reserved a ticket. Appendix E. Shortly after learning that that ceremony would once more have clergy-led prayers, he again filed suit, this time in the District Court for the District of Columbia, assuming that – by having made arrangements to attend the ceremony in person – he would have cured the defect obliquely referenced in the Ninth Circuit's ruling.

The case was heard by Hon. John D. Bates, who reached multiple legal conclusions. <u>Newdow v. Bush</u>, 391 F. Supp. 2d 95 (2005). He first concluded that issue preclusion existed, by contending that "the particular injury alleged by Newdow -- watching an inauguration on television, physically attending it, or forgoing it -- does not make a difference for purposes of the preclusion issue." <u>Id</u>., at 100 (n.2). But this, of course, was completely contrary to what the Ninth Circuit must have held to reach its conclusion.

Judge Bates then ruled that, even if issue preclusion did not exist, Newdow lacked standing. First, Newdow lacked an injury in fact, mainly because:

> [Newdow] does not have the necessary personal connection to establish standing. Newdow does not come in regular contact with the inaugural prayers ... There is no evidence that he is a frequent or regular attendee or invitee at Presidential Inaugurations.

<u>Id</u>., at 104. Additionally, Judge Bates found that Newdow's injury was not redressable, and also that the case was moot.

Newdow believed then (and believes now) that Judge Bates was wrong on all counts. However, because there was a possibility that the Court of Appeals would agree that there was no injury in fact because "Newdow does not come in regular contact with the inaugural prayers," Newdow opted not to appeal the ruling at that time. Instead, he resolved to cure the alleged "defect" by showing an unmistakable pattern of attending presidential inaugurations. Appendix D (MN Decl, ¶¶ 6-8). Because he has now cured that defect, issue preclusion does not apply. Additionally, issue preclusion does not apply because there are new facts, there has been a change in the law in the Ninth Circuit, and applying issue preclusion would work a "basic unfairness."

Finally, the claim against Defendant Hon. John Roberts, Jr., cannot be precluded because it involves a governmental activity readily differentiated from the addition of (Christian) Monotheistic clergy that formed the gravamen of the 2001 and 2005 inaugural cases.

## 1. There is No Issue Preclusion Against Newdow Regarding Clergy-Led Prayers

In order to achieve judicial finality, issue preclusion (also known as collateral estoppel) "may preclude relitigation of [an] issue in a suit on a different

cause of action involving a party to the first case." <u>Allen v. McCurry</u>, 449 U.S. 90, 94 (1980). However, "preclusion in the second case must not work a basic unfairness to the party bound by the first determination." <u>Yamaha Corp. of America v. United States</u>, 961 F.2d 245, 254 (D.C. Cir. 1992). Such unfairness exists "where a 'precondition requisite' to the court's proceeding with the original suit was not alleged or proven, and is supplied in the second suit." <u>Dozier v. Ford Motor Co.</u>, 702 F.2d 1189, 1192 (D.C. Cir. 1983). That has occurred in this case.

It is also basically unfair to preclude a second lawsuit when there has been a change in the facts or the law that led to the defeat in the prior litigation. "[T]he principle of collateral estoppel ... is designed to prevent repetitious lawsuits over matters which have once been decided **and which have remained substantially static, factually and legally**." <u>Commissioner v. Sunnen</u>, 333 U.S. 591, 599 (1948) (emphasis added). In this case, two new factual issues have arisen that alter the standing analyses that were used previously. Additionally, the law of the Ninth Circuit (which initially resulted in the denial of Newdow's standing) has undergone an "astonishing" change, to one which unquestionably would result in Newdow now being deemed to have suffered an injury in fact, even in the 2001 case. "Collateral estoppel is generally inappropriate when the issue is one of law and there has been a change in the legal context after the first decision." <u>Pharm. Care Mgmt. Ass'n v. District of Columbia</u>, 522 F.3d 443, 447 (D.C. Cir. 2008).

In view of the foregoing (combined with the overwhelming and pervasive weight of actual prayer case standing jurisprudence that has been shown virtually everywhere except for this sequence of cases), it would work a "basic unfairness" to Newdow to apply issue preclusion due to the vagaries of the Ninth Circuit's 2004 opinion (subsequent to the 2001 inaugural challenge), upon which Judge Bates' 2005 decision was based.

### (a) The "Precondition Requisite" has Now Been Supplied

"In ordinary circumstances a second action on the same claim is not precluded by dismissal of a first action for prematurity or failure to satisfy a precondition to suit. No more need be done than await maturity, satisfy the precondition, or switch to a different substantive theory that does not depend on the same precondition." 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4437 at 180 (2d ed. 2002). According to Judge Bates, as of January 2005 Newdow had not shown "regular contact with the inaugural prayers ... There is no evidence that he is a frequent or regular attendee ... at Presidential Inaugurations." That evidence now exists. Newdow has watched all three of the past three inaugurations over the past eight-plus years, and had tickets to the last two. Additionally, he has alleged that he plans on seeing every future inauguration for the rest of his life.

Accordingly, to preclude Newdow from litigating in the case at bar would definitely work a "basic unfairness." With:

(i) His research showing that an injury-in-fact had been deemed to exist **for every other plaintiff who had ever challenged a personally-witnessed government-sponsored prayer**;

(ii) Defendant Bush having asserted that Newdow did not suffer this injury-in-fact in the 2001 case because "Newdow was 3,000 miles away from the inaugural activities he watched on television;"

(iii) The District Court in that case having ruled that Newdow **had** suffered an injury-in-fact; and

(iv) The Ninth Circuit having ruled – **with no explanation** – that Newdow **had not** suffered an injury-in-fact,

Newdow had every reason to assume that witnessing the inauguration in person would cure that injury-in-fact standing defect.

Having cured that defect in 2005, but having been informed (for the first time) of another defect (i.e., that he lacked standing because "[t]here is no evidence that he is a frequent or regular attendee or invitee at Presidential Inaugurations" – which he felt was a plausible ruling), Newdow had no reason to appeal Judge Bates' decision at that time. Rather, he waited another four years to cure that newly-asserted defect. When there are two grounds for dismissal, "a rule which gives *res judicata* effect to both grounds leaves the losing party who concedes the

adequacy of one no appellate remedy for the patent invalidity of the other except a frivolous appeal." <u>Dozier</u>, 702 F.2d at 1194.[11]

### (b) There are New Factual Issues in the Instant Litigation

"[C]hanges in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues." <u>Montana v. United States</u>, 440 U.S. 147, 159 (1979). There are two such changes in the current litigation.

The first change concerns Defendant Warren, who specifically exhibited an animus toward Atheists such as Newdow. Original Complaint ¶ 73. With no reason given by the Ninth Circuit in its ruling that Newdow had not suffered an injury in fact, it may well be that the panel would have found such a display of anti-Atheism sufficient to give standing (even with a television viewing). Similarly, Judge Bates never dealt with such an explicit bias against America's Atheistic citizens.

Also different in the current case is the fact that Newdow was accompanying the minor child to the inaugural. That child's parents had entrusted her care to

---

[11] In <u>Dozier</u>, then-Judge Scalia also noted that "A rule declining to accord *res judicata* effect to an alternate ground must of course apply to both grounds, which would mean that a case which is doubly inadequate can be refiled whereas a case inadequate in only one respect cannot." <u>Id</u>. He left for the future the determination of the preferable rule. "We need not reach that more general question in the present case." <u>Id</u>. (Of course, the whole raison d'être for appellate courts is that trial court rulings may be erroneous, in which case nothing will have been "doubly inadequate.")

Newdow, and he thus had a special duty to protect her from offensive religious dogma. This fact situation, also, did not exist in either of the prior cases.

### (c)  The Law Has Changed

An exception to issue preclusion occurs when there are any "significant changes in ... legal principles." Montana v. United States, 440 U.S. 147, 157 (1979). See also, American Medical International, Inc. v. Secretary of Health, Education & Welfare, 677 F.2d 118, 120-21 (D.C. Cir. 1981). In fact, the Supreme Court case upon which this doctrine is largely founded, Commissioner v. Sunnen, 333 U.S. 591 (1948), indicated that when "a proper application of the [new legal] principles ... **might** well have produced a different result, ... collateral estoppel should not ... b[e] used." Id., at 607 (emphasis added).

In the Ninth Circuit, where it was initially stated that Newdow lacked standing because he had suffered no injury-in-fact, Newdow v. Bush, 89 Fed. Appx. 624 (9th Cir. 2004), a marked change in the legal principles regarding standing has transpired. In Barnes-Wallace v. City of San Diego, 530 F.3d 776 (9th Cir. 2008), a government entity (the City of San Diego) leased portions of two city parks to the Boy Scouts of America ("BSA"). Because BSA discriminates against those who don't believe in God, a group of agnostics challenged the lease on Establishment Clause grounds. The Ninth Circuit found the plaintiffs had suffered an injury-in-fact in that case even though "no religious symbols," id., at 782, were

present at either of the parks, and even though **there was no allegation that the plaintiffs would be personally exposed to anything religious at all!** According to the panel, the injury existed merely because "the plaintiffs have shown both personal emotional harm and the loss of recreational enjoyment." Id., at 785.

Clarifying this injury further, the Ninth Circuit wrote, "Our Establishment Clause cases have recognized an injury-in-fact when a religious display causes an individual such distress that she can no longer enjoy the land on which the display is situated." Id., at 784. If that applies to an individual who:

(i) Is involved in no political activity;

(ii) Is visiting a local park (where no religious dogma is espoused); and

(iii) Is never exposed to any religious claim at all (from a private group merely leasing land from the government)

then it surely must apply to Newdow, who:

(i) Is seeking to view "the transcendent ritual of American democracy;"

(ii) Is visiting the nation's capital (where "so help me God" was added to the President's oath of office and clergy-led prayers were issued); and

(iii) Is personally exposed to those religious claims (contrary to his own beliefs) made by government-appointed agents, acting on behalf of the government, itself.

The extent to which Barnes-Wallace has changed the Ninth Circuit's approach to standing in Establishment Clause cases can perhaps best be appreciated by reviewing Judge O'Scannlain's dissent from the denial of rehearing

*en banc*. <u>Barnes-Wallace v. City of San Diego</u>, 551 F.3d 891 (9th Cir. 2008). As Judge O'Scannlain stated in his opening sentence, <u>Barnes-Wallace</u> "promulgate[d] an astonishing new rule of law for the nine Western States. Henceforth, a plaintiff who claims to feel offended by the mere thought of associating with people who hold different views has suffered a legally cognizable injury-in-fact." Furthermore, he wrote:

> This case ... constitutes a precedential decision on the issue of standing.
>
> Indeed, ... the majority's opinion has already had collateral consequences. One district court in our circuit has already cited the majority's order as binding precedent to reach a conclusion it might not otherwise have reached. *See Trunk v. City of San Diego*, 568 F. Supp. 2d 1199, 1205 (S.D. Cal. 2008) ("If Plaintiffs' claims were based on any theory other than violation of the Establishment Clause, they would likely be out of court for lack of standing. ... In the Ninth Circuit, however, merely being ideologically offended, and therefore reluctant to visit public land where a perceived Establishment Clause violation is occurring, suffices to establish 'injury in fact.' ... *Barnes-Wallace v. City of San Diego*, 530 F.3d 776, 784-85 (9th Cir. 2008). ... Bound by these precedents, the Court concludes that all Plaintiffs have standing to bring this lawsuit.").

551 F.3d 891, ___ (n.2). Thus, because issue preclusion is not applicable when there is a change of the relevant law, issue preclusion does not apply against Newdow in the instant case.

**(d) Application of Issue Preclusion Would Work a "Basic Unfairness"**

Newdow was (and remains) unaware of a single Supreme Court, D.C.
Circuit or Ninth Circuit case where an "injury in fact" was not found for a plaintiff
challenging, on Establishment Clause grounds, a government-sponsored prayer he
personally witnessed. Appendix D (MN Decl, ¶ 5). Even if Defendants or the
Court can ultimately find an exception to this observation, the conclusion is
irrefutable: standing exists for such individuals. Newdow should not be precluded
because a Circuit Court (that now, under Barnes-Wallace, would be obligated to
grant him standing) denied standing without any explanation, especially where
there are new facts to Newdow's claim, and where he has cured a prior defect.

**2. There is No Issue Preclusion Against Newdow Regarding Defendant
   Roberts**

**(a) Newdow's "Personal Connection" to the Unauthorized "So Help Me
   God" Addition Cannot Seriously be Disputed**

As it pertains to the addition of "so help me God" to the President's oath of
office, Newdow unquestionably has the "personal connection" deemed lacking by
Judge Bates in the 2005 litigation. See at page 26, *supra*.

More than five years ago, Newdow began researching the claim that
presidents since George Washington have added "so help me God" to their oaths.
Appendix F. A year later, he received notice that the first known allegation that

President Washington used that phrase was made in 1854 ... 65 years after the actual event! Appendix G. Intrigued by this, Newdow personally set out to amass the evidence regarding that particular story.

Newdow spent countless hours in libraries and online researching the extant data. Appendix D (MN Decl, ¶¶ 9-10). He traveled to New York City to the site of the 1789 event to see if the claim upon which the "so help me God" story is based is even possible.[12] Eventually, two other dedicated researchers[13] joined in this effort as well, and the three have accumulated sufficient original source material to demonstrate conclusively that no valid evidence at all exists to support the claim that President Washington added "so help me God" when he took the first presidential oath of office. Newdow has discovered that those "authorities" contending the opposite (e.g., those provided in Appendix H, including the Library of Congress, the National Archives and Records Administration, the National Constitution Center, the Department of State, the National Endowment for the Humanities, the Congressional Quarterly, the Architect of the Capitol, the House of Representatives, Defendant JCCIC, CBS, PBS, CNN, the BBC, the National Review, News in Education, the Voice of America, the Capitol Historical

---

[12] It is not. The claim seems to be based on a report by Washington Irving, who allegedly recalled (apparently at about age seventy) that he heard the words spoken when he witnessed the 1789 inaugural at age six! From where Irving stated he was standing, it would have been impossible to have heard the first president's words. MN Decl, ¶ 11.
[13] Ray Soller and Matthew Goldstein. MN Decl, ¶ 12.

Society,[14] two Supreme Court justices, assorted professors, and numerous book authors) have all been doing nothing but perpetuating a fabricated story.

Further evidence of Newdow's personal interest in the "so help me God" aspect of the presidential oath of office is seen in the music video he personally created to inform the public (in a hopefully entertaining manner) of the truth. That video, available at www.restorethepledge.com (under "Videos"), follows a written explanation of the entire matter. The music and lyrics, the PowerPoint presentation, the performance, the editing and the explanation were all personally created by Newdow. Appendix D (MN Decl, ¶¶ 13-14).

In sum, with his interest in ending Establishment Clause violations, his extensive research into the "so help me God" claims, his video, his personal trip to the site of the first inauguration and his personal trips to view the inaugurals in Washington, DC, Newdow has an exceedingly strong "personal connection" to the challenged activity of Defendant Roberts. Add to this the great pride he takes in

---

[14] Some of these authorities have had the scholastic integrity to remedy their errors. The United States Capitol Historical Society, for example, had the following in 2005: "After repeating the 35-word oath, Washington added, 'I swear, so help me God.' Livingston raised the Bible, Washington bent over and kissed it, and Livingston turned to the crowd and said, 'Long live George Washington, President of the United States.'" Appendix H, at 32.

   After the error was brought to the Society's attention, it altered its website so that, in 2006, the prose became: "After Washington repeated the 35-word oath, Livingston turned to the crowd and said, 'Long live George Washington, President of the United States.'" Appendix H, at 34.

knowing that, but for his efforts,[15] an entire nation of 300,000,000 people is now being taught to question the George Washington story rather than remaining ignorant of the truth (as it had for the previous century), and Newdow, without question, has the "personal connection" necessary for standing in the case at bar. Cf. Animal Legal Defense Fund, *supra* (standing accrues to individual with unique personal interest in animal welfare).

**(b) This is a Different Claim Against a Different Defendant**

In regard to issue preclusion, there is an "exception which obtains for 'unmixed questions of law' in successive actions involving substantially unrelated claims," Montana v. United States, 440 U.S. 147, 162 (1979). That exception applies here, where the legal question of standing is now being applied to the administration of the presidential oath of office, which is "substantially unrelated" to clergy-led prayers. As the Supreme Court noted in an earlier case:

> Where, for example, a court in deciding a case has enunciated a rule of law, the parties in a subsequent action *upon a different demand* are not estopped from

---

[15] This is not to say that others should not share in the credit. The editors of *The Papers of George Washington*, http://gwpapers.virginia.edu/index.html (especially Dorothy Twohig and Philander Chase), Charlene Bickford (Appendix G), and Mr. Soller and Mr. Goldstein (note 13, *supra*) all played quite significant roles in this matter.

insisting that the law is otherwise, merely because the parties are the same in both cases.[16]

United States v. Moser, 266 U.S. 236, 242 (1924). The demand against the oath administrator(s) is different from the demand against the remaining defendants. The former involves ending the alteration of the oath of office, whereas the latter involves ending clergy-led prayers.

To be sure, there is related subject matter in the two cases; both involve Establishment Clause issues at presidential inaugurations. But the analysis cannot end there. For instance, if Defendants asked the audience to join in voicing a group denunciation of Atheism, that would also be an Establishment Clause issue at a presidential inauguration. So, too, would be a call for all participants to shout in unison, "We believe in God and Jesus. Down with Michael Newdow and his unchristian godlessness!" Certainly, he would not be deprived of his day in Court were those the constitutional offenses. In fact, because "**[t]his exception is of particular importance in constitutional adjudication,**" Montana, 440 U.S. at 162-63 (emphasis added), the "substantially unrelated claims" exception to issue preclusion must be broadly interpreted in the instant litigation, and Newdow's completely new claim against the oath administrator must be excepted from any application of the issue preclusion doctrine.

---

[16] Here, of course, the parties are not the same; neither Newdow and Defendant Roberts, nor Newdow and any Chief Justice, have ever previously been parties in the same lawsuit.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs in the case at bar have standing to litigate their claims. This includes Plaintiff Newdow, for whom issue preclusion is not applicable.


Respectfully submitted this 23rd day of February, 2009,


<u>/s/ - Michael Newdow</u>         <u>/s/ - Robert V. Ritter</u>

Michael Newdow               Robert V. Ritter
*In pro per* and *pro hac vice* (pending)   DC Bar #414030
PO Box 233345                 AHA – 1777 T Street, NW
Sacramento, CA  95823        Washington, DC  20009

(916) 427-6669               (202) 238-9088
NewdowLaw@gmail.com       BRitter@americanhumanist.org

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Civil Action No. 1:08-cv-02248-RBW**

**<u>Newdow v. Roberts</u>**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 23, 2009, I filed the following document:

**PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE #1**

electronically with the Clerk of the United States District Court for the District of Columbia, using the CM/ECF system. Accordingly, service will assumedly be made upon:

Counsel for Defendants Roberts, JCCIC, Feinstein, AFIC and Rowe:
     Eric B. Beckenhauer eric.beckenhauer@usdoj.gov
     Brad P. Rosenberg brad.rosenberg@usdoj.gov
     John C. O'Quinn john.c.o'quinn@usdoj.gov

Counsel for Defendants PIC and Beliveau:
     Desmond Hogan edhogan@hhlaw.com
     Craig Alan Hoover cahoover@hhlaw.com
     Dominic F. Perella dfperella@hhlaw.com

Counsel for Defendant Warren:
     J. Stephen Simms jssimms@simmsshowers.com
     Kevin E. Snider kevinsnider@pacificjustice.org

Signature:  <u>/s/ - Michael Newdow</u>

     Michael Newdow
     *In pro per* and *pro hac vice*
     PO BOX 233345
     SACRAMENTO, CA 95823

     (916) 427-6669
     NewdowLaw@gmail.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

### Civil Action No. 1:08-cv-02248-RBW

### Newdow v. Roberts

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2009, I filed the following document:

### PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE #1

By depositing it postage-prepaid, in a U.S. Postal Service receptacle, addressed to:

Rev. Joseph E. Lowery
3121 Cascade Rd. SW
Atlanta, GA 30311

I am at least 18 years of age and not a party to the cause.

Signature: _Jennifer Elliott_       February 23, 2009

Jennifer Elliott
19210 Pike 266
Clarksville, Mo 63336

(573) 754-2562